ORIGINAL

FILED
'08 JAN 29 AM 10:45
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

1 | PATRIC HOOPER  (State Bar No. 57343)
JORDAN KEVILLE  (State Bar No. 217868)
2 | ABIGAIL WONG  (State Bar No. 245652)
HOOPER, LUNDY & BOOKMAN, INC.
3 | 1875 Century Park East, Suite 1600
Los Angeles, California  90067-2517
4 | Telephone: (310) 551-8111
Facsimile: (310) 551-8181
5 | E-Mail:   phooper@health-law.com

6 | Attorneys for Plaintiffs Sharp Healthcare,
Internist Laboratory and Scripps Health

7

8 | ### IN THE UNITED STATES DISTRICT COURT

9 | ### FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11 | SHARP HEALTHCARE; INTERNIST
LABORATORY AND SCRIPPS
12 | HEALTH.
| CASE NO.  '08 CV 0170 W POR

13 |        Plaintiffs,
| COMPLAINT FOR
INJUNCTIVE RELIEF

14 |    vs.

15 | MICHAEL LEAVITT, SECRETARY
OF THE DEPARTMENT OF
16 | HEALTH AND HUMAN SERVICES,

17 |        Defendant.

18

19 |    Sharp HealthCare, Internist Laboratory and Scripps Health, plaintiffs, allege

20 | as follows:

21

22 | ## INTRODUCTION

23 |    1.    Unless immediately enjoined by this Court, the defendant, the Secretary

24 | of the Department of Health and Human Services ("Secretary"), will implement

25 | shortly (bids are due February 15, 2008) a Medicare "demonstration project" which

26 | will dramatically change and irreparably alter and damage the long-standing and

27 | well-established system for delivering clinical laboratory services to Medicare

28 | beneficiaries in the San Diego-Carlsbad-San Marcos area of San Diego County.

1041959.4

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

2.    The proposed project is the first of its kind with respect to clinical laboratory services under the Medicare program. While Congress has authorized the Secretary to establish a clinical laboratory demonstration project, it did not authorize and could not have intended to allow the Secretary to implement the demonstration project in the arbitrary and procedurally invalid manner in which he has done and will continue to do unless otherwise enjoined by this Court.

3.    Because the Secretary is implementing the demonstration project without abiding by the Notice and Comment rule-making requirements of the federal Administrative Procedure Act ("APA"), 5 United States Code ("U.S.C.") § 553, which he is obligated to follow in developing and changing substantive Medicare policy, the Secretary has been developing major policy components of the demonstration project on-the-fly. It therefore is not surprising that several of the policies he hopes to implement for the demonstration project are arbitrary, capricious, an abuse of discretion and inconsistent with, or violative of, numerous other federal laws including the very statute creating the demonstration project and the Medicare Act. Among other things, the Secretary's plan for implementing the demonstration project will: (1) require some laboratories to rely on price information for tests from their direct competitors simply in order to be able to submit a bid; (2) force certain highly specialized laboratories to accept payment rates that do not account for the unique level of care they provide; and (3) force some laboratories that do not "win" in the bidding process to service Medicare beneficiaries without any prospect of compensation.

4.    The arbitrary policies described above, as well as others, will result in irreparable harm to the plaintiffs and the Medicare beneficiaries they service.

5.    As explained below, it is critical that the implementation of the demonstration project be delayed to permit the project to be implemented through the required rulemaking procedures so that the Secretary adopts rational policies, which are consistent with Congressional intent and do not deprive plaintiffs and

1  others of their federal constitutional and statutory rights.

2

3                          **JURISDICTION AND VENUE**

4      6.      Under 28 U.S.C. Section 1331, this Court has the authority to resolve

5  the very important questions of federal law raised by this action.

6      7.      Venue lies in this judicial district under 28 U.S.C. Section 1391 in that

7  plaintiffs are located and reside within this judicial district and the consequences of

8  defendant's unauthorized and arbitrary activities are occurring within this judicial

9  district.

10

11                              **THE PARTIES**

12     8.      Defendant Michael Leavitt is the Secretary of the Department of Health

13 and Human Services, the federal agency responsible for administering the Medicare

14 program.  Medicare is the health insurance program for the aged and disabled.  The

15 Secretary administers the Medicare program through the Centers for Medicare and

16 Medicaid Services ("CMS").

17     9.      Plaintiff Internist Laboratory ("Internist'") is an independent clinical

18 laboratory located in Oceanside California.  Internist is owned and operated by the

19 husband and wife team of Gary and Christine Stevens, with a single location in

20 Oceanside.  The laboratory has only eight full-time employees.  Internist, which has

21 been in operation for 18 years, currently is certified to receive reimbursement for

22 laboratory testing services provided for the benefit of Medicare beneficiaries.  As

23 described above, Internist is the precise type of small business that Congress intends

24 the Secretary to assure has an opportunity to be a participant in the demonstration

25 project.    However, as explained below, due to the substantive policies, being

26 implemented, it is unlikely Internist will be a "winner" under the competitive

27 bidding project.  Yet, Internist is the prototypical small community laboratory that

28 must remain available to perform testing to assure Medicare beneficiaries access to

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1   laboratory services. Ironically, Internist was one of the few clinical laboratories that

2   provided such services during the recent wild fires that plagued San Diego County.

3       10.    Plaintiff Sharp HealthCare ("Sharp") operates an integrated health care

4   delivery system providing health care services in San Diego County to a wide

5   variety of patients, including Medicare beneficiaries, through acute care hospitals, a

6   home health agency, a hospice program, physical rehabilitation facilities, skilled

7   nursing facilities, mental health hospitals, and affiliated medical clinics. It also

8   owns and operates various clinical laboratories including clinical laboratories that

9   provide services not only to hospital inpatients and outpatients but also to non-

10  hospital patients. Included in the services that Sharp's laboratories provide is

11  emergency ("stat") testing, which is required by many non-hospital Medicare

12  beneficiaries. Under the policies being implemented by the Secretary in connection

13  with the demonstration project, it is questionable whether Sharp's laboratories will

14  be able to continue to furnish laboratory services to its non-hospital patients, which

15  could severely affect the quality of health care services being provided to Medicare

16  beneficiaries in San Diego.

17      11.    Plaintiff Scripps Health ("Scripps") is a not-for-profit, community-

18  based health care delivery network in San Diego that includes four acute-care

19  hospitals on five campuses, more than 2,300 affiliated physicians, an extensive

20  ambulatory care network, home health care and associated support services,

21  including clinical laboratories. Scripps' clinical laboratories provide services for

22  both hospital inpatients and outpatients and non-hospital patients. Like Sharp,

23  Scripps' laboratories also provide, among other things, "stat" testing to non-hospital

24  Medicare beneficiaries. Also like Sharp, Scripps may have to discontinue

25  completely, or significantly decrease, furnishing laboratory services to non-hospital

26  patients as a result of the demonstration project. If Scripps has to stop or scale back

27  the laboratory services it provides, it will have deleterious effects on the care

28  furnished to patients within the Scripps system.

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

## EXISTING MEDICARE POLICY REGARDING
## CLINICAL LABORATORY SERVICES

12.    Clinical laboratory services are critical to the successful diagnosis and treatment of illnesses and diseases.  Due to their conditions, Medicare beneficiaries, who consist of the elderly and the disabled, require a disproportionately high level and quantity of health care services, including clinical laboratory services.  Indeed, Medicare beneficiaries on average typically use nearly three times as many laboratory tests as non-Medicare patients.  Clinical laboratory services are furnished by independent clinical laboratories, such as Internist, hospital laboratories, such as Sharp and Scripps, and physician office laboratories.  Such laboratories are highly regulated by federal and state law, including the Clinical Laboratory Improvement Amendment of 1988, codified at 42 U.S.C. § 263a and state licensing laws, Cal. Bus. & Prof. Code §§ 1200, et seq.  Under these laws and implementing regulations, a laboratory may only perform testing at the electronic or written request of an authorized person, typically a physician, specifying the tests to be performed.  Many Medicare beneficiaries have long-standing relationships with their physicians, who, together with the patients, in turn, have established relationships with outside clinical laboratories to meet their laboratory testing needs.  In some cases, patients who need relatively frequent laboratory testing have a direct relationship with the laboratory itself.

13.    Under 42 U.S.C. Section 1395l(h), the Secretary has established fee schedules for clinical diagnostic laboratory tests other than laboratory tests performed by a hospital for an inpatient.  The fee schedules, known commonly as the Medicare Part B fee schedules, apply not only to independent clinical laboratories and physician office laboratories but also to hospital laboratories which perform testing for hospital outpatients and non-hospital patients.  The Secretary has committed himself to developing Medicare policies governing the Medicare Part B

1041959.4

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1  fee schedules and coverage for clinical laboratory testing (as well as other Medicare

2  policies) through compliance with the notice and comment rule-making procedures

3  of the federal Administrative Procedure Act, 5 U.S.C § 553. See, e.g., the final rules

4  governing Medicare coverage and administrative policies for clinical diagnostic

5  laboratory services published in the Federal Register ("Fed. Reg.") on November 23,

6  2001.    66 Fed. Reg. 58788-58890 (Nov. 23, 2001).    These latter rules were

7  established by the Secretary to develop national coverage and administrative

8  policies for clinical diagnostic laboratory services to promote Medicare program

9  integrity and national uniformity and to simplify administrative requirements for

10  clinical diagnostic laboratory services.  66 Fed. Reg. at 58788.

11        14.    The medical specialty of laboratory medicine includes thousands of

12  clinical diagnostic laboratory tests.  A patient often requires several tests to be

13  performed sequentially in a timely manner.  Not all clinical laboratories perform all

14  such tests.  Indeed, many laboratories, including independent clinical laboratories

15  like Internist and physician office laboratories, perform only a portion of the tests

16  that are the subject of the demonstration project and must therefore refer laboratory

17  tests to outside specialty "reference laboratories" depending on the particular needs

18  of their patients.  Thus, in addition to the crucial relationships existing between

19  physicians and their patients and clinical laboratories, there are also well

20  established, existing relationships among different laboratories, themselves.

21        15.    The choice of a clinical laboratory by a physician and the physician's

22  patient is based on numerous factors, including quality and service.    Many

23  laboratory tests must be performed on an urgent basis, which adds to the many

24  factors that must be considered by a patient's physician with respect to the choice of

25  a clinical laboratory.  In short, the relationship between physicians, their patients,

26  and providers of clinical laboratory services is interdependent, complex and

27  sensitive.  Laboratory services are not interchangeable commodities, like durable

28  medical equipment.    Rather, different laboratories offer different reasons why

1041959.4

1 physicians and their patients might choose to use them.  Moreover, in the case of

2 hospital patients it is critical that the hospital laboratory be available to follow the

3 patient throughout the patient's treatment, including any outpatient treatment and

4 post-hospital treatment.  This continuum of care will be substantially disrupted by

5 the policies established to implement the demonstration project.

6    16.    Under the existing Medicare fee-for-service payment system,

7 laboratories furnishing services to Medicare beneficiaries are paid in accordance

8 with the Part B fee schedules.  The relationships among Medicare beneficiaries,

9 their doctors and clinical laboratories, summarized above, have been forged in large

10 part in reliance on the current long-standing, fee-for-service system.  Because of the

11 way the Secretary plans to implement the demonstration project, these critical

12 relationships will be materially altered threatening the quality of laboratory services,

13 the viability of clinical laboratories in the San Diego-Carlsbad-San Marcos area, and

14 Medicare beneficiaries' access to care.

15

16 ### THE MEDICARE DEMONSTRATION PROJECT

17    17.    Section 302(b) of the Medicare Prescription Drug Improvement, and

18 Modernization Act of 2003 (Public Law 108-173) requires the Secretary to conduct

19 a demonstration project on the application of competitive acquisition for clinical

20 laboratory services that would otherwise be paid under the Part B fee schedules of

21 42 U.S.C. Section 1395l(h).  This Congressional directive is codified at 42 U.S.C.

22 Section 1395w-3(e), and is entitled "Demonstration Project for Clinical Laboratory

23 Services."

24    18.    The governing statute specifically requires the demonstration project to

25 include tests paid under the Medicare Part B Clinical Laboratory Fee Schedule and

26 excludes entities that have a "face-to-face encounter" with the patient (such as

27 physician office laboratories and hospitals) and excludes pap smears and colorectal

28 cancer screening tests.  Id.

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1041959.4

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

19.   The controlling statute also incorporates the provisions of other subsections of 42 U.S.C. Section 1395w-3, dealing with Medicare competitive acquisition programs in general, including the program requirements listed at 42 U.S.C Section 1395w-3(b), such as those for awarding contracts, the term of such contracts, the number of contractors, etc.   For example, under Section 1395w-3(b)(6)(D), the Secretary is required to ensure that "small suppliers" of health care items and services, such as Internist, have an opportunity to be considered for participation in a competitive acquisition program.

20.   Significantly, while Congress has authorized the Secretary to waive certain provisions of the Federal Acquisition Regulation in order to implement competitive acquisition programs, see 42 U.S.C. § 1395w-3(a)(1)(C), Congress has not authorized the Secretary to dispense with his longstanding compliance with the rule-making requirements of the APA.  Congress has also limited administrative and judicial review of certain specific details of a competitive acquisition program, none of which is involved here.  See 42 U.S.C. § 1395w-3(b)(10).

21.   Pursuant to statute, the Secretary was required to submit a report to Congress regarding the Demonstration Project for Clinical Laboratory Services no later than December 31, 2005.  42 U.S.C. § 1395w-3(e)(3).  The Secretary did not do so until April 2006.  In that report (copy attached as Exhibit A), the Secretary informed Congress that the Laboratory Competitive Bidding Demonstration project was developed by Research Triangle Institute, International, ("RTI"), a private contractor.  RTI held a meeting to discuss the planned design of the project in Massachusetts in August 2005, and CMS held conferences in October 2006 and July 2007 to discuss the proposed project.  However, the Secretary did not identify the San Diego-Carlsbad-San Marcos area as the site of the project until October 17, 2007.  See the October 17, 2007 Federal Register notice (copy attached as Exhibit B) which sets forth some details regarding the laboratory demonstration project, including:

a.    The purported objective of the demonstration project is to determine whether competitive bidding can be used to provide Part B clinical laboratory services at fees below current Medicare payment rates while maintaining quality and access to care;

b.    The demonstration project will cover tests provided to beneficiaries enrolled in the traditional fee-for-service Medicare program who reside in the San Diego-Carlsbad-San Marcos area during the three-year demonstration period;

c.    Certain laboratories are required to bid ("required bidders") i.e. those that supply or expect to supply at least $100,000.00 annually in demonstration tests to Medicare beneficiaries residing in the competitive bid area;

d.    Required bidders who bid and win will be paid under one demonstration fee schedule for services furnished to Medicare beneficiaries residing in the competitive bid area for the three year duration of the demonstration project;

e.    Some laboratories are not required to bid, but have the option to bid.  Non-required bidders who do not bid, or who elect to bid and win, will be paid under the demonstration fee schedule for the duration of the demonstration (with their reimbursement limited to $100,000.00 annually); and

f.    Non-required bidders who choose to bid and do not win, will, like required bidders who do not win, receive no payment for services provided to beneficiaries residing in the competitive bid area for the duration of the demonstration.

22.    The October 17, 2007 Federal Register notice (Exhibit B) also announced a bidders' conference to be held in the San Diego area on October 31, 2007 for potential bidders to learn about the demonstration project rules.  However, due to the state of emergency relating to the wildfires in Southern California, the Secretary postponed the bidders' conference and rescheduled it for December 5, 2007.  See November 21, 2007 Federal Register notice, 72 Fed. Reg. 65581.

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

23.    Only laboratories located in the demonstration area and/or serving beneficiaries in the demonstration area were invited to attend the bidders' conference. The Secretary's delegate, CMS, and its contractor, RTI, were present to answer questions regarding the bidding process at the December 5, 2007 conference. See December 5, 2007 CMS letter, copy attached as Exhibit C. At the conference, CMS again advised that the laboratories that bid and win will be paid under the competitively set demonstration fee schedule for the duration of the demonstration, while required bidders that do not bid, or bid and do not win, will not be allowed to bill Medicare directly for demonstration tests performed for Medicare fee-for-service beneficiaries residing in the demonstration area (but may serve as reference laboratories). As indicated above, those laboratories exempted from the bidding include laboratories that supply less than $100,000.00 annually in demonstration tests to Medicare fee-for-service beneficiaries residing in the demonstration area, laboratories providing services exclusively to beneficiaries entitled to Medicare by reason of end-stage renal disease ("ESRD"), laboratories providing services exclusively to beneficiaries in nursing facilities or receiving home health services and laboratories that provide "face-to-face" services to beneficiaries. Exempt laboratories, including those that service nursing facilities exclusively, are to be paid under the competitively set demonstration fee schedule unless they chose to bid and lose. If so, they will be paid nothing for their services. At the December 5, 2007 bidders' conference, CMS also distributed bidders' packages and other voluminous documents to the attendees.

24.    Under the bidding process, laboratories must submit bids for each of 303 different laboratory tests, and also must bid on a fee for the collection and handling of laboratory specimens. The 303 laboratory tests represent approximately 99% of the Medicare expenditures for laboratory fee-for-service tests. However, there are very few laboratories that provide all of the 303 tests which thus will require most laboratories, prior to submitting bids, to contract with

1041959.4

1   other laboratories for those tests they do not perform.

2       25.    Bids must be submitted on or before February 15, 2008; a date selected

3   by CMS and RTI and not mandated by Congress.  After the bids are evaluated,

4   clinical laboratories serving beneficiaries residing in the competitive bid area will be

5   designated by CMS as (a) "winners," (b) "non-winners," and (c) "passive"

6   laboratories (i.e. bidders that have designated themselves as small business, ESRD

7   laboratories or nursing home/home health laboratories and therefore exempt from

8   the bidding process).

9       26.    Only bids received on or before February 15, 2008, will be considered

10  for evaluation by CMS and RTI.  Each laboratory submitting an application must

11  declare its bidding status clearly.  Even nonrequired bidding laboratories must

12  submit an application but are only required to complete a portion of the application.

13  Ultimately, CMS and RTI will establish a "financially competitive range" of bids

14  based on composite bid prices, laboratory test capacity, and projected demand for

15  tests in the competitive bid area.  A cut-off price will be chosen such that the bidders

16  below the cut-off price will have sufficient capacity to serve the patients in the

17  competitive bidding area.  A composite bid is considered financially competitive if

18  it is equal to or less than the cut-off price.  Bids will purportedly be evaluated

19  thereafter based on CMS' determination of the "best value for the Medicare

20  program" based on price and nonprice criteria, including quality, access,

21  subcontracting  and  referral  relationships,  expansion  plan,  "gaming,"  and

22  "collusion."

23      27.    Laboratories do not actually know how much they will be paid under

24  the demonstration project.  Although non-exempted laboratories will submit "bids"

25  for the designated laboratory services, the demonstration project fee schedule will be

26  based on a complex calculation of the average bid price for all winning laboratories

27  for each test.  CMS has stated that every winning laboratory will be paid at least as

28  much as it bid for each test; however, this will be difficult to accomplish unless

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1  CMS pays the highest price submitted by any winning bidder for each test. CMS

2  has stated that an adjustment factor will be applied for the bundle of demonstration

3  tests in an attempt to assure that each winning laboratory will be paid at least as

4  much as it bid for each test; but this goal would only be realized if the test utilization

5  for all winning labs is proportional to the test weights provided by CMS, which is

6  unlikely.

7      28.    The December 5, 2007, conference was the one and only live

8  conference held for laboratories in the San Diego-Carlsbad-San Marcos competitive

9  bid area. Prior to the conference, laboratories and other impacted parties were given

10  little or no meaningful opportunity to interact with RTI or CMS regarding the design

11  of the demonstration project. As mentioned above, patients, physicians, and other

12  persons affected by the demonstration project were not invited to the bidders'

13  conference. Not surprisingly, in light of the complexity of the project, questions

14  arose during the December 5, 2007 bidders' conference, which resulted in CMS

15  issuing a written "follow up from bidders' conference," copy of which is attached as

16  Exhibit D.

17      29.    Among the many questions posed during the bidding conference was

18  whether a hospital laboratory is required to bid under the demonstration project if

19  the hospital is a foundation where the parent organization provides the facilities and

20  non-physician staff for medical clinics, such as is the case with Sharp. According to

21  CMS (Exhibit D, Answer 4), laboratories that are enrolled in Medicare and perform

22  Part B clinical laboratory services, such as an independent laboratory or a hospital

23  laboratory performing "non-patient services," are subject to the demonstration

24  project regardless of their affiliation with other entities. As a result, if such

25  laboratories do more than $100,000.00 of laboratory testing for non-patients, they

26  must be considered a required bidder according to CMS. Also, very significantly, in

27  response to the question (Exhibit D, no. 10) whether a laboratory could refuse to

28  provide testing for a Medicare beneficiary residing in the competitive bid area, CMS

1 answered "a laboratory that is enrolled as a Medicare supplier cannot legally refuse

2 to provide services to a beneficiary based on payment." In other words, a Medicare

3 certified laboratory must furnish services to a beneficiary even if the laboratory is a

4 non-winner and will be paid nothing for such services.

5      30. In addition to not being included among the invitees to the bidders'

6 conference, the plaintiffs are informed and believe and thereon allege that the

7 Secretary has not taken any steps to notify Medicare beneficiaries and physicians

8 residing the demonstration area of the demonstration project and how it might affect

9 them.

10

11 **COUNT ONE**

12 (Violation of the Administrative Procedure Act, 5 United States Code § 553(b))

13      31. The allegations of paragraphs 1 – 29 above are incorporated herein by

14 reference.

15      32. The rulemaking provisions of the APA are designed to assure fairness

16 and consideration of substantive administrative agency rules. Not only are they

17 intended to give the public notice of agency policymaking but they are also intended

18 to give the agency the benefit of public input. The Secretary and his agency are

19 bound by the rule-making requirements of the APA with respect to developing

20 substantive Medicare policy. See Secretary's "Statement of Policy" published at 36

21 Fed. Reg. 2532 [January 28, 1971]. Here, the policies established by the Secretary

22 and its contractor, RTI, including those discussed above, constitute major

23 substantive changes in the policy for paying for and delivering laboratory services to

24 Medicare beneficiaries in San Diego. Moreover, CMS has indicated that it intends

25 to utilize the information obtained in this bidding process for the purposes of

26 generally revising the Medicare fee schedule for laboratory services in the future.

27 Yet, the Secretary did not adopt any of the policy changes through the notice and

28 comment rule-making requirements of 5 U.S.C. § 553. Rather the Secretary did so

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1  on an ad hoc, on-the-fly basis that defeats the salutary purposes of the

2  Administrative Procedure Act.

3      33.    Such policy changes may not be legally implemented without first

4  ventilating them through the rule-making requirements. Rather than engaging in the

5  required notice and comment rule-making, CMS and RTI held a few conferences,

6  including the December 5, 2007 "bidders' conference," which do not begin to meet

7  the requirements of the mandatory rule-making provisions. In short, critical policies

8  were adopted by CMS (and continue to evolve) through private, nonpublic processes

9  which did not involve input from members of the public, including Medicare

10  beneficiaries and physicians. The Secretary's failure to follow rule-making

11  requirements necessarily prohibits the Secretary from implementing such policies,

12  including implementing the February 15, 2008 deadline for the submission of bids.

13

14  **COUNT TWO**

15  (Violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706)

16      34.    The allegations of paragraphs 1 – 29 above are incorporated herein by

17  reference.

18      35.    Under the APA, 5 U.S.C. §§ 701-706, courts must overturn agency

19  action that is arbitrary, capricious, an abuse of discretion or not otherwise in

20  accordance with the law.

21      36.    Independent of the Secretary's failure to follow the rule-making

22  requirements of the APA, many of the new policies he intends to implement with

23  respect to the demonstration project are substantively invalid under the APA

24  because they are arbitrary, capricious and an abuse of discretion. In particular, the

25  following demonstration project policies are substantively invalid:

26      (a)    The Secretary intends to treat hospital laboratories as

27  independent clinical laboratories and require them to bid on the demonstration

28  project tests if they perform testing on "non-hospital patients" which generates

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1  Medicare revenues in excess of $100,000.00. The controlling statute, 42 U.S.C. §

2  1395w-3(e)(1)(B) expressly exempts from the project entities that have a "face-to-

3  face" encounter with patients. Hospital laboratories, such as those operated by

4  Sharp and Scripps, have such face-to-face encounters with their patients, including

5  non-hospital patients, yet they are being required to bid on the demonstration

6  project. Given the nature of the services that hospital laboratories provide to non-

7  hospital patients, it is arbitrary and capricious for the Secretary to make such

8  laboratories mandatory bidders under the demonstration project;

9       (b)   The Secretary also proposes to require laboratories that serve

10  exclusively nursing facility patients and ESRD beneficiaries to accept the prices

11  ultimately determined through the demonstration project bidding process even

12  though such laboratories will not themselves be bidding on the services. Thus, such

13  laboratories will be "stuck with" rates for services determined by the bids of

14  laboratories that generally do not provide testing to nursing facility patients or

15  ESRD beneficiaries, levels of service that cost substantially more per test than

16  services rendered to other types of patients. It is arbitrary and capricious for the

17  Secretary to set the Medicare reimbursement rates that will be paid to these

18  laboratories based on bid pricing from laboratories that do not service the same

19  types of patients and are therefore not comparable;

20       (c)   As mentioned, the Secretary is requiring small laboratories, such

21  as Internist, to submit a bid on each of the 303 tests designated in the demonstration

22  project materials. Neither Internist nor other small laboratories in the San Diego

23  area provide all of the 303 tests. Thus, such laboratories can only submit viable bids

24  by obtaining the financial and bidding cooperation of their reference laboratories,

25  which will be competing bidders and thus have no financial or other incentive to

26  cooperate on a small laboratory's bid. It is arbitrary and capricious for the Secretary

27  to establish a bidding process that necessarily places laboratories that do not provide

28  all of the selected laboratory tests at a competitive disadvantage;

1041959.4

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

(d)     The Secretary's demonstration act policies also are inconsistent with Congress' intent that the Secretary take steps to assure the participation of small businesses in the project.  See 42 U.S.C. § 1395w-3(b)(6)(D).  As explained above, smaller laboratories that do not provide all 303 demonstration project tests are at a competitive disadvantage.  Further, the Secretary's dollar threshold for exclusion from the bidding process, less than $100,000 in demonstration test codes, is extremely narrow when compared with other federal authorities defining "small business" and therefore does not adequately protect businesses that would otherwise be regarded as "small."  In other words, since many laboratories that would be considered small under other federal statutory schemes must participate in the bidding process, but cannot fairly compete against larger laboratories, the Secretary's demonstration project policies do not assure the participation of "small" suppliers.  Along these same lines, the Secretary's demonstration project policies with respect to "small" business also are inconsistent with the provisions of, among other laws, the Regulatory Flexibility Act, as codified at 5 U.S.C. §§ 601, et seq.

(e)     The Secretary has decided to use Medicare claims paid data to determine and project test volume demand in the demonstration project.  Such data does not reasonably or accurately reflect the potential demand, which laboratories calculate differently.  Therefore, laboratories find themselves having to bid on testing for which the volume is not known.  This is only one of many examples where the Secretary's policies will leave a bidder uncertain of the ultimate factors being used to determine "winners" or what will be awarded under the demonstration project.

## COUNT THREE

(Violation of the United States Constitution – Takings Clause)

37.     The allegations of paragraphs 1 – 29 above are incorporated herein by reference.

1041959.4

38.    As mentioned, the Secretary has announced that laboratories that are not "winners" under the demonstration project but that continue to participate in the Medicare program will still be required to furnish services to Medicare beneficiaries without payment.  Continued participation in the Medicare program is a necessity for most laboratories even if they do not furnish services to Medicare beneficiaries in the competitive bidding area.  Even if these non-winning laboratories do not furnish the services to Medicare beneficiaries directly and refer the needed testing to other laboratories, they will nevertheless incur substantial cost in arranging for the laboratory services.

39.    In light of the foregoing, under the Secretary's proposed methodology for implementing the demonstration project, non-winning laboratories will not be justly compensated for the use of their services by Medicare beneficiaries in violation of the Fifth Amendment of the United States Constitution.

40.    This policy also is inconsistent with provisions of the Medicare Act. The Medicare Act generally requires that providers or suppliers that are properly enrolled in the program be reimbursed for medically necessary services otherwise covered under the program.  Forcing laboratories that are not "winners" through the bidding process, but who remain otherwise properly enrolled Medicare suppliers, to furnish services to Medicare beneficiaries without any compensation is inconsistent with one of the most basic principles of the Medicare Act.

## COUNT FOUR

(Violation of 42 U.S.C. § 1395w-3)

41.    The allegations of paragraphs 1 – 29 above are incorporated herein by reference.

42.    One of the Secretary's policies for implementing the demonstration project violates the very statute that creates the project.  The express language controlling statute, 42 U.S.C. § 1395w-3(e)(1), limits the scope of the demonstration

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1  project to laboratory tests.

2    43.    The Secretary has requested that bidders compete on the price they will

3  charge for collecting and handling laboratory specimens.    The collection and

4  handling process is not a laboratory test.    As such, the Secretary has exceeded the

5  scope of his authority granted under the controlling statute by requiring bidders to

6  submit price information on collection and handling.

7

8                                    **IRREPARABLE HARM**

9    44.    The Secretary's unlawful implementation of the Medicare laboratory

10  demonstration program in the San Diego-Carlsbad-San Marcos Area threatens to

11  cause severe and irreparable injury to plaintiffs Internist, Sharp and Scripps, as well

12  as to their respective employees and patients.

13    45.    Internist is a family owned and operated business, which has been a

14  fixture in the Oceanside community for 18 years.    It has already had to devote

15  significant time and expense merely to prepare a bid to submit for the demonstration

16  project, despite knowing that there is relatively minimal chance it will declared a

17  "winning" laboratory.    Internist only provides approximately half of the 303 tests for

18  which bidders must give prices as part of the bidding process.    Internist has had no

19  success in getting prices for the remaining 150 tests from other reference

20  laboratories who are its likely competitors.    As such, Internist is currently faced with

21  bidding the existing Medicare fee schedule rates on these tests and therefore almost

22  certainly will be pricing these tests higher than most competing laboratories.

23    46.    Internist depends on the money it receives from furnishing tests to

24  Medicare beneficiaries in order to remain in operation.    Roughly 65 percent of

25  Internist's business is devoted to Medicare beneficiaries and virtually all of the those

26  Medicare beneficiaries reside in the demonstration project bidding area.    If Internist

27  is precluded from receiving Medicare payments for the laboratory services it

28  provides, it will only be a matter of time before the laboratory is forced to

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1  significantly scale down operations or close its doors completely. Such a turn of
2  events would be devastating for Internist's employees because it would result in,
3  among other things, lost jobs.

4      47.   If Internist is abruptly forced out of business, it will be devastating for
5  the Medicare beneficiaries who have come to depend on the laboratory. As a
6  community-based laboratory, Internist has a direct relationship with many patients
7  who need frequent laboratory tests, which means that these patients actually go
8  physically to the Internist offices to have their blood drawn for testing, as well as for
9  the laboratory testing itself. As a result of the demonstration project, these patients,
10  some of whom have a longstanding relationship with Internist, face the prospect of
11  having their health care disrupted, which is likely to cause them otherwise
12  unnecessary stress and disappointment.

13      48.   Sharp has also had to bear the considerable resource demands of
14  preparing a bid application for the demonstration project despite uncertainty
15  regarding whether it will be a winner. This uncertainty is so significant that, upon
16  submission of the bid application, even before any winners are announced, Sharp
17  will evaluate whether to close some of its laboratory drawing stations in order to
18  prepare for the eventuality that it will be cut out of providing services to Medicare
19  beneficiaries. If Sharp elects to close these drawing stations, this will mean laying
20  off the phlebotomists that work in those drawing stations and reducing Medicare
21  beneficiaries' access to clinical laboratory testing services in the San Diego-
22  Carlsbad-San Marcos area.

23      49.   If Sharp does indeed fail to succeed in the demonstration project
24  bidding process, it will mean a significant disruption in the delivery of patient care
25  in the demonstration area. The laboratory component of Sharp's business already
26  operates on a very thin margin. Without the availability of Medicare
27  reimbursement, Sharp will not be able to continue to operate its outreach laboratory.
28  As a result, the laboratory staff will lose their jobs.

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

50.    Patient care will also be significantly impacted in many ways. Among other things, if Sharp is not a winning bidder, patients presenting to Sharp-affiliated urgent care clinics no longer will be able to get timely testing for laboratory tests ordered on an urgent basis. Rather, laboratory tests for urgent care patients will have to be sent to winning reference laboratories, which will slow the time in which the patients' physicians can get the test results and thereby make informed treatment decisions. Further, if Sharp is not a winning laboratory, it will derail the highly integrated system for delivering care that currently exists within the Sharp system. Under the current system, Sharp affiliated physicians are able to quickly access laboratory tests for their patients. If the Sharp outreach laboratories close and the laboratory tests formerly furnished within the Sharp system are outsourced, it will add a layer of administrative process and make the flow of information between the laboratory and health care professionals more cumbersome, to the detriment of the patients being treated.

51.    Like Sharp, Scripps has already incurred significant time and expense in preparation of a bid application despite considerable uncertainty as to whether it will be declared a "winner" under the demonstration project. At present, there are more than 10 Scripps employees and an outside consultant working on the bid application. The Scripps employees, including administrative and business services personnel are having to spend time working on the bid application in addition to fulfilling their normal job duties.

52.    Scripps only provides approximately half of the 303 services for which applications must submit bid prices under the demonstration project. Scripps will not be able to compete against other laboratories that provide a greater number of the demonstration project services with respect to price for the services. Scripps therefore is already making plans for the steps that it will take in the event that it does not win the right to continue billing Medicare for laboratory services furnished to patients residing in the demonstration area. Among other things, if Scripps is not

1 a winner, it will have to lay off as many as thirty (30) current employees in order to
2 mitigate the lost Medicare revenue.   This will put increased demands on the
3 remaining staff with respect to non-Medicare patients, which likely will adversely
4 impact the overall quality of services.

5     53.    The demonstration project may effectively undo a component of
6 Scripps' highly integrated system of delivering health care.   Patient laboratory test
7 results, including results for urgent, "stat" tests, will no longer be as readily
8 available to the patients' treating physicians.   Also, if Scripps is forced to refer out
9 laboratory testing for non-hospital patients, it will necessarily mean that physicians
10 will not be notified as quickly of critical laboratory testing results, some of which
11 are indicative of conditions that can potentially be fatal unless promptly and
12 appropriately treated.   Accordingly, the care Scripps patients receive necessarily will
13 be less effective than it is currently.

14

15 **INJUNCTIVE RELIEF IS NECESSARY**

16     54.    To prevent plaintiffs and others from being irreparably harmed, the
17 Secretary and his agents must be enjoined from unlawfully and arbitrarily
18 implementing the laboratory demonstration project in the San Diego-Carlsbad-San
19 Marcos area.

20

21 **PRAYER**

22     WHEREFORE, Plaintiffs Internist, Sharp and Scripps pray as follows:

23     2.    For an order enjoining the Secretary and his agents from implementing
24 the laboratory demonstration project (including the February 15, 2008 bid date),
25 under the currently announced terms, in the San Diego-Carlsbad-San Marcos area or
26 any other area;

27     3.    For an order compelling the Secretary and his agents, including CMS,
28 to comply with the mandatory provisions of the APA, including but not limited to

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1041959.4

1   the provisions requiring a public notice and comment process, before implementing

2   the laboratory demonstration project in any geographic area, including the San

3   Diego-Carlsbad-San Marcos area; and

4        4.    For costs of suit, including reasonable attorneys fees; and

5        5.    For such other and further relief as the Court deems necessary and
    appropriate.

6

7   DATED: January 28, 2008        HOOPER, LUNDY & BOOKMAN, INC.

8

9                                  By:_____
10                                       PATRIC HOOPER
                                   Attorneys for Plaintiffs Sharp Healthcare,
11                                 Internist Laboratory and Scripps Health

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1041959.4

COMPLAINT FOR INJUNCTIVE RELIEF

**EXHIBIT A**


### Report to Congress—Initial Report on the
### Medicare Clinical Laboratory Competitive Bidding Demonstration

This design report summarizes the recommended plan for the Medicare Clinical Laboratory Competitive Bidding Demonstration developed by Research Triangle Institute, International (RTI) for the Centers for Medicare & Medicaid Services (CMS). The purpose of the demonstration is to determine whether competitive bidding can be used to provide quality laboratory services at prices below current Medicare reimbursement rates.

#### Background

Section 302(b) of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 requires the Secretary of Health and Human Services to conduct a demonstration project on the application of competitive acquisition for payment of clinical laboratory services that would otherwise be made under Medicare Part B fee schedule. Under this statute, pap smears and colorectal cancer screening tests are excluded from this demonstration. Requirements under the Clinical Laboratory Improvement Amendments (CLIA) as mandated in section 353 of the Public Health Service Act are applicable. The aggregate amounts to be paid to contractors in a competitive acquisition area are expected to be less than the aggregate amounts that would otherwise be paid under the laboratory fee schedule. The payment basis determined for each competitive acquisition area will be substituted for payment under the existing clinical laboratory fee schedule. The contracts are to be re-competed every three years, and multiple winners are expected in each competitive acquisition area.

The proposed design was reviewed by a Technical Expert Panel established by RTI and shared with the public at a CMS Open Door Forum Special Listening Session. The design recommendations address the structure of the demonstration, selection criteria for the demonstration sites, bidding process, selecting winners, reimbursement, quality, and access.

#### Structure of the Demonstration

The recommended structure of the demonstration uses Metropolitan Statistical Areas (MSAs) to define demonstration sites. The demonstration will set competitively bid fees in the demonstration areas for all tests paid under the Medicare Part B clinical laboratory fee schedule, with the exception of pap smears, colorectal cancer screening tests, and new tests added to the Medicare Part B clinical laboratory fee schedule during the course of the demonstration.

The demonstration will cover demonstration tests for all Medicare Part B beneficiaries who live in the demonstration sites. Hospital inpatient testing is covered by Medicare Part A and therefore exempt from the demonstration. Physician office laboratory testing and hospital outpatient testing are not included in the demonstration, except where the physician office or hospital laboratory functions as an independent laboratory performing testing for a beneficiary who is not a patient of the physician or hospital outpatient department.

Page 2

There will be ongoing monitoring of the demonstration sites, and the demonstration will last three years. Early data from the demonstration may be used to assess the feasibility of expanding competitive acquisition areas and to estimate the range of achievable savings from competitive bidding. There will be two demonstration sites, and the demonstration will have a staggered start.

## Selection of Demonstration Sites

The fundamental criteria for the proposed demonstration sites allow for potential Medicare program savings from the demonstration, are administratively feasible, are representative of the laboratory market, and will yield demonstration results that can be generalized to other MSAs. RTI recommends selecting an MSA that is located within a single State because MSAs that cross state boundaries increase administrative costs when two carriers and two fiscal intermediaries are responsible for administering claims for the MSAs. Although higher population raises potential savings, it also increases administrative complexity and potential disruption. Therefore, RTI recommends an MSA that has a moderately large Medicare population. An MSA that has neither very low nor very high Medicare-managed care penetration (defined as greater than five percent but less than 50 percent penetration) also is recommended to enhance the representativeness and generalizability of the demonstration.

## Bidding

Independent, hospital and/or physician office laboratories with $100,000 or more in annual Medicare Part B (fee-for-service) payment for nonpatient services will be required to participate in the demonstration. Small laboratories, which will be defined as independent laboratories, hospital and/or physician office laboratories with less than $100,000 in annual Medicare Part B (fee-for-service) payment for nonpatient services will not be required to bid. Demonstration test annual payments will be based on the most recent 12-month period prior to demonstration for which data is available.

Bidding laboratories will not be required to bid to provide coverage to the entire demonstration site; but, they will be required to provide information on their capacity and geographic service area. This information will be used during the winner selection process to ensure that the demonstration does not adversely affect beneficiary access to laboratory services. Bidding behavior will be subject to anti-trust laws and regulations prohibiting collusion or anti-competitive behavior (under the jurisdiction of the Federal Trade Commission and the Department of Justice).

After release of the Bid Solicitation Package and prior to bidding, a "Bidders Conference" will be held for potential bidders to learn about the rules and ask questions about the bidding process. There will be a single bidding competition covering all demonstration tests. Bidders will be required to submit a bid price for each Health Care Procedure Coding System code in the demonstration test menu. Bidding laboratories will be asked to identify demonstration tests that they do not perform, and will be asked to explain their plans for responding to requests for demonstration tests that they do not perform in house (e.g., subcontracting and referrals). As

Page 3

part of their bid, laboratories will provide information on ownership, location of affiliated laboratories and drawing stations, CLIA certification, laboratory finances, and quality.

**Selecting Winners**

Key recommendations for the winner selection process include selecting multiple winners. A laboratory's bids for individual tests will be weighted and summed to form a single composite bid. Weights for each demonstration test will be based on the test's share of total expected demonstration volume. The composite bids will be arrayed from lowest to highest, and the array will be used in conjunction with other criteria to determine the "pivotal" composite bid that will determine the winners. Bidders with composite bids less than or equal to the pivotal composite bid will be winners. Bidders with composite bids greater than the pivotal composite bid will be losers.

Multidimensional selection criteria will be used to determine the winners, including: composite bid prices; capacity; geographic coverage; quality; number of winners; distribution of composite bids; and gaming behavior. A maximum acceptable composite bid, or "reservation bid," will be set. The reservation bid will be slightly less than the composite bid that would be obtained using the Medicare Part B clinical laboratory fee schedule. Laboratories whose composite bids exceed the reservation bid will automatically be determined losers.

**Reimbursement**

Recommendations for the reimbursement rules include a new fee schedule for individual demonstration tests, which will be set after the pivotal bid is selected and winning laboratories are determined. After considering quality, capacity, geographic coverage, and other non-price criteria, winner laboratories will be selected that can offer the full menu of demonstration tests at lower total costs than under the existing clinical laboratory fee schedule. While the recommendations for the demonstration project differ somewhat from CMS programs for Part B Drugs and Biologicals, and Durable Medical Equipment, Prosthetics, Orthotics, and Supplies, they are consistent with CMS's approach to competitive acquisition, which uses a bidding process that encourages cost savings and seeks opportunities for sharing those savings with beneficiaries. However, as there is no coinsurance for laboratory services, all winning laboratories will be paid the same price for each test under the demonstration.

For nonpatient testing, small laboratories will receive payment for demonstration tests under the demonstration fee schedule (not to exceed $100,000 in annual Medicare Part B payment for nonpatient services). The existing Medicare Part B clinical laboratory fee schedule will continue to apply to non-demonstration tests. Payment for non-demonstration tests will be unaffected by a laboratory's status as a winner or loser in the demonstration.

**Quality**

Key recommendations on quality of care can be divided into (1) protective demonstration design elements, and (2) monitoring.

Page 4

The demonstration will rely on the existing system of CLIA regulations already in place. The existing quality requirements provided under CLIA are intended to ensure the quality of laboratory testing, and all clinical laboratories must be properly certified to receive Medicare or Medicaid payments. CLIA specifies quality standards for proficiency testing (PT), patient test management, quality control, personnel qualifications and quality assurance for laboratories. Under the demonstration, additional measures such as turn-around-time are intended to supplement what is not monitored by existing CLIA requirements.

In addition to the CLIA requirements that apply to virtually all clinical laboratories, laboratories participating in the demonstration will each designate a quality assurance staff member who will serve as a point of contact for CMS, physicians, and beneficiaries. The CMS will maintain a toll-free hotline to receive complaints about the demonstration from beneficiaries, physicians, or laboratories. Multiple laboratories will be determined winners to maintain quality of service competition between laboratories. Each winning laboratory will be required to submit information on service and quality standards that CMS will send to physicians in their communities. Quality is considered in the winner selection process. The choice of multiple winners will help to assure quality since the laboratories will compete with each other on the basis of quality testing and service.

Specific recommendations on quality monitoring include reviewing PT data currently monitored through the CLIA program. Results of CLIA survey inspections will be monitored with the assistance of CMS Regional Offices. Winning laboratories will be required to report data on six different but standardized measures of test turnaround time: (1) total turnaround time; (2) transport turnaround time; (3) processing turnaround time; (4) total turnaround time for "statim" (immediate or "STAT") testing; (5) reporting turnaround time for critical values; and, (6) reporting turnaround time for public health disease notification.

Log-in error rates will be standardized and monitored. Physician satisfaction regarding quality of testing and service will be monitored. The number of specimens found unusable or lost in winning laboratories will be monitored.

**Access**

Recommendations to ensure beneficiary access to care include protective design elements. Demonstration sites will be selected to ensure sufficient numbers of laboratories exist to provide for both successful competitive bidding and assurance of access for beneficiaries. Multiple winning laboratories will be awarded so that the winners will have sufficient capacity to serve all of the beneficiaries in their site.

Capacity and geographic coverage are considered in the winner selection process. The rates of testing for five different types of laboratory tests per beneficiary will be monitored in each demonstration site. Physician satisfaction regarding access will be monitored.



NOTICES

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Medicare & Medicaid Services

[CMS-5045-N]

Medicare Program: Medicare Clinical Laboratory Services Competitive Bidding
Demonstration Project

Wednesday, October 17, 2007

AGENCY: Centers for Medicare & Medicaid Services (CMS), HHS.

**58856 ACTION: Notice.

SUMMARY: This notice announces the first demonstration site for the Medicare Clin-
ical Laboratory Services Competitive Bidding Demonstration project and the date
for the Bidder's Conference. The Medicare Clinical Laboratory Competitive Bidding
Demonstration was mandated by the Congress. Section 302(b) of the Medicare Pre-
scription Drug, Improvement, and Modernization Act of 2003 (MMA) ( Pub. L.
108-173) requires the Centers for Medicare & Medicaid Services (CMS) to conduct a
demonstration project on the application of competitive acquisition for clinical
laboratory services that would otherwise be paid under the Medicare Part B fee
schedule. The objective of the demonstration is to determine whether competitive
bidding can be used to provide Part B clinical laboratory services at fees below
current Medicare payment rates while maintaining quality and access to care.

The MMA specifically requires that the demonstration: (1) Includes tests paid un-
der the Medicare Part B Clinical Laboratory Fee Schedule; (2) excludes entities
that have a "face-to-face encounter" with the patient; (3) excludes Pap smears and
colorectal cancer screening tests; and, (4) includes requirements under the Clin-
ical Laboratory Improvement Amendments (CLIA) program. An initial Report to the
Congress was submitted April 2006.

Site(S): The fundamental criteria for selecting demonstration sites require that
each Metropolitan Statistical Area (MSA) allows for potential Medicare program
savings from the demonstration, is administratively feasible, represents the
laboratory market, and will yield demonstration results that can be generalized to
other MSAs.

The first demonstration site will be the San Diego-Carlsbad-San Marcos, Califor-
nia MSA.

A Bidders Conference is planned for October 31, 2007 in the San Diego-Carls-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

72 FR 58856-01
72 FR 58856-01, 2007 WL 3001871 (F.R.)
(Cite as: 72 FR 58856)

FOR EDUCATIONAL USE ONLY

Page 2

bad-San Marcos, California MSA.

  The demonstration covers tests provided to beneficiaries enrolled in the tradi-
tional fee-for-service (FFS) Medicare program who reside in the area of the demon-
stration site or competitive bid area (CBA) during the 3 year demonstration peri-
od. Beneficiaries who travel outside the CBA during the demonstration period and
require laboratory services will be able to access services from most laboratories
in the United States. We will not directly pay, however, for services furnished by
a required bidder that did not bid or bid and did not win or a non-required bidder
that bid and did not win. (The terms "required bidder" and "non-required bidder"
are explained in section II below.) Laboratories may not bill beneficiaries for
laboratory services covered under the Medicare program.

FOR FURTHER INFORMATION CONTACT: Linda Lebovic at (410) 786-3402 or lab-- bid -
-demo@cms. hhs.gov. Interested parties can obtain information about the demonstra-
tion project on the CMS Web site at http://www.cms.hhs.gov/ DemoProjectsEvalRpts/
downloads/2004--Demonstration-- Competitive-- Bidding-- Clinical-- Laboratory--
Services.pdf.

SUPPLEMENTARY INFORMATION:

I. Background

  Section 302(b) of the Medicare Prescription Drug, Improvement, and Modernization
Act of 2003 (MMA) (Pub. L. 108-173) amends section 1847(e) of the Social Security
Act (the Act) (42 U.S.C. 1395w-3) --"Competitive Acquisition of Certain Items and
Services," to include a demonstration project for clinical laboratory services.
The statute requires the Secretary of Health and Human Services to conduct a
demonstration project on the application of competitive acquisition for payment of
clinical laboratory services that would otherwise be made under Medicare Part B
Clinical Laboratory Fee Schedule.

II. Provisions of the Notice

  Under section 1847(e) of the Act, Pap smears and colorectal cancer screening
tests are excluded from this demonstration. Requirements under CLIA as mandated in
section 353 of the Public Health Service Act apply. The aggregate amounts to be
paid to contractors in a competitive acquisition area are expected to be less than
the aggregate amounts that would otherwise be paid under the laboratory fee sched-
ule. The payment basis determined for each competitive acquisition area will be
substituted for payment under the existing Medicare Part B Clinical Laboratory Fee
Schedule. The demonstration period is 3 years for each demonstration site or "com-
petitive bid area" (CBA). The competitively set demonstration fee schedule will be
used to pay for laboratory services in the CBA for the duration of the 3-year
demonstration period. Multiple winners are expected in each CBA.

  Required bidders are defined as those organizations that will supply, or expect
to supply, at least $100,000 annually in demonstration tests to Medicare benefi-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

72 FR 58856-01                    FOR EDUCATIONAL USE ONLY                    Page 3
72 FR 58856-01, 2007 WL 3001871 (F.R.)
(Cite as: 72 FR 58856)

ciaries residing in the CBA during any year of the demonstration. Required bidders
that bid and win will be paid under one demonstration fee schedule for services
provided to beneficiaries residing in the CBA for the duration of the demonstra-
tion.

Non-required bidders are defined as laboratories that are not exempt from the
demonstration, but have the option of participating in the bidding process. Non-
required bidders that do not bid as well as those that bid and win, will be paid
under the demonstration fee schedule for the duration of the demonstration. These
laboratories will be paid under the same fee schedule as the winning required bid-
ders. Non-required bidders that choose to bid and *58857 do not win will not re-
ceive payment for services provided to beneficiaries residing in the CBA for the
duration of the demonstration period.

A non-required bidder is:

• A small business laboratory, which we are defining as one that will supply less
than $100,000 annually in demonstration tests to Medicare FFS beneficiaries resid-
ing in the CBA during each year of the demonstration. These laboratories may
choose to be a "passive" laboratory. A passive-small business laboratory will have
a $100,000 ceiling on annual payment from Medicare for demonstration tests for the
duration of the demonstration.

• A laboratory that exclusively serves beneficiaries entitled to Medicare because
they have end-stage renal disease (ESRD) residing in the CBA may choose to be a
"passive" laboratory under the demonstration. A passive-ESRD laboratory may con-
tinue to provide services to ESRD beneficiaries residing in the CBA and receive
payment from Medicare for demonstration tests paid under the competitively set
Part B Clinical Laboratory Fee Schedule (demonstration fee schedule) for the dura-
tion of the demonstration.

• A laboratory that exclusively serves beneficiaries residing in nursing homes or
receiving home health services in the CBA may choose to be a "passive" laboratory
under the demonstration. A passive-nursing home laboratory may continue to provide
services to beneficiaries residing in nursing homes or receiving home health ser-
vices in the CBA and receive payment from Medicare for demonstration tests paid
under the demonstration fee schedule for the duration of the demonstration.

This notice announces a "Bidder's Conference" to be held in the San Diego-
Carlsbad-San Marcos, California MSA on October 31, 2007 for potential bidders to
learn about the demonstration rules and ask questions about the bidding process. A
Bidder's Package provides information about the demonstration project and is
available to the public on the CMS project Web site. There will be a single bid-
ding competition covering demonstration tests for each CBA. Bidders will be re-
quired to submit a bid price for each Health Care Procedure Coding System (HCPCS)
code in the demonstration test menu. Bidding laboratories will be asked to identi-
fy demonstration tests that they do not perform, and will be asked to explain
their plans for responding to requests for demonstration tests that they do not

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY

72 FR 58856-01                                                                    Page 4
72 FR 58856-01, 2007 WL 3001871 (F.R.)
**(Cite as: 72 FR 58856)**

perform in house (for example, subcontracting and referrals). As part of their bid, laboratories will provide information on ownership, location of affiliated laboratories and specimen collection sites, CLIA certification, laboratory finances, and quality.

III. Collection of Information Requirements

This information collection requirement is subject to the Paperwork Reduction Act of 1995 (PRA). The collection is currently approved under OMB control number 0938-1008 entitled "Medicare Clinical Laboratory Services Competitive Bidding Demonstration Project Application Form" with a current expiration date of January 31, 2009.

Authority: Section 302(b) of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA).

(Catalog of Federal Domestic Assistance Program No. 93.773 Medicare-- Hospital Insurance Program; and No. 93.774, Medicare--Supplementary Medical Insurance Program)

Dated: October 4, 2007.

Kerry Weems,

Acting Administrator, Centers for Medicare & Medicaid Services.

[FR Doc. E7-20499 Filed 10-16-07; 8:45 am]

BILLING CODE 4120-01-P

72 FR 58856-01, 2007 WL 3001871 (F.R.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**EXHIBIT C**

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Office of Research, Development & Information
7500 Security Boulevard
Baltimore, Maryland 21244-1850



December 5, 2007

Welcome.

Today's Bidder's Conference is planned to help laboratories providing services to Medicare beneficiaries residing in the San Diego-Carlsbad-San Marcos demonstration area understand the design of the Medicare Clinical Laboratory Services Competitive Bidding Demonstration Project and how it is going to be implemented.  Laboratories located in the demonstration area and/or serving beneficiaries in the demonstration area were invited to attend the Bidder's Conference. The Centers for Medicare & Medicaid Services (CMS) and our contractor, RTI International, will answer your questions about the bidding process during today's conference.

Section 302(b) of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (MMA) requires the Department of Health and Human Services to conduct a demonstration project on the application of competitive bidding for clinical laboratory services. The objective of the 3-year demonstration is to determine whether competitive bidding can be used to provide Part B clinical laboratory services at fees below the current Medicare payment rates while maintaining beneficiary access to laboratory services and quality of care.

This demonstration will be conducted in two metropolitan statistical areas (MSAs). The first demonstration site for the Medicare Clinical Laboratory Competitive Bidding Demonstration Project is the San Diego-Carlsbad-San Marcos, California metropolitan area.  The demonstration area is defined by zip code for you in your binders.

Laboratory organizations (i.e., a group of laboratories under common ownership or control) that supply at least $100,000 annually in demonstration tests to Medicare fee-for-service (FFS) beneficiaries residing in the demonstration area are required to submit bids.. Note that the rules for the demonstration do not apply to individual CLIA certificates but to laboratory organizations. Laboratory organizations must submit a single application to the demonstration.

Laboratories that bid and win will be paid under the competitively set demonstration fee schedule for the duration of the demonstration. Required bidders that do not bid, or bid and do not win may serve as reference laboratories for laboratories participating in the demonstration. However, they will not be allowed to bill Medicare directly for demonstration tests performed for Medicare FFS beneficiaries residing in the demonstration area.

CMS will exempt certain laboratories from the bidding requirement. They include:

- Laboratories that supply less than $100,000 annually in demonstration tests to Medicare FFS beneficiaries residing in the demonstration area
- Laboratories providing services exclusively to beneficiaries entitled to Medicare by reason of end-stage renal disease (ESRD). (Testing that falls outside the bundled payment and will be

December 5, 2007  -- Page 2

> paid under the competitively set demonstration fee schedule for the 3 year demonstration period.)

- Laboratories providing services exclusively to beneficiaries in nursing facilities or receiving home health services.

Exempt laboratories will be paid under the competitively set demonstration fee schedule for the duration of the demonstration.  However, an exempt laboratory chooses to bid and does not win, it may serve as reference laboratories to a laboratory participating in the demonstration, but it will not be allowed to bill Medicare directly and must bill the referring laboratory for demonstration tests performed for Medicare FFS beneficiaries residing in the demonstration area.

The Bidder's Package is included in your binder and is posted on the demonstration project website.. The project website is found at: http://www.cms.hhs.gov/center/clinical.asp (click on "Demonstration Project for Competitive Bidding of Clinical Laboratory Services").

We look forward to your participation and to the success of this demonstration.

Sincerely,

Linda M. Magno
Director
Medicare Demonstrations Program Group
Office of Research, Development and Information

<u>Follow-up from Bidder's Conference</u>

<u>Question 1</u>:    Will the Centers for Medicare & Medicaid Services (CMS) establish an anti-mark-up rule between laboratories under the terms and conditions of the demonstration?

<u>Answer 1</u>:    Mark-up between laboratories may continue under the demonstration.

<u>Question 2</u>:    Can referring and reference laboratories share bid prices with each other if the referring and reference laboratories both are submitting bids?  Do both referring and reference laboratories have to submit bids individually to be declared winning laboratories under the demonstration?

<u>Answer 2</u>:    Each bidding laboratory must provide bid prices for all 303 demonstration test codes.  A referring laboratory may request a price list from a laboratory providing its reference testing.  Referral and reference laboratory relationships should be identified in Sections C (questions 4 and 5) of the application.

A laboratory firm expecting to receive annual payment less than $100,000 for demonstration tests provided to beneficiaries enrolled in Medicare fee-for-service (FFS) and residing in the competitive bidding area (CBA) is not required to submit a bid, but would be paid under the competitively set fee schedule.  Laboratories required to bid that choose not to submit a bid will be considered non-winning laboratories and will not be able to bill Medicare directly for demonstration tests provided to beneficiaries enrolled in Medicare FFS residing in the CBA.

<u>Question 3</u>:    Under the demonstration, CMS will exempt laboratories providing services exclusively to beneficiaries in nursing facilities or receiving home health services from being required bidders.  Does that exemption from bidding extend to other units associated with a nursing facility such as assisted living and independent living, for example?

<u>Answer 3</u>:    Laboratories providing services exclusively to beneficiaries residing in nursing homes or receiving home health services in the CBA will not be required to bid, and will be paid at the competitively set demonstration fee schedule for demonstration tests otherwise paid under the Part B Clinical Laboratory Fee Schedule (CLFS).  Laboratories that wish to provide services beyond beneficiaries residing in nursing homes or receiving home health service (such as for assisted living or independent care) in the CBA will be required to bid and win under the demonstration.

CMS is exempting laboratories providing services exclusively to nursing facilities from being required bidders, thereby making it easier for nursing facilities to continue to provide continuity of care.  In addition, laboratories providing both Part A and Part B laboratory services to nursing facilities would be able to continue existing business relationships.  Laboratories would not be at risk of losing Medicare Part A business as a result of the

demonstration and would be paid at the competitively set rate for demonstration tests otherwise paid under the Part B CLFS. Laboratories will also continue to receive payment for mileage, phlebotomy, and the existing payment under any schedule other than the Part B CLFS for those tests included in the demonstration.

Question 4:     Are hospital laboratories required to bid under the demonstration if the hospital is a foundation where the parent organization provides the facilities and staff for the clinics (including laboratory services)? What if the laboratory is licensed as an independent laboratory but the medical director(s) of the laboratories are part of a medical group?

Answer 4:     Laboratories that are enrolled with a Medicare carrier, intermediary, or A/B MAC and perform Part B clinical laboratory services as an independent laboratory or a hospital laboratory performing "nonpatient" services are subject to the demonstration regardless of their affiliation with other entities. Under the demonstration, a hospital laboratory would continue to submit a "nonpatient" Part B claims either to its fiscal intermediary (using a 14X Type of Bill) or an A/B MAC. An individual who is seen by hospital personnel on a day only for the sole purpose of specimen collection for clinical laboratory testing (whether on hospital premises or off-site) is considered a "nonpatient."

Question 5:     Will CMS make information on the number of beneficiaries in the CBA available? What about utilization information?

Answer 5:     Various Medicare enrollment tables such as national and state enrollment trends, state enrollment by aged, disabled and all, as well as county level enrollment are available at:  http://www.cms.hhs.gov/MedicareEnrpts

Question 6:     Will CMS provide total volume per test code for individual laboratories? Will CMS provide information on denied claims?

Answer 6:     No. CMS provided the total Medicare payment for demonstration tests provided to beneficiaries enrolled in FFS residing in the CBA to individual laboratories. A letter was sent to individual laboratories either located in the CBA and/or paid more than $25,000 annually for demonstration tests provided to beneficiaries enrolled in FFS residing in the CBA. Market test code volumes and weights for the entire CBA are provided on page 19 of the Bidder's Conference materials.

Question 7:     Can a laboratory participate in the demonstration if it enters the CBA market after the demonstration has started without having participated in the bidding process?

Answer 7:     A laboratory firm entering the CBA market and expecting to receive annual payment under the demonstration to exceed $100,000 is required to submit a bid during the bidding process as described in the Federal Register Notice (CMS 5045N) published on October 17, 2007. In this example, the laboratory would be considered a non-winning laboratory for the duration of the demonstration.

A laboratory firm entering the CBA market expecting to receive annual payment for demonstration tests that is less than $100,000 is not required to submit a bid, and would be paid under the competitively set fee schedule. In this example, a laboratory would be considered a passive laboratory under the demonstration.

Question 8:    What happens if a laboratory acquires another laboratory that is a winning laboratory under the demonstration? What happens if a laboratory acquires another laboratory that is a non-winning laboratory under the demonstration?

Answer 8:    The status of the laboratory under the demonstration will be defined by the laboratory firm ownership. In other words, a laboratory firm that is a winner under the demonstration and its acquired laboratory will remain a winning laboratory. A laboratory firm that is declared a non-winning laboratory because it failed to bid or submit a winning bid will remain a non-winning laboratory (including its acquired laboratory) under the demonstration. Should a laboratory firm that chose to be exempt from bidding as a small business acquire a laboratory during the demonstration period, the $100,000 annual payment threshold for demonstration tests provided under the demonstration will apply to the laboratory annual payment combined.

CMS will validate the ownership of a laboratory firm based on the Medicare enrollment information provided on the CMS-855b form.

Question 9:    Can a non-winning laboratory draw blood and bill Medicare directly?

Answer 9:    If a laboratory is enrolled in Medicare as an independent laboratory and is declared a non-winning laboratory under the demonstration, then the laboratory may not bill Medicare directly for test codes that are paid under the Part B CLFS, including for phlebotomy. Phlebotomy services that are provided by entities other than independent laboratories and paid under fee schedules other than the Part B CLFS are not included in the demonstration.

Question 10:    Can a laboratory refuse to provide a laboratory test for a Medicare beneficiary residing in the CBA?

Answer 10:    A laboratory that is enrolled as a Medicare supplier cannot legally refuse to provide services to a beneficiary based on payment.

Question 11:    What is the proposed timeline?

Answer 11:    The Bidder's Conference was held in San Diego on December 5, 2007. Bids are due by February 15, 2008. Winners selected on April 11, 2008. Payments made under the demonstration by July 1, 2008. (Question #28 in Appendix A of the Bidder's Package)

Question 12:    How will capacity be determined under the demonstration – and specifically during the bid evaluation process?

Answer:      Capacity is evaluated to guarantee that the projected demand for demonstration test codes will be met under the demonstration. The projected demand for demonstration test codes will be determined from historical baseline utilization data for demonstration test codes trended forward by a factor reflecting the anticipated increase in utilization of demonstration test codes during the demonstration period. Both baseline utilization and the trend factor will be estimated from historical Medicare claims and enrollment data for the San Diego MSA.

Capacity will be determined using information provided by applicants, along with Medicare administrative claims data. Each applicant is required to report current annual test volume and maximum annual test capacity, which will be used to help determine each applicant's capacity.

In addition to the information that applicants provide, CMS will use Medicare paid claims to examine the historical volumes actually supplied to the San Diego MSA Medicare fee-for-service market by applicants. Historical volumes supplied to the National Medicare fee-for-service population will also be used. The Medicare claims data and the CLIA database will serve as additional sources of information, and as a validation of the capacities reported by applicants.

The multi-dimensional selection process is based on the competitive prices submitted <u>and</u> quality of care <u>and</u> access to care.  There are several dimensions to access to care, including capacity, geographic coverage, financial strength and stability, subcontracting and referral relationships, special populations and providers, expansion plans, and multiple winners.  The process allows for capacity to be greater than the projected demand so, should a laboratory discontinue participation in the demonstration, beneficiary access to quality laboratory services would not be impacted. In addition, the application allows a laboratory to indicate whether or not there is interest in or capacity to expand service to additional geographic areas under the demonstration.

(Note: Laboratories participating in the demonstration must be a Medicare enrolled supplier.)

*Last updated January 11, 2008*

UNITED STATES
DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

\# 146923        — BH

January 29, 2008
10:47:33

| Civ Fil Non-Pris
USAO #.: 08CV0170 CIVIL FILING
Judge..: THOMAS J WHELAN          $350.00 CK
Amount.:
Check#.: BC# 66179

Total-> $350.00

FROM: SHARP HEALTHCARE V. LEAVITT
CIVIL FILING

**ORIGINAL**

JS 44 (Rev. 12/07)    **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Sharp Healthcare, Internist Laboratory and Scripps Health

## DEFENDANTS
Michael Leavitt, Secretary of the Department of Health and Human Services

**(b)** County of Residence of First Listed Plaintiff **San Diego**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Patric Hooper (SBN 57343)
Jordan B. Keville (SBN 271868)
HOOPER, LUNDY & BOOKMAN, INC.
1875 Century Park East, Suite 1600
Los Angeles, CA 90067
(310) 551-8111

Attorneys (If Known)

**'08 CV 0170 W POR**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury— Med. Malpractice
- ☐ 365 Personal Injury— Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
  **Habeas Corpus:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus - Alien Detainee
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☒ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Administrative Procedure Act, 5 U.S.C. §§553, 706; U.S. Constitution, Amend. 5

Brief description of cause: Challenge to policies of Secretary of Health and Human Services as procedurally and substantially invalid under Administrative Procedures Act.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE: Jan. 28, 2008    SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT # 146923    AMOUNT $350   1/29/07 SH    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

American LegalNet, Inc.
www.FormsWorkflow.com