PATRIC HOOPER  (State Bar No. 57343)
JORDAN KEVILLE  (State Bar No. 217868)
ABIGAIL WONG  (State Bar No. 245652)
HOOPER, LUNDY & BOOKMAN, INC.
1875 Century Park East, Suite 1600
Los Angeles, California  90067-2517
Telephone: (310) 551-8111
Facsimile: (310) 551-8181
E-Mail:  ph ooper@health-law.com

Attorneys for Plaintiffs SHARP
HEALTHCARE, INTERNIST
LABORATORY and SCRIPPS HEALTH

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARP HEALTHCARE;  INTERNIST LABORATORY; AND SCRIPPS HEALTH,<br><br>        Plaintiffs,<br><br>    vs.<br><br>MICHAEL LEAVITT, SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>        Defendant. | CASE NO. 08 CV 0170 WPor<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER / ORDER TO SHOW CAUSE**<br><br>[filed concurrently with Application for Temporary Restraining Order; Declarations in Support thereof; [Proposed] Orders thereon] |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1042170.5

## TABLE OF CONTENTS                                                        Page

I.    INTRODUCTION .................................................................................................1

II.   FACTUAL AND LEGAL BACKGROUND ........................................................2

      A.    Existing Medicare Policy on Clinical Laboratory Services ....................2

      B.    The Medicare Demonstration Project .....................................................4

      C.    The Plaintiffs ...........................................................................................9

III.  ARGUMENT ......................................................................................................11

      A.    Judicial Review is Required Under 5 U.S.C. § 701, *et seq.* ...................11

      B.    Grounds for Injunctive Relief Exist .....................................................12

      C.    Plaintiffs Will Be Irreparably Harmed if the Demonstration Project is Not
            Immediately Enjoined ...........................................................................12

      D.    The Balance of the Hardships Tips Sharply in the Plaintiffs' Favor .......16

      E.    The Policies Challenged by Plaintiffs Were Required to be Promulgated
            Under the APA .......................................................................................17

      F.    The Secretary's Policy of Requiring Bid "Losers" to Treat Medicare Patients
            Is Unlawful ............................................................................................19

      G.    The Secretary Has Violated the Statute by Requiring Bids on Collection and
            Handling .................................................................................................20

      H.    Several of the Secretary's Demonstration Project Policies are Arbitrary and
            Capricious ..............................................................................................21

            1.    The Secretary Is Not Exempting All Laboratories That Have "Face
                  to Face" Encounters With Patients From Bidding .......................21

            2.    The Secretary's Policies Unfairly Determine the Reimbursement that
                  Will be Paid to Laboratories Focusing on SNF and ESRD Patients ...........22

            3.    "Winning" Laboratories Will Not Know What They Are Going to
                  Be Reimbursed .............................................................................23

      I.    The Current Bidding Mechanism Does Not Adequately Protect Small
            Businesses ..............................................................................................23

IV.   CONCLUSION ...................................................................................................25

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

## TABLE OF AUTHORITIES <span style="float:right">Page</span>

### Federal Cases

*Abbott Laboratories v. Gardner*,
   387 U.S. 136 (1967) ........................................................................11

*Beno v. Shalala*,
   30 F.3d 1057 (9th Cir. 1994) ..........................................................11

*Kootenai Tribe of Idaho v. Veneman*,
   313 F.3d 1094 (9th Cir. 2002) ........................................................12

*Los Angeles Memorial Coliseum v. National Football League*,
   634 F.2d 1197 (9th Cir. 1980) ........................................................12

*Mahoney v. Babbitt*,
   113 F.3d 219 (D.C. Cir. 1997) ........................................................12

*Mt .Diablo Hospital District v. Bowen*,
   860 F.2d 951, fn. 6 (9th Cir. 1988) ............................................1, 18

*National Association of Psychiatric Treatment Ctrs. v. Weinberger*,
   658 F. Supp. 48 (D. Colo. 1987) ....................................................11

*National Association of Psychiatric Treatment Ctrs. v. Weinberger*,
   909 F.2d 1378 (10th Cir. 1990) ......................................................12

*Pride International, LLC v. U.S.*,
   64 Fed. Cl. 754 (2005) ....................................................................24

*Psychiatric Treatment Centers v. Weinberger*,
   661 F. Supp. 76 (D. Colo. 1986) ..............................................1, 19

*Regents of the University System of Georgia v. Carroll*,
   338 U.S. 586, 70 S. Ct. 586, 94 L. Ed. 363 (1950) ......................20

### United States Constitution

U.S. Const. amend. V ..............................................................................20

### Federal Statutes

5 U.S.C. § 553 ........................................................................................18

5 U.S.C. § 601 ..................................................................................23, 24

5 U.S.C. § 602 ..................................................................................23, 24

5 U.S.C. § 603 ..................................................................................23, 24

5 U.S.C. § 609 ..................................................................................23, 24

5 U.S.C. §§ 701-706 ..............................................................................11

HOOPER, LUNDY & BOOKMAN, INC.<br>1875 CENTURY PARK EAST, SUITE 1600<br>LOS ANGELES, CALIFORNIA 90067-2517<br>TEL: (310) 551-8111 • FAX: (310) 551-8181

ii         08-CV-0170 W POR

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

## TABLE OF AUTHORITIES                                                Page

15 U.S.C. § 631 ..............................................................................................23

15 U.S.C. § 632 .........................................................................................23, 24

42 U.S.C. § 1395 ...........................................................................................2, 3

42 U.S.C. § 1395hh ..........................................................................................18

42 U.S.C. § 1395l(h) ................................................................................3, 4, 21

42 U.S.C. § 1395w-3 .................................................................................*passim.*

### Federal Regulations

13 C.F.R. § 121.101 .........................................................................................23

13 C.F.R. § 121.104 .........................................................................................24

### Other

66 Fed. Reg. 58788-58890 (November 23, 2001).............................................4

72 Fed. Reg. 58856, 58857 (October 17, 2007)..............................................24

72 Fed. Reg. 65581 (November 21, 2007).........................................................7

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

## I.    **INTRODUCTION**

Plaintiffs Sharp HealthCare ("Sharp"), Internist Laboratory ("Internist") and Scripps Health ("Scripps") need immediate relief from this Court to prevent Defendant, the Secretary of the Department of Health and Human Services ("Secretary"), from rushing to implement a new Medicare "demonstration project" that will drastically affect and adversely alter the delivery of clinical laboratory services in San Diego.    The Secretary has not promulgated the policies for implementing this demonstration project through the Administrative Procedure Act ("APA") rulemaking requirements and therefore it is not surprising that the policies are not only ill-conceived and unfair, but are substantively invalid under fundamental principles of administrative law.    Moreover, as explained below, if the Secretary is permitted to go forward with these invalid policies it will result in extensive irreparable harm to each of the Plaintiffs and many third-parties.

Where APA rulemaking procedures are ignored, as here, agencies often disregard concerns expressed by Congress and fail to consider other relevant factors, resulting in ill-considered and arbitrary substantive policies.[1]    Fortunately, federal courts are required to prohibit agencies from circumventing APA rulemaking procedures. *See, Psychiatric Treatment Centers v. Weinberger*, 661 F. Supp. 76 (D. Colo. 1986), in which the federal district court preliminarily enjoined the Department of Defense from implementing major policy changes in how residential treatment centers are reimbursed under the CHAMPUS program because of the failure to implement the changes through APA rulemaking requirements.

This is precisely the type of case in which a Court should step in and force the

---

[1] Because of the complexity of health care policy making, the Secretary has recognized for more than 35 years the need to establish Medicare program policy through the APA notice and comment process.  *See Mt. Diablo Hosp. Dist. v. Bowen*, 860 F.2d 951, 956-57, fn. 6 (9th Cir. 1988).

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR  TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

1  Secretary to follow the APA.  The demonstration project calls for the majority of
2  clinical laboratories in the San Diego area to compete against each other to continue
3  to participate in the Medicare program.  These laboratories must submit bids to the
4  Secretary, which currently are due February 15, 2008.  The Secretary will then
5  select "winners" from among the laboratories that submit bids.  "Losers" will no
6  longer be paid for services rendered to Medicare beneficiaries residing in the
7  demonstration project area.

8      The Secretary's demonstration project policies are convoluted and continually
9  evolving.  He effectively has been making major policy decisions with respect to
10 how the demonstration project will operate in an ad-hoc, on-the-fly manner.  As a
11 result, many of these policies are arbitrary, capricious and inconsistent with federal
12 law.  For example, as recently as last month, the Secretary announced for the first
13 time a policy that requires providers who are not "winning bidders" to continue to
14 furnish clinical laboratory services to Medicare patients even though as bid "losers"
15 they will be paid nothing for such services.  This new policy, which was issued by
16 the Secretary in a form of questions and answers following a "Bidder's conference,"
17 violates the takings provision of the Constitution and is contrary to the basic
18 Medicare statutes requiring Medicare to pay providers for services furnished to
19 Medicare beneficiaries.

20     Simply put, the demonstration project is wreaking havoc among laboratories,
21 physicians and beneficiaries.  The project threatens to drive laboratories that provide
22 high quality, needed services, out of business for the sake of an experiment.  Most
23 respectfully, the project therefore should be enjoined until the Secretary complies
24 with all applicable procedural and substantive requirements of the law.

25 **II.    FACTUAL AND LEGAL BACKGROUND**

26      **A.    Existing Medicare Policy on Clinical Laboratory Services**

27     Title XVIII of the Social Security Act establishes a federally-subsidized
28 health insurance program for persons who are least 65 years of age or disabled,

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1  known as the Medicare program.  42 U.S.C. §§ 1395, *et seq.*  Part A of the Medicare

2  program provides insurance against the cost of certain institutional health services,

3  such as services rendered by hospitals, nursing homes or hospice facilities.  Part B is

4  a voluntary insurance program that covers a portion of the costs of certain physician

5  services, nonphysician services, outpatient physical therapy, and other medical

6  health care services, including clinical diagnostic laboratory services.

7      Clinical laboratory services are critical to the successful diagnosis and

8  treatment of illnesses and diseases.  Medicare beneficiaries, because of their ages

9  and disabilities, require a disproportionately high level and quantity of such

10  services.  The medical specialty of laboratory medicine includes thousands of

11  clinical diagnostic laboratory tests.  A patient often requires several tests to be

12  performed sequentially in a timely manner.  Not all clinical laboratories perform all

13  such tests.  Indeed, many laboratories, including independent clinical laboratories

14  like Internist and physician office laboratories, perform only a portion of the tests

15  that are the subject of the demonstration project and must therefore refer laboratory

16  tests to outside specialty "reference laboratories" depending on the particular needs

17  of their patients.

18      The choice of a clinical laboratory by a physician and the physician's patient

19  is based on numerous factors, including quality and service.  Many laboratory tests

20  must be performed on an urgent basis, which adds to the many factors that must be

21  considered by a patient's physician with respect to the choice of a clinical

22  laboratory.  Laboratory services are not interchangeable commodities, like medical

23  equipment.  Rather, different laboratories offer different reasons why physicians and

24  their patients might choose to use them.  Moreover, in the case of hospital patients it

25  is critical that the hospital laboratory be available to follow the patient throughout

26  the patient's treatment, including any outpatient treatment and post-hospital

27  treatment.

28      Historically, Medicare has paid for clinical laboratory services furnished on a

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

1 fee-for-service basis under Part B of the Medicare program in accordance with fee

2 schedules originally established in 1984. *See* 42 U.S.C. § 1395l(h). The laboratory

3 fee schedules, which are periodically updated, are commonly known as the

4 Medicare Part B fee schedules, and apply not only to independent clinical

5 laboratories and physician office laboratories, but also to hospital laboratories,

6 which perform testing for hospital outpatients and non-hospital patients. (Hospital

7 laboratory services furnished to hospital inpatients are paid under Part A of the

8 Medicare Program.)

9     As indicated above, the Secretary has committed himself to developing

10 Medicare policies governing the Medicare Part B fee schedules and coverage for

11 clinical laboratory testing through compliance with the Notice and Comment

12 Rulemaking requirements of the APA. *See, e.g.*, 66 Federal Register ("Fed. Reg.")

13 58788-58890. However, as discussed below, he has ignored these rulemaking

14 requirements in developing the substantive policies he is using to implement the

15 demonstration project at issue.

16     **B.    The Medicare Demonstration Project**

17     Section 302(b) of the Medicare Prescription Drug Improvement, and

18 Modernization Act of 2003 (Public Law 108-173) requires the Secretary to conduct

19 a demonstration project on the application of competitive acquisition for clinical

20 laboratory services that would otherwise be paid under the Part B fee schedules of

21 42 U.S.C. § 1395l(h). *See*, 42 U.S.C. § 1395w-3(e), entitled "Demonstration Project

22 for Clinical Laboratory Services."

23     The governing statute specifically requires the demonstration project to

24 include tests paid under the Medicare Part B clinical laboratory fee schedule and

25 excludes entities that have a "face-to-face" encounter with patients (such as

26 physician office laboratories and hospitals) and excludes PAP smears and colorectal

27 cancer screening tests 42 U.S.C. § 1395w-3(e).

28     The controlling statute also incorporates the provisions of other subsections of

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1   42 U.S.C. § 1395w-3 dealing with Medicare competitive acquisition programs in

2   general, including the program requirements listed at 42 U.S.C. § 1395w-3(b). The

3   latter subsection addresses issues such as the criteria for awarding contracts, the

4   term of such contracts, and the number of contractors. Importantly, under § 1395w-

5   3(b)(6) (D), the Secretary is required to ensure that "small suppliers" of health care

6   items and services have an opportunity to be considered for participation in a

7   competitive acquisition program.

8       While Congress has authorized the Secretary to waive certain provisions of

9   the Federal Acquisition Regulation to implement competitive acquisition programs,

10  *see* 42 U.S.C. § 1395w-3(a)(1)(C), Congress has not authorized the Secretary to

11  dispense with his longstanding compliance with the rulemaking requirements of the

12  APA.

13      The enabling statute does not establish a time frame by which the Secretary

14  must implement the demonstration project. *See* 42 U.S.C. § 1395w-3(e). The

15  statute states only that the Secretary was to have submitted an initial progress report

16  to Congress regarding the demonstration project by December 31, 2005. *See* 42

17  U.S.C. § 1395w-3(e)(3)(A). The Secretary did not meet this deadline. Rather, his

18  initial report to Congress regarding the demonstration project was delivered in April

19  2006. At that time, the Secretary advised Congress that he had hired a private

20  company, Research Triangle Institute, International, ("RTI"), to design the program.

21      RTI held a meeting to discuss the planned design of the project in

22  Massachusetts in August 2005, and the Secretary held a conference in October 2006,

23  and again, on July 16, 2007, to discuss the project. Attendees of these various

24  conferences were not given a particularly meaningful opportunity to comment on

25  the design of the project. Further, the Secretary did not identify the San Diego-

26  Carlsbad-San Marcos area as the site of the project until October 17, 2007. *See*

27  October 17, 2007, Federal Register Notice, copy attached as Exhibit B to the

28  Complaint, which sets forth certain details regarding the laboratory demonstration

project, including:

    1.    The objective of the demonstration project is to determine whether competitive bidding can be used to provide Part B clinical laboratory services at fees below current Medicare payment rates while maintaining quality and access to care;

    2.    The three-year demonstration project will cover tests provided to beneficiaries enrolled in the traditional fee-for-service Medicare program who reside in the San Diego-Carlsbad-San Marcos area;

    3.    Certain laboratories are required to bid ("required bidders"), *i.e.*, those that supply or expect to supply at least $100,000.00 annually in demonstration tests to Medicare beneficiaries residing in the competitive bidding area;

    4.    Required bidders who bid and win will be paid under one demonstration fee schedule for services furnished to Medicare beneficiaries residing in the competitive bid area;

    5.    Some laboratories are not required to bid but have the option to bid. If such non-required bidders do not bid, or bid and win, they will be paid under the demonstration fee schedule for the duration of the demonstration; and

    6.    Non-required bidders who choose to bid but do not win, like required bidders that do not win, will receive no Medicare payment for services provided to beneficiaries residing in the competitive bid area for the duration of the demonstration project period.

On October 27, 2007, the Secretary announced a "Bidder's Conference" to be held in the San Diego area on October 31, 2007. However, due to the state of emergency related to the wildfires in Southern California, the Secretary postponed the bidders' conference and rescheduled it for December 5, 2007. *See* 72 Fed. Reg. 65581 (November 21, 2007).

Only laboratories located in the demonstration area and/or serving beneficiaries in the demonstration area were invited to attend the Bidder's

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

1  Conference. Medicare participating physicians and Medicare beneficiaries were not

2  involved. The Secretary's delegate, the Centers for Medicare and Medicaid Services

3  ("CMS"), and its contractor, RTI, were present to answer questions regarding the

4  bidding process. At the Conference, CMS reiterated the elements of the bidding

5  process described above.

6  CMS also discussed at the bidders' conference the laboratories that are exempt

7  from bidding. Again, laboratories that supply less than $100,000.00 annually in

8  demonstration tests to Medicare beneficiaries in the demonstration area need not

9  bid. Laboratories providing services exclusively to beneficiaries who suffer from

10  end stage renal disease ("ESRD"), and laboratories providing services exclusively to

11  beneficiaries in nursing facilities or receiving home health services also are exempt.

12  Although not required to bid, exempt laboratories nevertheless will be impacted by

13  the bidding process. Exempt laboratories, including those that service nursing

14  facilities exclusively, are to be paid under the competitively set demonstration fee

15  schedule unless they choose to bid and lose. If they lose, they will be paid nothing

16  for their services but, as explained below, will still be required to provide services if

17  presented with laboratory specimens.

18  Under the bidding process, laboratories must submit bids for each of 303

19  different laboratory tests and also must bid on a fee for the collection and handling

20  of laboratory specimens. The 303 laboratory tests represent approximately 99% of

21  the Medicare expenditures for laboratory fee-for-services tests. However, there are

22  very few laboratories that provide all of the 303 tests, which will require those

23  laboratories to contract with other laboratories for those tests they do not perform.

24  Only bids received on or before February 15, 2008, will be considered by

25  CMS and RTI. Further, once bids are submitted, CMS will deem them final and

26  does not intend to consider information submitted after the initial bid deadline.

27  Ultimately, CMS and RTI will establish a "competitive financial range" of bids

28  based on composite bid prices, laboratory test capacity and projected demand for

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1    tests in the competitive bid area. Bids will purportedly be evaluated thereafter based
2    on CMS' determination of the "best value for the Medicare program" based on price
3    and nonprice criteria, including quality, access, etc.

4       The December 5, 2007, Bidder's Conference was the one and only conference
5    held for laboratories in San Diego, the competitive bid area. As mentioned above,
6    only laboratories were invited the conference, and thus patients, physicians, and
7    other persons affected by the demonstration project were not invited. The Bidder's
8    Conference represented the first time that any parties impacted by the demonstration
9    project were given any meaningful, substantive interface with CMS and RTI
10    regarding the project. However, at that point, CMS and RTI had largely finalized
11    their design of the project and their plans for implementing. Not surprisingly, in
12    light of the complexity of the project, questions arose during the December 5, 2007,
13    bidders' conference, which resulted in CMS issuing a written "follow up from
14    bidders' conference," a copy of which is attached as Exhibit D to the Complaint.

15       Among the many questions posed during the bidding conference was whether
16    a hospital laboratory is required to bid under the demonstration project if the
17    hospital is a foundation where the parent organization provides the facilities and
18    staff for medical clinics. According to CMS (Exhibit D, Ans. 4), laboratories that
19    are enrolled in Medicare and perform Part B clinical laboratory services such as
20    an independent laboratory or a hospital laboratory performing non-patient services
21    are subject to the demonstration project regardless of their affiliation with other
22    entities. As a result, if such laboratories do more than $100,000.00 worth of testing
23    for nonpatients, they must be considered a required bidder.

24       Also, as indicated at the outset, in response to the question of whether a
25    laboratory could refuse to provide testing for a Medicare patient residing in the
26    competitive bid area, CMS answered "a laboratory that is enrolled as a Medicare
27    supplier cannot legally refuse to provide services to a Medicare beneficiary based on
28    payment." In other words, a Medicare-certified laboratory must furnish services to a

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

1  beneficiary even if the laboratory is a nonwinner and will be paid nothing for such

2  services. *See* question and answer no. 10, Exhibit D to the Complaint.

3  ## C.    **The Plaintiffs**

4  The Plaintiffs in the present action all provide clinical laboratory services in

5  the San Diego area. Sharp and Scripps are both private, non-profit organizations

6  that operate separate health care delivery systems. *See* Declaration of Donna

7  Thompson ("Thompson Decl.") ¶ 4; Declaration of Cindy Wisner ("Wiesner Decl.")

8  ¶ 4. The Sharp and Scripps systems both offer a fully integrated network of heath

9  care services, which include acute care hospitals, medical groups, outpatient clinics

10  and related ancillary support services. Thompson Decl. ¶ 4; Wiesner Decl. ¶ 4.

11  Included among the ancillary services furnished by the Sharp and Scripps networks

12  are clinical laboratory services. Sharp and Scripps operate laboratories not only for

13  the benefit and use of their hospital patients, but also operate laboratories that

14  service non-hospital patients.  Thompson Decl. ¶ 5; Wiesner Decl. ¶¶ 5 – 6.

15  Between the two systems, these laboratories have hundreds of employees and

16  furnish services for the benefit of thousands of patients, including a substantial

17  portion of Medicare fee-for-service beneficiaries. Thompson Decl. ¶ 5; Wiesner

18  Decl. ¶¶ 5 -6.

19  There are significant advantages, from a clinical perspective, of having

20  laboratory services incorporated into a larger network of health care delivery. When

21  physicians affiliated with either the Scripps or Sharp systems order a laboratory test

22  on one of their non-hospital patients from a laboratory that is part of the system, the

23  test is performed, and the results returned, much more quickly than would be the

24  case if the test had to be referred to an outside laboratory. Thompson Decl. ¶ 8 ;

25  Wiesner Decl.¶ 12.  This saved time can be vitally important in the case of

26  emergency or "stat" laboratory tests or when a routine laboratory test reveals a

27  potentially dangerous level for a "critical" item. Thompson Decl. ¶ 8; Wisner Decl.

28  ¶¶ 12, 14. In the Scripps and Sharp systems, if one of the laboratories were to detect

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

1    a critical blood level, the relevant patient's treating physician would be notified

2    immediately, which would not be the case if the blood test was performed by an

3    outside reference laboratory.  Wiesner Decl. ¶ .14.  Fast laboratory results are also

4    crucial for patients serviced in the Sharp and Scripps urgent care clinics.  *See*

5    Wiesner Decl. ¶ 13.

6    The laboratories operated by both Sharp and Scripps provide what can fairly

7    be characterized as "face-to-face" encounters with patients.  Thompson Decl. ¶ 14;

8    Wiesner Decl. ¶ 8.  Nevertheless, it was made evident after the bidder's conference

9    that, since the Sharp and Scripps clinical laboratories each provide more than

10   $100,000.00 per year in demonstration project testing codes to Medicare

11   beneficiaries, they must submit bids in order to continue to service Medicare

12   patients under the demonstration project.  Thompson Decl. ¶ 14; Wiesner Decl. ¶ 8.

13   Internist is a family owned and operated "community" laboratory.  Located in

14   Oceanside, Internist has been in operation for approximately eighteen years.

15   Declaration of Gary Stevens ("Stevens Decl.") ¶ 2.  Internist currently has 8

16   employees, not including the husband and wife team that runs the business, and a

17   consulting pathologist.  Stevens Decl. ¶ 2.  Approximately 65% of the laboratory

18   tests that Internist performs on an annual basis are for Medicare beneficiaries.  As a

19   result, Internist depends on its Medicare participation to remain in business.  Stevens

20   Decl. ¶ 7.

21   Unlike some competing clinical laboratories, Internist has a direct relationship

22   with many of the patients for whom it provides laboratory tests.  The patients come

23   directly to the Internist offices to have their blood drawn for the purposes of testing.

24   Stevens Decl. ¶¶ 3 -5.  Since many of these patients have medical conditions that

25   require laboratory testing on a fairly regular basis, they regard Internist simply as

26   one of their health care providers, like their physician.  *See id.*  These patients

27   depend on Internist for its friendly, personal service, comfortable atmosphere and

28   prompt turn-around on test results.

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

1  Although Internist is a small, local laboratory, it provides a sufficient volume
2  of testing that it is a required bidder under the demonstration project. However,
3  Internist only provides roughly half of the 303 tests for which bidders must furnish
4  prices in their applications. Stevens Decl. ¶ 11  Internist therefore has requested
5  pricing information from other reference laboratories on the tests it does not perform
6  so that it can complete its demonstration project bid application. *See id.* To date,
7  Internist has not received useful pricing information from any of the reference
8  laboratories it has contacted. *See id.*

9  ## III.  ARGUMENT

10  ### A.  Judicial Review is Required Under 5 U.S.C. § 701, *et seq.*

11  Review of agency action initiated by aggrieved persons will not be cut off
12  unless there is persuasive reason to believe that such was the purpose of Congress.
13  The presumption favoring judicial review of administrative action can only be
14  overcome by a clear showing of explicit or implicit Congressional intent to preclude
15  such review. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967).

16  In fact, even when the Secretary engages in demonstration projects, his
17  decision-making is subject to court review under the APA, 5 U.S.C. §§ 701-706.
18  *See Beno v. Shalala*, 30 F.3d. 1057, 1066-1067 (9th Cir. 1994), holding that the
19  Secretary's Demonstration Project in that case was subject to review for compliance
20  with applicable laws and regulations and nonarbitrariness. The mere fact that an
21  enabling statute might give an agency considerable discretion does not make the
22  agency action unreviewable. *Id.*

23  Under circumstances similar to those here, in *National Association of*
24  *Psychiatric Treatment Ctrs. v. Weinberger,* 658 F. Supp. 48, 51-53 (D. Colo. 1987),
25  the federal court, relying on the presumption in favor of judicial review of
26  administrative agency action, asserted jurisdiction to review a change in payment
27  policy under the CHAMPUS health care program, notwithstanding the Department
28  of Defense's arguments that Congress gave the Department of Defense so much

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

1  discretion that there was "no law to review."[2]

2  **B.    Grounds for Injunctive Relief Exist**

3  As this Court is well aware, to obtain temporary injunctive relief, a moving

4  party must demonstrate either (a) a combination of probability of success on the

5  merits and the possibility irreparable harm; or (b) that serious questions are raised

6  and the balance of hardships tips sharply in the moving party's favor. *Los Angeles*

7  *Memorial Coliseum v. National Football League*, 634 F.2d 1197, 1201 (9th Cir.

8  1980).

9  When, as here, the violations of the law are clear, and therefore a plaintiff is

10  likely to prevail on the merits of its challenge, the showing regarding the other

11  requirements for injunctive relief need not be as compelling as otherwise might be

12  the case.  Indeed, it is enough that there is simply a possibility of irreparable harm.

13  *See Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1124 (9th Cir. 2002)

14  (where it is quite likely a plaintiff will prevail on the merits of the challenges to an

15  agency's policies and practices, the plaintiff only has to make a minimal showing of

16  harm to justify a preliminary injunction).

17  For the reasons discussed below, Plaintiffs have demonstrated a strong

18  likelihood that irreparable harm will occur if the implementation of the

19  demonstration project is not temporarily enjoined and have also shown a strong

20  probability of prevailing on the merits of their arguments.

21  **C.    Plaintiffs Will Be Irreparably Harmed if the Demonstration**

22  **Project is Not Immediately Enjoined**

23  The evidence shows that if the Secretary is permitted to implement the

24  _____

25  [2]   The Tenth Circuit vacated the decision of the district court, *see* 909 F.2d. 1378

26  (10th Cir. 1990).  However, the reasoning of vacated decisions may nevertheless be
    considered by other courts. *See Mahoney v. Babbitt*, 113 F.3d 219, 222 (D.C. Cir.

27  1997).

28

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

1   demonstration project under the current terms, it will harm the Plaintiffs, their

2   employees and the patients who rely on them in myriad ways.  First and foremost,

3   plaintiff Internist faces a significant threat of being forced out of business.  As

4   mentioned above, with only roughly two weeks to go until the bid submission

5   deadline, Internist has not received pricing information from reference laboratories

6   sufficient to bid on the demonstration laboratory tests it does not perform.  Stevens

7   Decl. ¶ 11   Unless circumstances change soon, in order to avoid submitting an

8   incomplete application, the best Internist will be able to do is to bid the current

9   Medicare fee schedule rates.  Stevens Decl. ¶ 13.  Since the announced purpose of

10  the demonstration project is to determine if competitive bidding is a viable method

11  for furnishing services below current fee schedule rates, Internist almost certainly

12  will be pricing the tests higher than its competitors.  *See id.*

13      Internist cannot survive the loss of its Medicare business.  Virtually no

14  company can withstand losing the source of 65% percent of its revenue, which is

15  exactly what will happen to Internist when it fails to win under the bidding process.

16  Without Medicare reimbursement, the laboratory will be forced to shut down.

17  Stevens Decl. ¶ 15.  The company's eight employees will be forced to look for other

18  jobs and the proprietors likely have to look for an entirely new occupation.  Stevens

19  Decl. ¶¶ 15, 16.

20      Further, the patients who have come to depend on Internist for laboratory

21  services and who have developed personal relationships with the laboratory, will

22  have their health care disrupted.  These patients, who have received no notice or

23  guidance from the Secretary regarding the demonstration project, will have to figure

24  out on their own where else they can go for laboratory services.  *See* Declaration of

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

1   C. W. ("C.W. Decl.") ¶¶ 6, 9.[3]   Assuming they can find another laboratory that is a

2   "winner," the patients may have to travel much further than they do currently.  C.W.

3   Decl. ¶ 9.  More importantly, the patients will not want to be treated by another

4   laboratory as they have decided to get care from Internist for a reason.  C.W. Decl. ¶

5   10.  Internist's patients therefore are facing an abrupt, unwanted disruption in the

6   health care services they are accustomed to receiving.  This kind of disruption would

7   be upsetting for anyone, but particularly so for seniors with chronic medical

8   conditions. *Id.*

9        Both Sharp and Scripps have serious reservations regarding whether they will

10  prevail as "winners" in the demonstration project bidding process.  Thompson Decl.

11  ¶ 12; Wiesner Decl. ¶ 9.  Like Internist, neither Sharp nor Scripps will be able to

12  compete on price alone against some other laboratories with respect to many of the

13  services covered under the demonstration project.  Thompson Decl. ¶ 12; Wiesner

14  Decl. ¶ 9.  While CMS is supposed to consider factors other than price in deciding

15  the winners, given the currently amorphous nature of what those factors are and how

16  they will be weighted, no laboratory can have any level of comfort that the other

17  factors it can offer will be enough to overcome more favorable pricing offered by

18  competitors.  Thompson Decl. ¶ 13; Wiesner Decl. ¶ 10.

19       Sharp is so concerned about the bid process that, as soon as the bids are

20  submitted on February 15, it will start to evaluate whether to close some of its blood

21  drawing stations.  *See* Thompson Decl. at ¶ 16.  If Sharp chooses to close certain

22  drawing stations in anticipation of losing its Medicare business, the employees that

23  man these sites will find themselves out of work.  Thompson Decl. ¶ 16.  If Sharp

24  does indeed fail to win through the bidding process, it will certainly close these

25  _____

26  [3] The Internist patient providing the declaration is identified by initials only out of

27  patient confidentiality concerns.

28

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1    drawing stations and, in fact, likely will shut down all a significant component of its

2    non-hospital laboratories. Thompson Decl. ¶¶ 16, 17.   Sharp simply cannot operate

3    these laboratories on the same scale without being eligible to receive Medicare fee-

4    for-service reimbursement.  Thompson Decl. ¶ 17.

5    Scripps is in a similar situation.  Failure to achieve "winner" status as part of

6    the demonstration project will mean a significant reduction in the laboratory

7    services Scripps currently offers.  Specifically, Scripps estimates that it will have to

8    offset the revenue loss from laboratory services through employee layoffs.  Wiesner

9    Decl. ¶ 11 .  A reduction of services of that nature would leave numerous people

10   without jobs.

11   The elimination of Scripps, Sharp or both from the market for Medicare

12   laboratory services would have a serious, adverse impact on patient care in San

13   Diego.  As explained above, because the Scripps and Sharp laboratories are part of

14   integrated medical networks, the communication of critical patient health

15   information between the laboratories and clinicians is fast, efficient and streamlined.

16   Thompson Decl. ¶ 8; Wiesner Decl. ¶ 12.  Physicians are provided with, or can

17   access, critical laboratory results in an extremely timely manner and thereby quickly

18   make informed treatment decisions.  Thompson Decl. ¶¶ 8 – 10; Wiesner Decl. ¶¶

19   12, 13, 15, 18, 19.  This process will be slowed considerably if Sharp and Scripps

20   need to refer laboratory services for non-hospital patients to outside laboratories.

21   Thompson Decl. ¶¶ 18, 19; Wiesner Decl. ¶¶ 12, 13, 15, 18, 19.

22   Moreover, the involvement of another party in the testing and treatment

23   process necessarily has the potential to adversely impact quality control.  Thompson

24   Decl. ¶ 18.  For example, the way the Sharp and Scripps systems currently operate,

25   laboratory test results are communicated by the laboratory computers directly into a

26   patient's electronic medical record.  *See* Thompson Decl. ¶ 10; Wiesner Decl. ¶ 15.

27   In contrast, if Sharp and Scripps are forced to refer laboratory services out,

28   laboratory test results will have to be input manually or semi-manually into a

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

1  patient's medical record after Sharp and Scripps receives the results back from the

2  reference laboratories.  The manual or semi-manual entry of complicated test results

3  into the medical record greatly increases the possibility that data will get recorded

4  incorrectly.  Thompson Decl. ¶¶ 18, 19; Wiesner Decl. ¶ 15.  It is not difficult to

5  envision such an error having disastrous results for a patient.

6  The outsourcing of laboratory services for non-hospital patients within the

7  Scripps and Sharp systems potentially has other implications with respect to quality

8  of care.  Many types of laboratory tests are most valuable when performed

9  repeatedly over time, thereby allows physicians to observe changes or trends.  *See*

10  Wiesner Decl. ¶ 19.  In order to make accurate and appropriate observations, it

11  therefore is important that laboratory tests be performed in a consistent manner.

12  This is unlikely to be the case when tests are performed by more than one

13  laboratory.  Different laboratories perform the same tests in different ways; they

14  often have different methodologies and different normal ranges, to provide two

15  examples.  *See id.*  For that reason, laboratory test results from different laboratories,

16  even for the same test, cannot be trended.  *See id.*

17  Currently, there is consistency within the Scripps and Sharp systems with

18  respect to laboratory services for Medicare beneficiaries.  Laboratory tests are

19  performed in the same manner for patients in the inpatient hospital, outpatient

20  hospital and non-hospital settings.  Wiesner Decl. ¶ 19.  This consistency will fall by

21  the wayside if Scripps and Sharp are not declared winners under the demonstration

22  project.  Laboratory services for Medicare patients in the non-hospital setting will

23  necessarily have to be performed by different laboratories than those performing the

24  services when the patients are in the hospital setting.  *See id.*  For the reasons

25  explained above, this inconsistency will increase the probability of medical errors

26  and miscommunications.  Thompson Decl. ¶ 19; Wiesner Decl. ¶ 19.

27  **D.    The Balance of the Hardships Tips Sharply in the Plaintiffs' Favor**

28  In contrast to the dire consequences that will beset Plaintiffs if the Secretary is

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

1   permitted to implement the demonstration project in its current form, there is no risk

2   of prejudice to the Secretary if ordered by this Court to delay the demonstration

3   project for further refinement of the policies.  There is no deadline in the statute that

4   creates the demonstration project by which the Secretary must roll out the project.

5   The February 15, 2008 bid submission deadline was unilaterally selected by CMS

6   and RTI.  It possesses no "magic" or special import.

7        Further, the Secretary has already delayed considerably in attempting to roll-

8   out the demonstration project.  As mentioned, the project was created by a statute

9   that was enacted in 2003.  Between the time the relevant statute was enacted and the

10  San Diego-Carlsbad-San Marcos area was designated as the first site of the project

11  in late 2007, CMS and RTI effectively developed the entire project behind closed

12  doors, without giving any parties that would be affected a chance to participate in

13  the design.  By the time CMS and RTI held the Bidder's Conference on December 5,

14  2007 and allowed labs to meaningfully comment on the demonstration project, it

15  was effectively a <u>fait accompli</u>.  Still, the limited involvement that laboratories have

16  had in the development of the demonstration project has led the Secretary to change

17  and clarify certain policies.

18        Considering that CMS and RTI continue to tweak and revise policies related

19  to the demonstration project even at this late stage, it is plain that additional time to

20  refine these policies prior to bid submission would benefit all parties involved,

21  including the Secretary.  Slowing down the demonstration project would give CMS

22  and RTI additional time to work out the nuances and broadly communicate the

23  policies to prospective bidders.  In short, the Secretary has nothing to lose, and will

24  only benefit, from an order stopping the immediate implementation of the

25  demonstration project.

26  **E.    The Policies Challenged by Plaintiffs Were Required to be**

27         **Promulgated Under the APA**

28        As pointed out above, since 1971, the Secretary has agreed to be bound by the

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1  provisions of the APA with respect to promulgating and changing Medicare policy.

2  Thus, when a policy acts as a substantive rule and alters an existing regulatory

3  scheme, the Secretary must adopt it under 5 U.S.C. § 553, which requires him to

4  give the public notice by publishing the policy in the Federal Register and by

5  allowing the public to participate in such policy-making through the submission of

6  written comments. *Mt. Diablo Hosp. Dist. v. Bowen*, 860 F.2d at 956. Rules that

7  "effect a change in existing law or policy," are subject to notice and comment

8  rulemaking requirements. *Id. See also* 42 U.S.C. 1395hh.

9      Here, each of the policies challenged by the Plaintiffs clearly changes existing

10 Medicare substantive rules and imposes new obligations on providers. For example,

11 the policy of requiring a provider to treat Medicare patients for free if the

12 provider is a "loser" under the demonstration project is clearly new and completely

13 unauthorized under current Medicare policy. While existing regulations prohibit

14 Medicare providers from discriminating against Medicare beneficiaries based on

15 Medicare payment, there is no Medicare statute or regulation that can be interpreted

16 to allow the Secretary to force a provider to treat Medicare patients for free. This

17 same analysis applies to the other policies being challenged.

18      In short, the policies established by the Secretary to implement the

19 demonstration project, as set forth in the December 2007 questions and answers,

20 constitute substantive changes in Medicare policy and impose materially different

21 and new obligations on providers in San Diego. If anything, the fact that these

22 policies are part of demonstration project presents even more reason that they should

23 have been vetted through the notice and comment process. The fact the Secretary

24 has never conducted a program like this before seems like a good reason to solicit as

25 much input as possible for the parties that will be impacted. Thus, as in *Psychiatric*

26 *Treatment Ctrs. v. Weinberger*, *supra*, this Court must conclude that Plaintiffs are

27 likely to succeed on the merits of their challenge to the Secretary's implementation

28 of the Demonstration Project because of the Secretary's failure to promulgate the

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

1  policies pursuant to the rulemaking requirements of the APA.

2  **F.    The Secretary's Policy of Requiring Bid "Losers" to Treat**

3  **Medicare Patients Is Unlawful**

4  Among the most objectionable policies that the Secretary intends to

5  implement is that losing bidders must continue furnishing laboratory services to

6  Medicare beneficiaries even though they will receive no Medicare payment for such

7  services.  Again, after the December 5, 2008 bidder's conference, CMS stated with

8  respect to non-winning laboratories that:

9  A laboratory that is enrolled as Medicare supplier cannot

10  legally refuse to provide services to a beneficiary based on

11  payment.

12  *See* Complaint Exh. D.

13  While it is difficult to determine with any certainty who the "losers" will be

14  (because of the lack of specific, concrete bid criteria), it is certainly safe to assume

15  that many existing providers will be "losers."  (By nature, any "competitive" system

16  necessitates that not all participants can be winners.)  If not forced out of business,

17  these laboratories will continue to be enrolled in Medicare.  While participation in

18  Medicare technically is "voluntary" for suppliers, there are several reasons why

19  disenrolling from the program is not an option for the majority of suppliers.  In

20  particular, the demonstration project only precludes Medicare payment to non-

21  winning laboratories for services rendered to beneficiaries residing in the

22  demonstration project area.  These laboratories still may be paid for services

23  rendered to patients residing outside of the impacted area.  To be paid for services

24  rendered to any Medicare beneficiaries, including, patients outside of the

25  demonstration project area, these laboratories must remain enrolled in Medicare.

26  In light of the foregoing, most non-winning laboratories will have to continue

27  to be enrolled as Medicare suppliers to remain in business.  As a result, they will

28  also be required, under the Secretary's new policy, to furnish services or make

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

laboratory services available to any Medicare beneficiary in the demonstration project area. Thus, if a physician sends a laboratory specimen to a "losing" laboratory, the laboratory will have to perform the requested testing if the patient is a Medicare beneficiary residing in the demonstration project area. If the laboratory provides the testing directly, it will do so without the prospect of Medicare reimbursement. If the laboratory sends the specimen out to a reference laboratory, there are costs involved, such as staff time, couriers and record keeping, which will not be compensated by Medicare. Thus, whether a non-winning laboratory provides services to a Medicare beneficiary in the demonstration project area directly or indirectly, it will not be adequately compensated for its services.

The foregoing scenario provides a classic "taking" violation under the United States Constitution. The "Takings Clause" of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. Forcing certain Medicare providers to utilize resources, such as office space, staff and equipment, for the treatment of Medicare beneficiaries without any prospect of payment is a taking prohibited by the Constitution.

## G.  The Secretary Has Violated the Statute by Requiring Bids on Collection and Handling

One of the Secretary's policies for implementing the demonstration project is not permitted under the very statute that creates the project and is therefore invalid. Agencies are statutorily created and must find their powers within the "compass of authority given [them] by Congress." *See Regents of the University System of Georgia v. Carroll*, 338 U.S. 586, 597, 70 S.Ct. 586, 94 L.Ed. 363 (1950). If an agency is not authorized by its enabling legislation to institute a policy or take a particular action, it may not do so. The Secretary has violated this basic tenet of administrative law with respect to the demonstration project.

The express language of the controlling statute, 42 U.S.C. § 1395w-3(e)(1), limits the scope of the demonstration project to "laboratory tests." However, the

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

1   Secretary has requested that bidders compete on the price they will charge for
2   collecting and handling laboratory specimens. The collection and handling process
3   is not a laboratory test. This is made clear by the fact that, under the Secretary's
4   current rules, specimen handling and collection is reimbursed by Medicare under an
5   entirely separate methodology from laboratory tests. Compare 42 U.S.C. §
6   1395l(h)(1)(A) to 42 U.S.C. § 1395l(h)(3). As such, the Secretary has exceeded the
7   scope of his authority granted under the controlling statute, and therefore acted
8   unlawfully, by requiring bidders to submit price information on collection and
9   handling.

10   **H.    Several of the Secretary's Demonstration Project Policies are**
11          **Arbitrary and Capricious**

12          1.    The Secretary Is Not Exempting All Laboratories That Have
13                "Face to Face" Encounters With Patients From Bidding

14   One of the Secretary's policies for implementing the demonstration project is
15   inconsistent with the plain language 42 U.S.C. § 1395w-3. As mentioned above,
16   Congress clearly and unequivocally stated that only laboratories that **do not** have a
17   "face-to-face encounter" with the individual should be the subject of the
18   demonstration project. The Secretary has interpreted this "face-to-face" language in
19   an extremely narrow manner and has exempted only laboratories located in
20   physician offices from the demonstration project. The Secretary is effectively
21   taking the position that no laboratory that is independently enrolled in the Medicare
22   program can have a face-to-face encounter for the purposes of the statutory
23   exemption from the demonstration project. Yet, the laboratories operated by all
24   three of the Plaintiffs to this action, all of which are "independent" laboratories for
25   Medicare purposes, have face-to-face encounters with individuals.

26   As explained above, laboratories operated by both Sharp and Scripps often
27   provide services through face-to-face encounters with non-hospital patients. In most
28   cases, the patients do not even realize that the laboratory is separate in any way from

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1  the physician clinic they are visiting.  The laboratories are located in the same

2  buildings as the physician clinics, so when the patient goes to have his or her blood

3  drawn for laboratory testing, they perceive it simply as a part of the doctor's visit.

4  Thompson Decl. ¶ 7; *see also* Wiesner Decl. ¶ 8.  Internist similarly has face-to-face

5  encounters with individual plaintiffs.   Patients frequently come directly to the

6  Internist offices to have their blood drawn for testing. Stevens Decl. ¶¶ 3 – 5.  A

7  patient's physical presence in a laboratory for a blood draw fits within the plain

8  meaning of a "face-to-face" encounter.     Thus, Sharp, Scripps and Internists

9  laboratories should not even be part of the demonstration project.  If Congress

10  intended only to exclude physician office laboratories from the demonstration

11  project, it would have said so expressly and not exempted all laboratories that have a

12  "face-to-face" encounter with individuals.    Most respectfully, the Secretary's

13  application of the "face-to-face" exemption is inconsistent with Congressional

14  intent, as expressly indicated in the statute, and is otherwise arbitrary and capricious.

15        2.    The Secretary's Policies Unfairly Determine the Reimbursement

16              that Will be Paid to Laboratories Focusing on SNF and ESRD

17              Patients

18        The Secretary also proposes to require laboratories that serve exclusively

19  nursing facility patients and ESRD beneficiaries to accept the prices ultimately

20  determined through the demonstration project bidding process even though such

21  laboratories will not themselves be bidding on the services.  Thus, such laboratories

22  will be "stuck with" rates for services determined by the bids of laboratories that

23  generally do not provide testing to nursing facility patients or ESRD beneficiaries,

24  levels of service that cost substantially more per test than services rendered to other

25  types of patients.  It is arbitrary and capricious for the Secretary to set the Medicare

26  reimbursement rates that will be paid to these laboratories based on bid pricing from

27  laboratories that do not service the same types of patients and are therefore not

28  comparable.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

3. <u>"Winning" Laboratories Will Not Know What They Are Going to Be Reimbursed</u>

The Secretary has decided to use Medicare claims paid data to determine and project test volume demand in the demonstration project. Such data does not reasonably or accurately reflect the potential demand, which laboratories calculate differently. Therefore, laboratories find themselves having to bid on testing for which the volume is not known. This is only one of many examples where the Secretary's policies will leave a bidder uncertain of the ultimate factors being used to determine "winners" or what will be awarded under the demonstration project.

## I. The Current Bidding Mechanism Does Not Adequately Protect Small Businesses

The demonstration project is inconsistent with the procedural and substantive rights accorded to small businesses under federal law. First, all federal agencies must follow strict procedural requirements when issuing rules that affect small businesses. *See* 5 U.S.C. § 601 et seq., 15 U.S.C. § 631 et. seq. Second, the narrow definition of "small business laboratory" used in the demonstration project is inconsistent with the statutory and regulatory definitions of "small business" set forth under federal law. *See* 5 U.S.C. § 601(3), 15 U.S.C. § 632, 13 C.F.R. § 121.101 et seq. Finally, the demonstration project statute itself requires the Secretary to ensure that small businesses have a equal opportunity to participate in the demonstration project. *See* 42 U.S.C. § 1395w-3(b)(6)(D).

Under the Regulatory Flexibility Act and the Small Business Regulatory Enforcement Fairness Act, among other things, the Secretary must publish regulatory flexibility analyses that describe the impact of proposed and final rules on small entities. *See* 5 U.S.C. §§ 602, 603. In addition, the Secretary must "assure that small entities have been given an opportunity to participate in the rulemaking for the rule through the reasonable use" certain, enumerated techniques. *See* 5 U.S.C. §609(a). The Secretary did not meet these requirements with respect to the

1   demonstration project.

2         The Secretary also violated the procedural rights of small laboratories when
3   he defined "small business laboratory" as "one that will supply less than
4   $100,000.00 annually in demonstration tests to Medicare." 72 Fed. Reg. 58856,
5   58857 (October 17, 2007). Federal agencies may only prescribe size standards for
6   small businesses by providing notice and the opportunity for comment, publishing
7   the definition in the Federal Register, and obtaining the approval of the Small
8   Business Administration ("SBA"). *See* 5 U.S.C. § 601(3), 15 U.S.C. § 632(a)(2)(C).
9   The Secretary did not meet these procedural requirements here.

10         The Secretary's definition of "small business laboratory" ignores the
11   definition of "small business" for medical laboratories already promulgated by the
12   Small Business Administration under the authority granted by 5 U.S.C. § 601(3) and
13   15 U.S.C. § 632(a)(2)(A). *See Pride International, LLC v. U.S.*, 64 Fed. Cl. 754,755
14   n.1 (2005). According to the SBA, a medical laboratory is considered a small
15   businesses if its annual receipts total less than $12.5 million dollars. *See* 13 C.F.R.
16   §§ 121.104, 121.201. Small labs that serve primarily Medicare patients, like
17   Internist, are outside of the demonstration project's $100,000.00 "small business
18   laboratory" exemption, but could easily meet the SBA standard for small businesses.
19   Consequently, the $100,000.00 demonstration project standard selected arbitrarily
20   by the Secretary must be invalidated as inconsistent with the SBA standard for
21   "small business."

22         The demonstration project statute requires that the Secretary "ensure that
23   small suppliers of items and services have an opportunity to be considered for
24   participation for the program…" *See* 42 U.S.C. § 1395w-3(b)(6)(D). Internist is
25   just one of many small "required bidders" located in the San Diego area that does
26   not perform all 303 tests. For reasons explained above, the current implementation
27   of the demonstration project therefore makes it impossible for small laboratories like
28   Internist to meaningfully participate.

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1      Finally, the Secretary's definition for "small" laboratories under the

2  demonstration project will lead to anomalous, absurd results.  Since the Secretary's

3  definition is keyed only to the volume of Medicare testing provided by a laboratory

4  in the demonstration area only, and does not consider other factors, it presumably

5  would permit a large national entity with a relatively small presence in the San

6  Diego escape the bidding requirement.  In other words, even if such an entity

7  furnished tens of millions of dollars worth of Medicare testing outside of San Diego,

8  as long as it provided $100,000.00 or less worth of testing within San Diego, it

9  would not be required to submit a bid under the demonstration project.  Meanwhile,

10 an entity with no presence outside of San Diego, like Internist, is required to bid.

11 Accordingly, the Secretary's policy does not really protect "small" suppliers, but

12 suppliers that perform relatively few services in the San Diego area.

13 **IV.  <u>CONCLUSION</u>**

14     For the foregoing reasons, the Court should find that Plaintiffs have shown

15 that irreparable harm will result if Secretary's demonstration project is not enjoined,

16 that there will be no prejudice to Defendants if a temporary injunction is granted and

17 that Plaintiffs are likely to succeed on the merits of this action.  Accordingly, this

18 Court should grant Plaintiffs' request for a temporary restraining order and an order

19 to show cause regarding a preliminary injunction.

20 DATED: February 4, 2008         HOOPER, LUNDY & BOOKMAN, INC

21                                     PATRIC HOOPER
                                    JORDAN KEVILLE

22                                     ABIGAIL WONG

23                                     By:  s/Patric Hooper

24                                           Patric Hooper
                                    Attorneys for Plaintiffs

25                                     SHARP HEALTHCARE, INTERNIST
                                    LABORATORY and SCRIPPS HEALTH

26

27

28

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 1875 Century Park East, Suite 1600, Los Angeles, California 90067-2517.

On February 4, 2008, I served the following document(s) described as **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE** on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

Christopher B. Latham                    *Attorneys for Defendant*
Assistant United Sattes Attorney
Christopher.Latham@usdoj.gov

Thomas C. Stahl                          *Attorneys for Defendant*
Assistant Untied States Attorney
Thomas.Stahl@usdoj.gov

**BY ELECTRONIC MAIL TRANSMISSION:**  By electronic mail transmission from phooper@health-law.com on February 4, 2008, by transmitting a PDF format copy of such document(s) to each such person at the e-mail address listed below their address(es).  The document(s) was/were transmitted by electronic transmission and such transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on February 4, 2008, at Los Angeles, California.


_s/Patric Hooper_____
Patric Hooper

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1042170.5

08-CV-0170 W POR
PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE