PATRIC HOOPER (State Bar No. 57343)
JORDAN B. KEVILLE (State Bar No. 217868)
ABIGAIL WONG (State Bar No. 245652)
**HOOPER, LUNDY & BOOKMAN, INC.**
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
Telephone: (310) 551-8111
Facsimile: (310) 551-8181
phooper@health-law.com

Attorneys for Plaintiffs SHARP
HEALTHCARE, INTERNIST
LABORATORY and SCRIPPS HEALTH

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARP HEALTHCARE; INTERNIST LABORATORY and SCRIPPS HEALTH,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL LEAVITT, SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Defendant. | CASE NO. 08-CV-0170 W Por<br><br>**DECLARATION OF DONNA THOMPSON IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>[filed concurrently with Application for Temporary Restraining Order; Memorandum of Points and Authorities in Support thereof; Declarations in Support thereof; [Proposed] Orders thereon]<br><br>Date:   TBD<br>Time:   TBD<br>Courtroom of Hon. Thomas J. Whelan |

1042761.1

08-CV-0170 WPor
DECLARATION OF DONNA THOMPSON IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY
RESTRAINING ORDER/ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

## DECLARATION OF DONNA THOMPSON

I, DONNA THOMPSON, declare as follows:

1. I am Vice President of Business Development for Sharp Healthcare ("Sharp"), one of the Plaintiffs in the above-entitled action. I make this declaration in support of PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION. The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I could and would competently do so under oath.

2. I have been the Vice President for Business Development for Sharp since 2003. In this position, I am responsible for analyzing key operational and financial issues facing Sharp and making decisions about how to proceed in manner most beneficial to Sharp. Among other things, I have been involved in major operational matters related to clinical laboratories owned and operated by Sharp. I personally oversaw the development of Sharp's hospital "outreach" laboratory program. I continue to support all of the Sharp laboratories with respect to system-related issues.

3. Before moving into my current position, I was the Service Line Direct for Laboratory, Emergency and Radiology services for Sharp. I had general oversight authority over Sharp's laboratory services, which made me responsible for, among things, quality initiatives and standardization of services. While acting as the Service Line Director, I became very familiar with clinical laboratory functions and operations.

4. Sharp is a not-for-profit integrated regional health care delivery system based in San Diego. The Sharp system includes four acute care hospitals, three specialty hospitals and three medical groups, plus a full spectrum of other facilities and services. As indicated above, among the other services offered within the Sharp system are clinical laboratory services.

5.  Sharp operates clinical laboratories for the benefit of both hospital inpatients and outpatients, but also for non-hospital patients and non-hospital ambulatory clinic patients. Specifically, the Sharp system includes a total of thirteen (13) laboratories that provide "outreach" services, all located throughout San Diego and the surrounding areas. Within the Sharp system, "outreach" services describe all laboratory testing performed by independent, non-hospital laboratories and hospital laboratories for non-hospital patients. Together, the Sharp laboratories provide services for thousands of patients and employ hundreds of people. A significant portion of the patients the Sharp laboratories furnish services to are beneficiaries of the Medicare fee-for-service program.

6.  The Sharp laboratories provide a full array of clinical laboratory services. Among other things, our laboratories furnish emergency or "stat" laboratory testing on a 24 hour/7 days per week basis. We also provide phlebotomy, or blood drawing services, to non-hospital and hospital patients directly through the laboratories.

7.  Sharp has "certified independent" laboratories, which are located in its non-hospital based ambulatory clinics. The placement of the laboratories makes for a fairly seamless experience for a patient who needs a laboratory test. In a typical situation, a patient will arrive at a Sharp clinic, see his or her physician, receive an order from their physician for a laboratory test, and simply walk to another room within the clinic to have blood drawn and the laboratory test performed. In this respect, there is no difference between the experience a patient has receiving laboratory services from one of Sharp's independent laboratories and the experience a patient would have getting services from a "physician office" laboratory.

8.  There are significant clinical advantages of having laboratory services incorporated into a larger network of health care delivery. When physicians affiliated with the Sharp system order a laboratory test on one of their hospital or non hospital patients from a Sharp operated laboratory, the test is performed and the

1042761.1

2                                                                 08-CV-0170 WPor
DECLARATION OF DONNA THOMPSON IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

results returned more efficiently than would be the case if the test had to be referred to an outside laboratory. This saved time can be vitally important in the case of emergency or "stat" laboratory tests or when a routine laboratory test reveals a potentially dangerous level for a "critical" test.

9. Laboratory test results are more accessible to physicians because the Sharp laboratories are part of an integrated system.

10. Laboratory test results go directly from the laboratory system to the patient's medical record. As a result, regardless of where the patient is treated within the Sharp system, whether hospital or non-hospital, a physician has ready access to a patient's recent and historical laboratory test results.

11. Although the Sharp non-hospital laboratories are part of a larger health care delivery system, they are enrolled with the Medicare program as "independent" laboratories. In addition, Sharp's hospital laboratories perform laboratory testing for "non-hospital" patients. For that reason, I am currently overseeing the preparation of a bid application for the clinical laboratory competitive bidding "demonstration project" the Medicare program is instituting in the San Diego area. Laboratories that are not declared winners under the demonstration project will no longer be allowed to bill Medicare directly for services rendered to Medicare beneficiaries residing in the demonstration project area. I believe that this demonstration project has the potential to seriously disrupt and detrimentally impact the quality of care provided within the integrated Sharp system.

12. I have concerns about whether Sharp will be declared a "winning" laboratory under the demonstration project. Because the Sharp laboratories are part of a hospital system, they have different cost structures than outside laboratories. Further, the Sharp laboratories do not provide all of the 303 test codes on which laboratories must bid under the demonstration project. I therefore am going to have to rely on outside laboratories to obtain prices for the services the Sharp laboratories do not perform in order to bid on all 303 demonstration tests. For these

reasons, I think it is doubtful that the prices the Sharp laboratory will bid are going to be as competitive as the prices submitted by the competing outside laboratories. In short, if Sharp is able to "win" under the demonstration project, it will not be because of price.

13. Although the Centers for Medicare and Medicaid Services ("CMS") has indicated that it intends to consider factors other than price when evaluating bid applications under the demonstration project, it is not at all clear what those factors are and how they will be weighted. I therefore am not sure how I can adequately convey the quality and value of Sharp's laboratory services through the bid application process.

14. The completion of the CMS Medicare Clinical Laboratory bid application for this demonstration project has been difficult and extremely time consuming for me. Laboratories were only made aware that the demonstration project would be initiated in the San Diego area in October 2007. Prior to then, no category of laboratory was afforded any kind of substantial input to CMS regarding the scope and design of the demonstration project. Further, at the time the location of the project was first announced, it was not clear to me whether the Sharp laboratories were subject to the demonstration project. It is my understanding that the statute creating the demonstration project expressly exempts from the project any laboratory that has a "face-to-face encounter" with an individual. Since the Sharp laboratories, have "face-to-face" encounters with patients, I was unclear as to whether the Sharp laboratories would benefit from this exemption. I attempted to clarify this issue with CMS at a "Bidder's Conference" that was held in San Diego on December 5, 2007. In response to a question I asked, CMS stated that any laboratory enrolled with the Medicare program as an independent laboratory is subject to the demonstration project, provided that it furnishes more than $100,000 in Medicare laboratory testing per year.

1042761.1

4    08-CV-0170 WPor

DECLARATION OF DONNA THOMPSON IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

15. Even after the Bidder's Conference, which was the first time laboratories servicing the San Diego MSA got the chance to communicate with CMS regarding the demonstration project, many bidding application requirements remain unclear. I have had to repeatedly contact the private entity working with CMS on the demonstration project, RTI, International ("RTI"), to seek guidance and/or clarification regarding requirements in the "Bidder's Package" for the demonstration project. Although RTI has generally answered my questions, it has sometimes taken more than a week. With bid applications required to be submitted roughly two weeks from now, on February 15, 2008, I am concerned about having all of the information I will need to complete the application.

16. If Sharp does not submit a "winning" bid, it is going to cause significant harm to not only the Sharp system, but more importantly to the patients serviced by the Sharp system. I am so concerned about whether Sharp will win under the demonstration project that, as soon as bids are submitted to CMS, Sharp will start to evaluate whether to close some of blood drawing sites within the Sharp system. If Sharp elects to close these locations, the employees working at those sites will lose their jobs and some employees in the clinical laboratories may lose their jobs as well.

17. If Sharp fails to win through the bidding process, it will certainly close some drawing sites and, in fact, likely will shut down a significant segment of its outreach laboratory business. Sharp simply cannot continue to operate its outreach laboratory program on its current scale without being eligible to receive Medicare fee-for-service reimbursement. Scaling down the Sharp laboratory operations will mean significant employee layoffs.

18. Losing the right to bill Medicare for laboratory services performed by Sharp laboratories for non-hospital patients will necessitate significant operational changes within the Sharp system. Since the Sharp system cannot afford to furnish laboratory services to Medicare beneficiaries for free, we will need to send testing

out to the selected "winning" laboratories. Consequently, at minimum, staffing will need to be shifted from performing clinical laboratory functions to administrative functions related to sending specimens out. This will add significant cost to the Sharp system, with no associated revenue. Sharp's medical record-keeping system will also have to significantly change. Without the benefit of Sharp's existing direct interface between the laboratory computer system and the electronic patient medical record, test results from the winning outside laboratories will most likely be sent in paper format to the ordering physician; therefore, results will not become part of Sharp's comprehensive electronic patient medical record. While Sharp could develop an interface that would allow for the direct input of information from outside laboratories into the patient electronic medical record, such a process could take up to two (2) years and cost tens of thousands of dollars.

19. In my opinion, the most problematic aspect of all the changes that Sharp will have to make as a result of "losing" under the demonstration project is the impact those changes will have on patient care. Sharp's patients and physicians will lose the clinical advantages in having laboratories perform testing, the results of which are integrated in a single medical record with all each patient's evaluations, treatments and services provided by the rest of the Sharp health care delivery system. Physicians will receive laboratory test results, including results for "stat" tests, in a less timely manner. Further, because different laboratories have varying methodologies and protocols for performing the same tests, including reference ranges, critical values, units of measures and interpretations, the consistency in laboratory testing that currently exists within the Sharp system will be compromised and increase the probability of medical errors and miscommunications.

20. For all the reasons discussed above, if the Sharp outreach laboratories are eliminated from the Medicare fee for service market for outreach testing in San Diego as a result of the demonstration project, it will not just impact Medicare beneficiaries, but the overall level of care within the Sharp system. In my opinion,

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1042761.1

6

08-CV-0170 WPor

DECLARATION OF DONNA THOMPSON IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1 | this would be an extremely unfortunate consequence for the sake of experimenting
2 | with the way the Medicare program pays for laboratory services.
3 |     I declare under penalty of perjury under the laws of the United States of
4 | America that the foregoing is true and correct.
5 |     Executed on February 1, 2008, at San Diego, California.

*/s/ Donna Thompson*
DONNA THOMPSON

1042761.1

7    08-CV-0170 WPor

DECLARATION OF DONNA THOMPSON IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 1875 Century Park East, Suite 1600, Los Angeles, California 90067-2517.

On February 4, 2008, I served the following document(s) described as **DECLARATION OF DONNA THOMPSON IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

| | |
|---|---|
| Christopher B. Latham<br>Assistant United Sattes Attorney<br>Christopher.Latham@usdoj.gov | *Attorneys for Defendant* |
| Thomas C. Stahl<br>Assistant Untied States Attorney<br>Thomas.Stahl@usdoj.gov | *Attorneys for Defendant* |

**ELECTRONIC MAIL TRANSMISSION:** By electronic mail transmission from phooper@health-law.com on February 4, 2008, by transmitting a PDF format copy of such document(s) to each such person at the e-mail address listed below their address(es). The document(s) was/were transmitted by electronic transmission and such transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on February 4, 2008, at Los Angeles, California.

            s/Patric Hooper
            Patric Hooper

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1042761.1

08-CV-0170 WPor

DECLARATION OF DONNA THOMPSON IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION