PATRIC HOOPER (State Bar No. 57343)
JORDAN B. KEVILLE (State Bar No. 217868)
ABIGAIL WONG (State Bar No. 245652)
**HOOPER, LUNDY & BOOKMAN, INC.**
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
Telephone: (310) 551-8111
Facsimile: (310) 551-8181
E-mail: phooper@health-law.com

Attorneys for Plaintiffs SHARP HEALTHCARE, INTERNIST LABORATORY and SCRIPPS HEALTH

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARP HEALTHCARE; INTERNIST LABORATORY and SCRIPPS HEALTH,<br><br>    Plaintiff,<br><br>vs.<br><br>MICHAEL LEAVITT, SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>    Defendant. | CASE NO. 08-CV-0170 WPor<br><br>**DECLARATION OF CINDY WIESNER IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>[filed concurrently with Application for Temporary Restraining Order; Memorandum of Points and Authorities in Support thereof; Declarations in Support thereof; [Proposed] Order thereon]<br><br>Date: TBD<br>Time: TBD<br>Courtroom of Hon. Thomas J. Whelan |

1042833.1

08-CV-0170 WPor

DECLARATION OF CINDY WIESNER IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

## DECLARATION OF CINDY WIESNER

I, CINDY WIESNER, declare as follows:

1. I am the Administrative Director of the Scripps Clinic Medical Laboratories ("SCML"), which are part of Scripps Health ("Scripps"), one of the Plaintiffs in the above-entitled action. I make this declaration in support of PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION. The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I could and would competently do so under oath.

2. I have been the Administrative Director for SCML for the past 22 years. In this position, I have complete responsibility for the Scripps Clinic clinical laboratory system, including issues related to quality, payment, and administration.

3. I have been involved with the performance of clinical laboratory testing for virtually my entire professional career. I am licensed by the State of California as a clinical laboratory scientist and hold various board and specialty certifications in pathology. I also hold a Bachelors of Arts in Biology and Bachelors of Science in Medical Technology from the University of Texas at Austin, Texas, as well as a Masters in Business Administration from the University of Phoenix, San Diego. Before joining the Scripps system, I worked for the Texas Department of Public Health and the Austin State Hospital as a medical technician and Medical Technologist, respectively. Based on my experience with Scripps and other employers, I am intimately familiar with the field of clinical laboratory testing, both from a clinical and administrative perspective.

4. Scripps is a not-for-profit integrated regional health care delivery system based in San Diego. The Scripps system includes four acute care hospitals on five campuses, more than 2,300 affiliated physicians, an extensive ambulatory care network at Scripps Clinic, including clinical laboratory services, and home health care and associated support services.

1042833.1

1

08-CV-0170 WPor

DECLARATION OF CINDY WIESNER IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

5. Scripps operates clinical laboratories for the benefit of both hospital inpatients and outpatients, but also for non-hospital patients. In particular, Scripps owns Scripps Clinic and its laboratories. SCML includes three testing laboratories and seven patient service centers, located at or very near to different Scripps Clinics throughout the San Diego area. These laboratories provide services for thousands of Scripps Clinic patients and employ hundreds of Scripps Clinic employees.

6. The Scripps Clinic Medical Laboratories are part of an integrated group of medical services available to support the Scripps Clinic Medical Group ("SCMG"). In the State of California, a medical group cannot be employed by a health care system, so are not considered to be employees. However, this medical group of around 350-400 physicians almost exclusively sees Scripps Clinic's non-hospital patients and is exclusively supported by Scripps-owned support services. The physicians in the SCMG use Scripps-provided offices on Scripps property, and SCML provides all of the SCMG physicians' office testing. SCMG also exclusively admits the vast majority of their patients into Scripps Green Hospital, where one of the Scripps Clinic Medical Laboratories is located. SCML sells its services to Scripps Green Hospital where it exclusively services SCMG's inpatients and hospital outpatients. SCML also provides what our laboratory considers "outreach" testing for some non-SCMG physicians in the community. There are four other Scripps hospital laboratories in the Scripps Health system, that support their respective hospitals' inpatients and hospital outpatients, as well as a non-Scripps-owned acute care rehabilitation hospital.

7. A significant portion of the patients to whom SCML furnishes services are beneficiaries of the Medicare program. For this reason, I am very concerned about the clinical laboratory competitive bidding "demonstration project" that the Medicare program is implementing in the San Diego-San Marcos-Carlsbad area.

8. I believe that a closed medical group, such as SCMG, should be excluded from the demonstration project. I am concerned that the Centers for

Medicare and Medicaid Services ("CMS"), the agency responsible for implementing the demonstration project, has not adequately defined some of the conditions of the demonstration project. For example, the demonstration project exempts laboratories that have "face-to-face" encounters with individual patients. However, CMS has not clearly defined the term "face-to-face" encounters and "physician's office laboratory" as it relates to this exemption. Since, given the relationship between SCML, Scripps Clinic Medical Group and other closed Scripps medical groups, SCML effectively is a physician's office laboratory and has face-to-face encounters with patients, SCML should be exempt from submitting a bid under the demonstration project. While not completely clear, CMS has given indications that SCML will be considered a required bidder under the demonstration project. In addition, CMS does not appear to understand the make-up of an integrated healthcare system with its closed Medical Group structure. Because of these and other ambiguities in the bidder's packet that CMS distributed to prospective demonstration project participants, which provides detail on the bid application process, I am unclear how to proceed with respect to submitting a bid and will need more time to determine this and other questions.

9. I am concerned about whether SCML will be declared a "winning" laboratory under the demonstration project. Under the terms of the project, all laboratories that are required to bid must submit bid prices on all of 303 laboratory tests specifically identified by CMS. SCML only provides 208 of the tests. That means, for the tests SCML do not perform, we have to obtain prices from outside laboratories in order to complete the bid application. The outside laboratories, some of which are also submitting bids, have no motivation to cooperate with Scripps in this regard, and are able to bid prices which are lower than prices charged to customers, such as SCML. I therefore am doubtful that SCML will match the prices for services offered by many of our competitors in the demonstration project.

1042833.1

3

08-CV-0170 WPor

DECLARATION OF CINDY WIESNER IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

10. Given that SCML probably will not be able to compete in terms of price with some other laboratories, I have to hope that CMS heavily considers non-financial factors when evaluating bid applications under the demonstration project. Although CMS has indicated that it will consider factors other than price, no clear guidance has been offered to laboratories regarding what those factors are, and how they will be measured. I do not believe that the bidder's package allows a way for me to express the value of the Scripps laboratory to our patients in terms of quality and accessibility. I have serious doubts that these non-financial factors can be evaluated in an objective way. In short, I am skeptical that CMS is going to really focus on any factors other than price. If I had additional time to complete the bid application, I may be able to clarify with CMS what non-price factors I should address in the bid application and how to most effectively do so.

11. If the Scripps laboratory is not a "winning" laboratory under the demonstration project, it will have wide-ranging, adverse consequences for the entire Scripps Health system and the patients the system services. The loss of all revenue for Medicare laboratory services will necessarily lead to a reduction in services. Scripps received an approximate reimbursement of $1.9 million from Medicare for laboratory services in 2006. I therefore presume that at least this same amount would be lost from the Scripps revenue stream if we are no longer permitted to bill Medicare as a result of the demonstration project. To offset this loss, Scripps likely will have to lay off numerous employees.

12. I believe the integration between the Scripps laboratories and the rest of the Scripps Health delivery network are critical to the overall quality of care provided by the Scripps system. If SCML were to be declared a non-winner under the demonstration project, Scripps patient's care would be significantly impacted. When physicians who are affiliated with the Scripps Clinic system order a laboratory test on one of their non-hospital patients, SCML performs the testing, and the results returned, much more quickly than would be the case if the test had to be

referred to an outside laboratory. This saved time can be vitally important in the case of emergency or "stat" laboratory tests.

13. The ability of SCML to turn around test results rapidly is especially important because Scripps Clinic operates an urgent care clinic. Many of the patients who present to the urgent care clinic are quite ill and seen for urgent reasons like cardiac arrest, stoke, or gastro-intestinal bleeding. For patients with conditions such as these, it is critical that laboratory testing be performed and processed as swiftly as possible so the patients can be treated effectively and promptly. As such, it simply would not be safe to send laboratory testing ordered for these patients to an outside laboratory because of the time delay that would be created. Consequently, the demonstration project is effectively going to require Scripps to perform some critical laboratory testing services without any compensation or risk serious harm to the patients. One of the stated objectives of the demonstration project it to maintain quality of care available to Medicare beneficiaries. It therefore surprises me that the only way CMS can accomplish this demonstration project objective is by effectively forcing some laboratories to perform services at no cost to the Medicare program. Further, the whole scenario also makes be concerned because I am aware that the provision of free services to Medicare beneficiaries in some contexts has before been determined to violate certain federal statutes and regulations, some of which carry fairly harsh penalties.

14. SCML, in consultation with the SCMG Medical Executive Committee, maintains a list of "critical" results of certain laboratory tests. When test results fall into life-threatening ranges, it is extremely dangerous for a patient, and potentially can even be fatal. For example, if the level of potassium in a patient's blood is above a certain level, it can be life-threatening if not treated quickly. When SCML becomes aware of a critical laboratory result for a patient, that patient's SCMG physician is notified immediately. The physician can then can take immediate action, such as admitting the patient to the hospital, to remedy the patient's

condition. If SCML loses the bid, the routine patient's laboratory testing must be outsourced to a reference laboratory, most of which typically run routine patient specimens the evening following the receipt of a blood sample, and therefore would likely not even be aware of a critical value until much later than would be the case with a test performed by SCML at Scripps Clinic.

15. The integration between SCML, SCMG, and the rest of the Scripps system extends to the patient's medical record. Laboratory test results go directly from the laboratory instrumentation and laboratory computer into the Scripps Clinic computer system where SCMG physicians can immediately see the test results. This means that laboratory test results, both recent and historical, are virtually always accessible for clinicians to review. Further, because of the high level of integration and the way Scripps maintains medical records, physicians get a more complete, comprehensive view of a patient's condition than they would under an external reference laboratory's interfaced computer system, if it exists. For certain patients, synoptic report summaries are reported as a group on the Scripps' computer for certain diseases, such that the laboratory results are consolidated with those of various other disciplines, such as imaging and clinical studies. The availability of this combined information increases the quality of care for a patient, because a patient's physician can see the "whole diagnostic picture" at one time. This high quality practice could not easily occur if laboratory testing were outsourced. Since test results will have to come from an outside laboratory and then be input in the Scripps medical record system semi-manually, data input errors may occur, and those results will not be joined with other patient information as quickly, which could delay care.

16. Losing Medicare business will necessarily require Scripps to undergo some significant operational changes. For example, we will need to set up administrative systems to check patient zip codes to determine whether the patient resides in the demonstration project area. To illustrate, a Medicare patient would

DECLARATION OF CINDY WIESNER IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1. check into a Scripps laboratory after a SCMG physician's office visit. The laboratory would first need to determine whether the patient is subject to the demonstration project. If the patient does reside in the demonstration project area, the laboratory would either have to send the patient away to an outside laboratory draw station within the community or would draw the patient's blood at no charge, and then send the blood to one or more reference laboratories based on which tests are ordered. If the Scripps laboratory determines that the patient does not reside in the demonstration project area, SCML would draw the blood and perform the testing. SCML currently draws blood for over 30,000 patients per month. As such, adding additional administrative processes to an operation that large would require more staff and increase costs. Further, it also would create longer waits for all of our patients who already often wait over 20 minutes to be drawn.

17. There are more operational complications that increase healthcare expenses and impact patient care. The way that the demonstration project is currently set up, Scripps laboratory could perform some of the tests ordered for a specific Medicare patient, but the same patient's other tests would have to be sent to winning laboratory. To explain, the demonstration project only covers 303 tests. Accordingly, if Scripps is not a winner, it theoretically still could bill Medicare for laboratory tests other than those 303 tests. That means, if a Medicare patient residing in the demonstration project area presented to a Scripps laboratory with lab orders for 10 tests, for example, and 5 of those tests are not among the 303 designated test costs, the Scripps laboratory would have to draw extra tubes, and greater volumes, of blood from the Medicare patients, so that 5 tests could be performed at Scripps and the other 5 must be outsourced to one or more reference labs. I expect this scenario to occur frequently, because our SCMG expert specialists often must order some of the 400 or so esoteric tests that are not on the CMS demonstration project list. This practice may also be harmful to the patient. In particular, anemic patients may not be able to sustain larger than absolutely

1042833.1

7

08-CV-0170 WPor

DECLARATION OF CINDY WIESNER IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

necessary blood extractions. Further, the laboratory results for the outsourced tests would be returned to the Scripps laboratory and the physician later than the 5 tests performed within the Scripps laboratory, creating a delay in patient diagnosis and treatment. Scripps would incur extra cost to hire more staff to package and handle the high number of specimens that would need to be outsourced.

18.  The Scripps laboratory supports the Scripps Clinic Hematology/Oncology division and Cancer treatment center. Laboratory testing for these patients is essential to the treatment protocol, as chemotherapy generally cannot be performed without a physician first knowing a patient's blood levels. If laboratory tests for Medicare patients with cancer were outsourced, the turn around time on such testing for these patients would significantly delay their treatment. Instead, if these patients were required to personally go to a separate commercial laboratory to have their blood drawn, and then travel to their physician's office at a Scripps clinic, it would present a very significant hardship to them, since oncology patients often are already ill, weak, and depressed.

19.  Losing under the demonstration project will impact the <u>continuum of care</u> currently available to patients treated in the Scripps system. To illustrate, a Medicare patient could be admitted by a Scripps physician into Scripps Green Hospital, an acute care hospital supported by SCML. During the patient's stay in the hospital, laboratory testing would be performed by SCML, since inpatient hospital testing falls outside of the demonstration project. Once released from the hospital, the patient still would be under the care of the same Scripps physician, who would continue to monitor the patient. When the physician orders the same tests for his non-patient that were performed in the hospital, those tests will not be performed by SCML if Scripps is not a winner under the demonstration project. The testing therefore would have to be done by an outside laboratory. Different laboratories have different instrumentation for testing, different normal ranges for a test, different methodologies, and different ways of reporting results. Therefore, the

Scripps physician will not be able to compare his patient's clinic outpatient results with the inpatient results, since testing for this patient will have been performed at two, or possibly more, different labs. In my opinion, this is a <u>critical failure</u> with respect to quality of patient care.

20.  Scripps does not support dual levels of patient care. Our goal is to treat all patients in the same excellent fashion, regardless of the source of payment for the patient's care. The CMS demonstration project forces Scripps Clinic to use what we consider to be a dual standard of care, since we must unnecessarily outsource testing for Medicare patients if Scripps loses the bidding. Scripps would never provide its non-Medicare patient care in manner as that which our Medicare patients presumably will have to endure as a result of the way CMS is implementing the competitive bidding legislation, should Scripps lose in the demonstration project bidding process.

21.  For the foregoing reasons, I believe the demonstration project has the potential to seriously disrupt and decrease the health care currently being provided to thousands of Medicare beneficiaries through the Scripps system. I do not think that CMS has adequately considered the importance of the relationship between laboratory testing and other health care services when designing the demonstration project.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 4, 2008, at Encinitas, California.

*Cindy C. Wiesner*
CINDY WIESNER

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 1875 Century Park East, Suite 1600, Los Angeles, California 90067-2517.

On February 4, 2008, I served the following document(s) described as **DECLARATION OF CINDY WIESNER IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

| | |
|---|---|
| Christopher B. Latham<br>Assistant United Sattes Attorney<br>Christopher.Latham@usdoj.gov | *Attorneys for Defendant* |
| Thomas C. Stahl<br>Assistant Untied States Attorney<br>Thomas.Stahl@usdoj.gov | *Attorneys for Defendant* |

**ELECTRONIC MAIL TRANSMISSION:** By electronic mail transmission from phooper@health-law.com on February 4, 2008, by transmitting a PDF format copy of such document(s) to each such person at the e-mail address listed below their address(es). The document(s) was/were transmitted by electronic transmission and such transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on February 4, 2008, at Los Angeles, California.

                                           s/Patric Hooper
                                           Patric Hooper

HOOPER, LUNDY & BOOKMAN, INC.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1042833.1

08-CV-0170 WPor