1  JEFFREY S. BUCHOLTZ
   Acting Assistant Attorney General
2  KAREN P. HEWITT
   United States Attorney
3  SHEILA LIEBER
   Deputy Director
4  KATHRYN L. WYER
   U.S. Department of Justice, Civil Division
5  20 Massachusetts Avenue, N.W.
   Washington, DC  20530
6  Tel.  (202) 616-8475 / Fax (202) 616-8470
   kathryn.wyer@usdoj.gov
7  *Attorneys for Defendant*

8              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF CALIFORNIA
9

10 _____   )  Case No. 08 CV 0170 W Por
                                      )
   SHARP HEALTHCARE; INTERNIST        )
11 LABORATORY; AND SCRIPPS            )  **DEFENDANT'S OPPOSITION TO**
   HEALTH,                            )  **PLAINTIFFS' APPLICATION FOR**
12                                    )  **TEMPORARY RESTRAINING ORDER /**
            Plaintiffs,               )  **ORDER TO SHOW CAUSE REGARDING**
13                                    )  **PRELIMINARY INJUNCTION**
            v.                        )
14                                    )  Date: TBD
   MICHAEL LEAVITT, SECRETARY         )  Time: TBD
15 OF THE DEPARTMENT OF               )  Courtroom:    7
   HEALTH AND HUMAN SERVICES,         )
16                                    )  HONORABLE THOMAS J. WHELAN
            Defendant.                )
17 _____   )

18

19

20

21

22

23

24

25

26

27
   Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
28 Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iv

INTRODUCTION ...........................................................................................................1

STATUTORY BACKGROUND ..................................................................................... 2

    A.    Overview Of Medicare Part B ............................................................... 2

    B.    Medicare Competitive Bidding Demonstration Projects .........................................3

FACTUAL BACKGROUND ..........................................................................................4

ARGUMENT ..................................................................................................................6

    I.    PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER STANDARDS ...........................................................6

    II.    PLAINTIFFS FAIL TO ESTABLISH THE IRREPARABLE INJURY NECESSARY TO OBTAIN EITHER A TEMPORARY RESTRAINING ORDER OR A PRELIMINARY INJUNCTION .......................................7

    III.    PLAINTIFFS FAIL TO SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS ...........................................................10

        A.    THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS BECAUSE CONGRESS HAS PRECLUDED JUDICIAL REVIEW OF THE DEMONSTRATION PROJECT'S BIDDING STRUCTURE, AWARD OF CONTRACTS, AND PAYMENT AMOUNTS ...........................................................10

        B.    IF JUDICIAL REVIEW IS NOT STATUTORILY BARRED, JURISDICTION IS LACKING BECAUSE PLAINTIFFS FAIL TO MEET MEDICARE'S PRESENTMENT AND EXHAUSTION REQUIREMENTS ...........................................................12

        C.    RIPENESS AND STANDING REQUIREMENTS ARE NOT MET ......14

        D.    PLAINTIFFS HAVE FAILED TO SHOW THEY ARE LIKELY TO SUCCEED ON COUNT ONE ...........................................................16

        E.    PLAINTIFFS HAVE FAILED TO SHOW THEY ARE LIKELY TO SUCCEED ON COUNT TWO ...........................................................19

        F.    PLAINTIFFS HAVE FAILED TO SHOW THEY ARE LIKELY TO SUCCEED ON COUNT THREE ...........................................................23

        G.    PLAINTIFFS HAVE FAILED TO SHOW THEY ARE LIKELY TO SUCCEED ON COUNT FOUR ...........................................................24

    IV.    PLAINTIFFS HAVE FAILED TO SHOW THAT EITHER THE BALANCE OF HARDSHIPS OR THE PUBLIC INTEREST WEIGHS

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- ii -

1

IN THEIR FAVOR ................................................................................25

CONCLUSION ........................................................................................25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

## CASES

3    Abend v. MCA, Inc., 863 F.2d 1465 (9th Cir. 1988) ............................................................7

4    Am. Acad. of Opthalmology, Inc. v. Sullivan, 998 F.2d 377 (6th Cir. 1993) ...............................20

5    Am. Soc'y of Anesthesiologists v. Shalala, 90 F. Supp. 2d 973 (N.D. Ill. 2000) .........................11

6    Am. Soc'y of Cataract & Refractive Surgery v. Thompson, 279 F.3d 447 (7th Cir. 2002) ...........11

7    Am. Soc'y of Dermatology v. Shalala, 962 F. Supp. 141 (D.D.C. 1996),
        aff'd, 116 F.3d 941 (1997) ...............................................................................................11

8

9    Amgen, Inc. v. Smith, 357 F.3d 103 (D.C. Cir. 2004) ..........................................................11

10   Arcamuzi v. Continental Airlines, Inc., 819 F.2d 935 (9th Cir. 1987) .......................................7

11   Ariz. Health Care Cost Containment Sys. v. McClellan, 508 F.3d 1243 (9th Cir. 2007) .............20

12   Bates v. UPS, Inc., 511 F.3d 974 (9th Cir. 2007) ........................................................14, 16

13   Bennett v. Spear, 520 U.S. 154 (1997) .............................................................................17

14   Beno v. Shalala, 30 F.3d 1057 (9th Cir. 1994) ............................................................12, 21

15   Big Country Foods, Inc. v. Bd. of Educ. of the Anchorage Sch. Dist.,
        868 F.2d 1085 (9th Cir. 1989) ..........................................................................................6

16   Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667 (1986) ........................................10

17   Burditt v. U.S. Dep't of Health & Human Servs., 934 F.2d 1362 (5th Cir. 1991) ..........................23

18   Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668 (9th Cir. 1988) ................................6-7

19   Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984) ...........20

20   Citizens for Better Forestry v. U.S. Dep't of Agric., 481 F. Supp. 2d 1059 (N.D. Cal. 2007) .......19

21   Devlin v. Scardelletti, 536 U.S. 1 (2002) ...........................................................................16

22   Ecology Ctr., Inc. v. U.S. Forest Serv., 192 F.3d 922 (9th Cir. 1999) ...............................16, 17

23   Flemming v. Nestor, 363 U.S. 603 (1960) .........................................................................23

24   Florida Ass'n of Medical Equipment Dealers v. Apfel, 194 F.3d 1227 (11th Cir. 1999) .............15

25   Garelick v. Sullivan, 987 F.2d 913 (2d Cir. 1993) ...............................................................23

26   Garrett v. City of Escondido, 465 F. Supp. 2d 1043 (S.D. Cal. 2006) ........................................7

27   Gonzales v. Oregon, 546 U.S. 243 (2006) .........................................................................19

28   Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers,
        Local No. 70 of Alameda County, 415 U.S. 423 (1974) ..........................................................7

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- iv -

1    <u>Heckler v. Chaney</u>, 470 U.S. 821 (1985) ....................................................................21

2    <u>Heckler v. Ringer</u>, 466 U.S. 602 (1984) .............................................................12, 13

3    <u>Indus. Customers of Nw. Utilities v. Bonneville Power Admin.</u>, 408 F.3d 638 (9th Cir. 2005) ....17

4    <u>In re Sac & Fox Tribe of Miss. in Iowa/Meskwaki Casino Litig.</u>,
          340 F.3d 749 (8th Cir. 2003) ................................................................................17

5
     <u>Kean v. Heckler</u>, 799 F.2d 895 (3d Cir. 1986) .....................................................20
6
     <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992) ..........................................14
7
     <u>Martin v. Int'l Olympic Comm.</u>, 740 F.2d 670 (9th Cir. 1984) ...............................6
8
     <u>Mazurek v. Armstrong</u>, 520 U.S. 968 (1997) ........................................................6
9
     <u>Mich. Ass'n of Indep. Clinical Labs. v. Shalala</u>, 52 F.3d 1340 (6th Cir. 1994) .................13
10
     <u>Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare</u>,
11         742 F.2d 442 (8th Cir. 1984) ................................................................................24

12   <u>Nat'l Ass'n of Psychiatric Treatment Ctrs. v. Weinberger</u>, 658 F. Supp. 48 (D. Colo. 1987),
          <u>vacated by</u> 909 F,2d 1378 (10th Cir. 1990) ..........................................................12
13
     <u>Natural Res. Def. Council v. Winter</u>, 502 F.3d 859 (9th Cir. 2007) ...........................6, 24
14
     <u>Painter v. Shalala</u>, 97 F.3d 1351 (10th Cir. 1996) ..................................................11
15
     <u>Parsons & Whittemore, Enters. Corp. v. Cello Energy, LLC</u>, No. 07-743,
16         2008 WL 227952 (S.D. Ala. Jan. 25, 2008) ..........................................................9

17   <u>Phany Poeng v. United States</u>, 167 F. Supp. 2d 1136 (S.D. Cal. 2001) ........................8

18   <u>Pinewood Healthcare, LLC v. Leavitt</u>, No. 07-59, 2007 WL 1381802 (D. Idaho Mar. 16, 2007)....14

19   <u>Portman v. County of Santa Clara</u>, 995 F.2d 898 (9th Cir. 1993) ..............................14

20   <u>Resident Councils of Wash. v. Leavitt</u>, 500 F.3d 1025 (9th Cir. 2007) .........................20

21   <u>Riverbend Farms, Inc. v. Madigan</u>, 958 F.2d 1479 (9th Cir. 1992) ...............................19

22   <u>Sagebrush Rebellion, Inc. v. Hodel</u>, 790 F.2d 760 (9th Cir. 1987) ...............................19

23   <u>Shalala v. Illinois Council on Long Term Care, Inc.</u>, 529 U.S. 1 (2000) ..................12, 13, 14

24   <u>Skagit County Public Hospital Dist. No. 2 v. Shalala</u>, 80 F.3d 379 (9th Cir. 1996) .................11

25   <u>Thomas v. Anchorage Equal Rights Comm'n</u>, 220 F.3d 1134 (9th Cir. 2000) (en banc) .............14

26   <u>United States v. Erika, Inc.</u>, 456 U.S. 201 (1982) ....................................................2

27   <u>United States v. Mead Corp.</u>, 533 U.S. 218 (2001) ..............................................19-20

28   <u>Weinberger v. Salfi</u>, 422 U.S. 749 (1975) ............................................................12

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

Whitman v. Am. Trucking Ass'n, 531 U.S. 457 (2001) ..........................................17

Whitney v. Heckler, 780 F.2d 963 (11th Cir. 1986) ...............................................23

Wilson ex rel. Estate of Wilson v. United States, 405 F.3d 1002 (Fed. Cir. 2005) ...............14

**STATUTES**

5 U.S.C. § 553 ..............................................................................13, 16, 19

Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 ..........................................22

5 U.S.C. § 611 .................................................................................22

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 ......................1, 10, 16

5 U.S.C. § 704 .....................................................................................16

5 U.S.C. § 706 ................................................................................16, 19

Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. II ..............................15

28 U.S.C. § 1331 ..............................................................................12

Tucker Act, 28 U.S.C. § 1491 ...............................................................14

42 U.S.C. § 405 ...................................................................................12

Medicare Act, 42 U.S.C. §§ 1395 et seq. ...................................................2

42 U.S.C. § 1395b-1 .........................................................................3, 20

42 U.S.C. § 1395j ................................................................................2

42 U.S.C. 1395k .................................................................................2

42 U.S.C. § 1395l ...........................................................................3, 9, 24

42 U.S.C. § 1395r ................................................................................2

42 U.S.C. §1395s .................................................................................2

42 U.S.C. § 1395t .................................................................................2

42 U.S.C. § 1395w ..............................................................................2

42 U.S.C. § 1395w-3 ........................................................................passim

42 U.S.C. § 1395x .................................................................................2

42 U.S.C. § 1395ff ..........................................................................12, 13

42 U.S.C. § 1395ii ..............................................................................12

42 U.S.C. § 1395ww ..........................................................................11

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- vi -

Pub. L. 97-248, § 147, 96 Stat. 394 (Sep. 3, 1982) ..........................................................3

Balanced Budget Act of 1997 ("BBA"), Pub. L. 105-33, § 4021 (1997) ...........................3

Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("MMA"),
    Pub. L. 108-173, § 302(b)(1) (2003) ..............................................................1, 3

H.R. Rep. No. 108-178 (II), § 302 .....................................................................................3

## ADMINISTRATIVE MATERIALS

42 C.F.R. § 414.402 ...........................................................................................................22

CMS, Proposed Rule, 71 Fed. Reg. 25654 (May 1, 2006) ..............................................18

CMS, Notice, 72 Fed. Reg. 58856 (Oct. 17, 2007) ......................................................4, 5

CMS, Clinical Laboratory Demonstration Project Website,
    http://www.cms.hhs.gov/DemoProjectsEvalRpts/MD/itemdetail.asp?itemID=CMS1198949 .......4

## MISCELLANEOUS

Nancy-Ann DeParle, Medicare at 40: A Mid-Life Crisis?,
    7 J. Health Care L. & Pol'y 70 (2004) ........................................................2-3

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- vii -

# INTRODUCTION

This Court should dismiss plaintiffs' application. Plaintiffs fail to establish the irreparable injury necessary to obtain either a temporary restraining order or a preliminary injunction. Plaintiffs seek to halt a Congressionally mandated Medicare competitive bidding demonstration project at a time when bids are still being submitted, winners have yet to be chosen, and any final determinations in this experimental endeavor have yet to be made. Indeed, it is unclear at this juncture whether the demonstration project will move forward; if, after all bids have been submitted and reviewed, the Secretary of Health Human Services ("Secretary") concludes that no meaningful savings will be achieved by the demonstration, that there is insufficient participation, or that the demonstration poses too many other risks, he need not go ahead with the demonstration. Essentially, plaintiffs assert that if the project is allowed to proceed even to its very first step – the application stage – they will inevitably lose business, lay off employees, and even shut down. Far from being "imminent," plaintiffs' asserted injury is too speculative at this point to justify injunctive relief, or any relief whatsoever.

Furthermore, plaintiffs fail to demonstrate any likelihood of success in their suit because the Court lacks jurisdiction, and plaintiffs' claims have no merit. A provision of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("MMA"), Pub. L. 108-173, § 302(b)(1) (2003) removes the fundamental aspects of the competitive bidding process from judicial review. Even if the Court holds that provision inapplicable, the Medicare Act generally deprives courts of jurisdiction where, as here, plaintiffs fail to present their claims to the agency or exhaust administrative remedies. Indeed, the speculative nature of plaintiffs' injury deprives the Court of jurisdiction on ripeness and standing grounds alone.

Plaintiffs are not likely to fare any better if the Court were to reach the merits of their claims. First, there has been no "final agency action" that is subject to review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. The Secretary was not required to engage in rulemaking at this early stage when, as plaintiffs themselves note, the demonstration project is still evolving. Second, plaintiffs' challenge to the criteria that the Secretary has established thus far, in regard to who is required to submit bids and other aspects of the bidding

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction, Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 1 -

1   process, ignores the broad discretion that the Secretary may, and indeed must, exercise in

2   furtherance of making the demonstration project a success. By its very nature, a competitive

3   bidding system requires competition, and the Secretary has reasonably implemented Congress'

4   directive so as to ensure that the project bidding satisfies that fundamental requirement while also

5   protecting the smallest laboratories from being overrun. Third, as is well established, plaintiffs

6   cannot assert a takings claim when their choice to participate in the Medicare program is

7   voluntary. Finally, the Secretary's inclusion of specimen collection within the scope of a

8   competitive bidding project focused on laboratory tests is well within his authority. To enjoin

9   the demonstration project at this point will interfere with agency operations and cause

10  unjustifiable delay in an endeavor that is ultimately aimed at sustaining the Medicare program in

11  light of the ever-increasing financial burdens that it faces.

12  ### STATUTORY BACKGROUND

13  **A.    Overview Of Medicare Part B**

14      Title XVIII of the Social Security Act, commonly known as Medicare, 42 U.S.C. §§ 1395

15  et seq., provides federally-subsidized health insurance coverage to the elderly and disabled.

16  While Medicare Part A provides coverage for hospital expenses, Medicare Part B provides

17  optional supplemental coverage for some medical services and products excluded from Part A,

18  id. § 1395j, 1395k(a)(1), including "diagnostic laboratory tests," id. § 1395x(s)(3). See United

19  States v. Erika, Inc., 456 U.S. 201, 202-03 (1982). This coverage is funded by premiums paid by

20  Part B enrollees, together with government contributions, which are paid into the Federal

21  Supplementary Medical Insurance Trust Fund ("Trust Fund"). Id. at 202-03 (citing 42 U.S.C. §§

22  1395r, 1395s, 1395t, 1395w). As trustee of the Trust Fund, see id. at 203, the Secretary has a

23  fiduciary duty to protect the Trust Fund's assets. Experts expect that "Medicare spending will

24  continue to grow at a rate higher than the rest of the economy for the foreseeable future." See

25  Nancy-Ann DeParle, Medicare at 40: A Mid-Life Crisis?, 7 J. Health Care L. & Pol'y 70, 85

26  (2004). Accordingly, "Medicare faces significant long-term financing challenges." Id.

27  **B.    Medicare Competitive Bidding Demonstration Projects**

28      The demonstration project that is the subject of this lawsuit is the latest in a series of steps

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 2 -

1  that Congress has taken to address the financial challenges that Medicare faces.  Congress first

2  authorized the Secretary, through the Center for Medicare and Medicaid Services ("CMS"), to

3  develop and conduct Medicare demonstration projects "to determine whether the use of

4  competitive bidding . . . would be efficient and effective" in 1982.  Pub. L. 97-248, § 147, 96

5  Stat. 394 (Sep. 3, 1982) (adding subsection (a)(1)(K) to 42 U.S.C. § 1395b-1).  More recently,

6  with rising concern over Medicare financing, Congress has provided more specific direction.

7  The Balanced Budget Act of 1997 ("BBA"), Pub. L. 105-33, § 4021 (1997), directed the

8  Secretary to conduct demonstration projects that would examine whether the use of competitive

9  bidding to select suppliers of items and services under Medicare Part B would save money.  Id. §

10  4319 (enacting former version of 42 U.S.C. § 1395w-3).  These demonstration projects were

11  successful, and Congress therefore established competitive bidding as the permanent method for

12  setting prices for these items and services.  MMA, Pub. L. 108-173, § 302(b)(1) (2003) (revising

13  § 1395w-3); H.R. Rep. No. 108-178 (II), § 302 (finding that both taxpayers and Medicare

14  beneficiaries "saved significantly and quality standards were higher under the demonstration").

15        At the same time that it made those changes, Congress added a new subsection to §

16  1395w-3, directing the Secretary to undertake a new demonstration project that would apply the

17  competitive bidding process to another Medicare Part B service – clinical diagnostic laboratory

18  tests.  MMA, Pub. L. 108-173, § 302(b)(1) (2003) (enacting 42 U.S.C. § 1395w-3(e)).  This

19  demonstration project will use competitive bidding to set fees for laboratory services that would

20  otherwise be paid under a Medicare Part B fee schedule.  42 U.S.C. § 1395w-3(e)(1)(A)

21  (referencing the fee schedule for clinical diagnostic laboratory tests established pursuant to 42

22  U.S.C. § 1395l(h)).  Pap smear and colorectal cancer screening tests are excluded from the

23  project, as are all tests performed by entities that "have a face-to-face encounter with the

24  individual" being tested.  Id. § 1395w-3(e)(1)(A)-(B).  The MMA specified that laboratory tests

25  funded through this process must meet CLIA quality standards.  Id. § 1395w-3(e)(2)(B).  Other

26  than those specifications, as well as any "other conditions [that] the Secretary determines to be

27  appropriate," the project "shall be under the same conditions" set forth in § 1395w-3(a) and (b)

28  (with the exception of subsection (b)(5)(B)), which are "applicable to [those] items and services"

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 3 -

1  for which fees are set through the competitive bidding program that resulted from the earlier

2  Medicare Part B demonstration project.  Id. § 1395w-3(e)(2)(A).

3  **FACTUAL BACKGROUND**

4      In September 2004, CMS engaged the services of RTI International to assist with

5  designing and operating the laboratory test competitive bidding demonstration project.  RTI, in

6  turn, convened a Technical Expert Panel to provide advice during the development of the project.

7  CMS also held a Special Open Door Forum in August 2005.  CMS submitted its initial report to

8  Congress summarizing the proposed project design in April 2006.  It posted a draft Bidder's

9  Package on the CMS website on July 3, 2007, which was announced through CMS' listservs, and

10  held another Special Open Door Forum in July 2007.  On October 17, 2007, CMS announced

11  that the first three-year demonstration site for the project would be the metropolitan area of San

12  Diego-Carlsbad-San Marcos, California.  CMS, Notice, 72 Fed. Reg. 58856 (Oct. 17, 2007).

13  CMS issued the final Bidders' Package in November 2007.  Appendix A to that Package

14  included a series of Frequently Asked Questions ("FAQs") explaining specific aspects of the

15  bidding process.  A Bidder's Conference for potential bidders in the demonstration was held in

16  San Diego on December 5, 2007.  After the Bidder's Conference, CMS issued additional follow-

17  up questions and answers.[1]  See Wynn Decl. ¶¶ 9-18 (attached hereto as Exhibit A).

18      In materials issued as the project has developed, CMS has indicated that Congress' intent

19  in including a "face-to-face encounter" exemption in the statute was to exclude those laboratories

20  that bill as part of hospital services under Medicare Part A or that are part of a physician's office

21  and provide laboratory services as part of a beneficiary's visit to the physician's office.  Wynn

22  Decl. ¶¶ 20, 23. CMS therefore stated  that such laboratories are not subject to the demonstration

23  project.  Id.  In addition, CMS has indicated that end-stage renal disease ("ESRD") tests that are

24  billed as part of a bundle are excluded from the demonstration.  Id. ¶ 26.  ESRD tests that are

25  billed under Medicare Part B are included, but CMS has indicated that those laboratories that

26

27      [1]The CMS website contains a page devoted to the laboratory services competitive bidding

28  demonstration project, which includes downloadable pdf versions of all these documents.  See
http://www.cms.hhs.gov/DemoProjectsEvalRpts/MD/itemdetail.asp?itemID=CMS1198949.

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 4 -

1 exclusively provide testing to ESRD beneficiaries, or to beneficiaries in nursing facilities, do not

2 need to submit bids in order to participate in the project.  72 Fed. Reg. at 58857.  In addition,

3 CMS has indicated that laboratories that expect to supply less than $100,000 annually in

4 demonstration tests to Medicare beneficiaries in the test area are not required to submit a bid.  Id.

5 These "nonrequired" bidders may choose to submit a bid; CMS anticipates that some non-

6 required bidders may indeed choose to bid in an effort to gain in market share.  FAQs at 9 (# 23)

7 (attached as Exhibit 1 to Wynn Declaration).

8       If they are not otherwise excluded or exempted under the categories listed above,

9 laboratories that expect to provide at least $100,000 per year of services to Medicare

10 beneficiaries in the test area are required bidders.  72 Fed. Reg. at 58856; Wynn Decl. ¶ 19.

11 Required bidders who either lose in the bidding process or fail to submit bids may not bill

12 Medicare directly for any of the laboratory tests involved in the project.  FAQs at 12 (#34).

13 Nonrequired bidders who opt to submit a bid but lose are also precluded from billing Medicare

14 directly although they may still contract with winning laboratories to provide services to

15 Medicare beneficiaries in the project area.  FAQs at 8 (#16).  Those laboratories whose bids are

16 accepted as winners, as well as nonrequired bidders who opt not to bid, may bill Medicare

17 directly and will receive a set fee based on the demonstration fee schedule that is determined

18 through the competitive bidding process.  The terms and conditions that will govern CMS'

19 contracts with winning laboratories are not yet final.  FAQs at 15 (#47).

20       CMS has included 303 laboratory tests as part of the demonstration project and has

21 indicated that bidders must submit bids on all 303 tests.  CMS anticipates that no single bidder

22 actually performs all 303 tests in its own laboratory, but expects that bidders will form

23 relationships with other laboratories that would act as "reference laboratories," performing any

24 tests the bidder does not perform under a contractual relationship with the bidder, so that all 303

25 tests would be covered.  There is no restriction on participating in the demonstration project as a

26 reference laboratory as well as a bidder.  Indeed, unsuccessful bidders may continue to serve as

27 reference laboratories, performing tests for Medicare beneficiaries in the project area, but being

28 compensated for these tests through their contractual relationships with the winning bidders who

1  bill Medicare directly.

2      Under the current schedule for implementation of the project, the deadline for submitting

3  bids is February 15, 2008.  CMS anticipates that it will select the winning bidders on April 11,

4  2008, and that it will begin to pay for laboratory tests included in the demonstration project under

5  the project's fee schedule on July 1, 2008.

6                                    <u>**ARGUMENT**</u>

7  **I.  PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER STANDARDS**

8  

9      "'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not

10  be granted unless the movant, by a clear showing, carries the burden of persuasion.'"  <u>Mazurek v.</u>

11  <u>Armstrong</u>, 520 U.S. 968, 972 (1997).  The Ninth Circuit has described two sets of criteria for

12  preliminary injunctive relief:  "Under the traditional test, a plaintiff must show: (1) a strong

13  likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if

14  preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4)

15  advancement of the public interest (in certain cases)."  <u>Natural Res. Def. Council v. Winter</u>, 502

16  F.3d 859, 862 (9th Cir. 2007).  Alternatively, a plaintiff must "demonstrate either a combination

17  of probable success on the merits and the possibility of irreparable injury or that serious

18  questions are raised and the balance of hardships tips sharply in his favor."  <u>Id.</u>  "These two

19  formulations represent two points on a sliding scale in which the required degree of irreparable

20  harm increases as the probability of success decreases."  <u>Id.</u>

21      However, no matter how great the plaintiff's showing of irreparable harm, "it must be

22  shown as an irreducible minimum that there is a fair chance of success on the merits."  <u>Martin v.</u>

23  <u>Int'l Olympic Comm.</u>, 740 F.2d 670, 675 (9th Cir. 1984).  And no matter how great the

24  likelihood of success on the merits, "the moving party must demonstrate a significant threat of

25  irreparable injury."  <u>Big Country Foods, Inc. v. Bd. of Educ. of the Anchorage Sch. Dist.</u>, 868

26  F.2d 1085, 1088 (9th Cir. 1989).  Mere speculation that an injury will occur, however severe the

27  injury might be, is insufficient.  <u>Id.</u>; <u>Caribbean Marine Servs. Co. v. Baldrige</u>, 844 F.2d 668, 674

28  (9th Cir. 1988).  Furthermore, "when the public interest is involved, it must be a necessary factor

in the district court's consideration of whether to grant preliminary injunctive relief."  <u>Id.</u>  The

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 6 -

1    petitioner bears the burden of proof on each factor and must provide facts supporting its

2    assertions.  See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers, Local

3    No. 70 of Alameda County, 415 U.S. 423, 441 (1974).  As this Circuit has recognized, injunctive

4    relief is a "'harsh and drastic' discretionary remedy, never an absolute right." Abend v. MCA,

5    Inc., 863 F.2d 1465, 1479 (9th Cir. 1988).

6         The purpose of a temporary restraining order ("TRO") is to preserve the *status quo* and

7    prevent "irreparable loss of rights" before a preliminary injunction hearing may be held.  Garrett

8    v. City of Escondido, 465 F. Supp. 2d 1043, 1048 (S.D. Cal. 2006).  A TRO applicant must

9    therefore "demonstrate 'immediate and irreparable injury, loss or damage.'" Id. at 1049 (quoting

10   Fed. R. Civ. P. 65(b)).  Otherwise, the standard for issuing a TRO is similar to that for a

11   preliminary injunction.  Id.

12   **II.    PLAINTIFFS FAIL TO ESTABLISH THE IRREPARABLE INJURY**
          **NECESSARY TO OBTAIN EITHER A TEMPORARY RESTRAINING ORDER**
13        **OR A PRELIMINARY INJUNCTION**

14        Plaintiffs fail to demonstrate that they are entitled to a temporary restraining order or

15   preliminary injunctive relief under either the "traditional" test or "alternate" test employed for

16   such relief in the Ninth Circuit.  As will be demonstrated below, plaintiffs cannot show any

17   likelihood of success on the merits, much less a strong one.  Of primary significance, however,

18   plaintiffs' failure to show that they are threatened with immediate and irreparable harm is fatal to

19   their efforts to obtain a temporary restraining order or preliminary injunctive relief.  See

20   Arcamuzi v. Continental Airlines, Inc., 819 F.2d 935, 937 (9th Cir. 1987) ("Under any

21   formulation of the test, the moving party must demonstrate a significant threat of irreparable

22   injury.").

23        What plaintiffs attempt to portray as an imminent and inevitable injury if the

24   demonstration project is not immediately enjoined is actually pure speculation built upon a series

25   of unsupported assumptions.  Plaintiffs suggest that they will suffer irreparable harm because, if

26   they are unsuccessful in the bidding process, their businesses will suffer and may be forced to

27   close.  See Pl. Mem. at 13 (arguing plaintiff Internist "faces a significant threat of being forced

28   out of business" if its bid is unsuccessful); id. at 14-15 (arguing plaintiff Sharp will be forced to

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 7 -

shut down some laboratory components if its bid is unsuccessful); id. at 15 (arguing plaintiff

Scripps will be forced to reduce its laboratory services if its bid is unsuccessful). The entire basis

for their allegation of irreparable harm is thus their assumption that they will lose in the bidding

process. They explain that they expect to lose because they do not perform all 303 tests that are

part of the project, and they believe that the prices they bid for tests that are performed elsewhere

will not be competitive. Id. at 13-15 (citing declarations).

There is simply no reason to assume, at this point, that plaintiffs will inevitably be

unsuccessful bidders, or even that their businesses will suffer greatly if they are unsuccessful. As

previously noted, CMS does not anticipate that any laboratory will perform all 303 tests covered

by the demonstration, so there is no reason to assume that plaintiffs are at a competitive

disadvantage in that regard. See Wynn Decl. ¶ 24. Moreover, CMS has specifically designed the

bidding process to incorporate the common industry practice of forming contractual relationships

with "reference" laboratories to provide those tests that the first laboratory does not perform on

site. Id. Furthermore, as plaintiffs themselves acknowledge, CMS has emphasized that the

selection of winners, as well as the number of winners, will be based on both price and non-price

criteria, including quality, financial stability, capacity, and geographic coverage, including ability

to provide services to special populations and provider types. See Wynn Decl. ¶ 25; FAQs at 14-

15 (#45, 46). Although CMS will initially set a financially competitive bid range before

examining non-price criteria, the process contemplates expanding that range as needed in light of

non-price criteria. Id. The selection process is aimed at achieving the goals of the demonstration

project while ensuring that the projected needs of all Medicare beneficiaries within the project

area will be met. Id.[2]

_____

[2]In addition to arguing that their business operations will be harmed, plaintiffs also claim that the demonstration project will harm Medicare beneficiaries by making laboratories inaccessible and degrading the quality of care beneficiaries receive. Pl. Mem. at 14-16. "[T]he traditional irreparable injury standard examines the possibility of injury to [the plaintiff] and not third parties." Phany Poeng v. United States, 167 F. Supp. 2d 1136, 1142 (S.D. Cal. 2001) (rejecting store owner's argument, in support of his request for a stay of administrative action, that his store's disqualification from the food stamp program would irreparably harm food stamp recipients who were his customers). Additionally, CMS has stated its intention to ensure that

1    Plaintiffs further assume that if they do not win in the bidding process, they will be

2    entirely unable to perform any of the specified tests for Medicare beneficiaries in the project area

3    and will thus inevitably lose all revenue derived from these tests.  However, while the terms of

4    the demonstration project would prevent plaintiffs from billing Medicare for these tests,

5    nonwinning laboratories may perform these tests on a contract basis for winning laboratories.

6    See FAQs at 17 (#54) ("A non-winning laboratory . . . can act as a subcontractor/reference

7    laboratory to winning and passive laboratories . . . .").  Medicare suppliers of laboratory tests are

8    expressly allowed to contract out to reference laboratories up to 30 % of the services they bill to

9    Medicare.  42 U.S.C. § 1395*l*(h)(5)(A)(ii)(III).

10    Even if plaintiffs' speculative predictions of injury could be credited, the threat certainly

11    cannot be deemed "immediate" such that a TRO would be warranted.  While bids are currently

12    due on February 15, 2008, CMS is not scheduled to announce who has been selected as winners

13    of the competitive bidding process until April 11, 2008, and payments will not begin to be made

14    under the project until July 1, 2008.  Even if plaintiffs' claims were to proceed to the merits, this

15    case would be limited to review of an administrative record and the consideration of legal issues;

16    there would be no discovery or trial.  Thus, there is no reason at this point to assume that there is

17    any possibility at all of injury occurring before the case is resolved.

18    Accordingly, this Court should deny plaintiffs' motion for a temporary restraining order

19    and preliminary injunction on this basis alone.

20

21

22

23

24    beneficiaries retain access and not to allow the quality of care to be affected.  Wynn Decl. ¶ 29.
      Plaintiffs have failed to provide any meaningful evidence that CMS will be unable to meet its

25    own stated goals, or that the entire project is doomed from the start, before it even begins.  See
      Parsons & Whittemore, Enters. Corp. v. Cello Energy, LLC, No. 07-743, 2008 WL 227952, at

26    *24 (S.D. Ala. Jan. 25, 2008) (denying a preliminary injunction where plaintiff failed to present
      sufficient evidence that the project it sought to enjoined was "a doomed project if an entity other

27    than [plaintiff] constructs it").  Furthermore, if the project as currently structured fails to yield

28    bids that, in CMS' view, appear likely to achieve the project's goals, it is doubtful that the
      demonstration will actually take place as currently planned.

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

**III.    PLAINTIFFS FAIL TO SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS**

    **A.    THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS BECAUSE CONGRESS HAS PRECLUDED JUDICIAL REVIEW OF THE DEMONSTRATION PROJECT'S BIDDING STRUCTURE, AWARD OF CONTRACTS, AND PAYMENT AMOUNTS**

        By developing and implementing a laboratory services demonstration project, the Secretary is acting pursuant to the explicit directive from Congress that he "shall conduct a demonstration project on the application of competitive acquisition," as it has already been developed in regard to other items and services, "to clinical diagnostic laboratory tests." 42 U.S.C. § 1395w-3(e)(1).  In furtherance of this objective, Congress provided that the demonstration project is to be conducted "under the same conditions as are applicable to items and services described in [§ 1395w-3(a)(2)] . . . and other conditions as the Secretary determines to be appropriate."  Id. § 1395w-3(e)(2)(A).  One of the conditions applicable to competitive bidding programs involving such items and services is that they are conducted, in large part, outside the scope of administrative or judicial review.  Specifically, the MMA expressly bars judicial review of:

> (A) the establishment of payment amounts under paragraph (5);
> (B) the awarding of contracts under this section;
> (C) the designation of competitive acquisition areas under subsection (a)(1)(A) of this section;
> (D) the phased-in implementation under subsection (a)(1)(B) of this section;
> (E) the selection of items and services for competitive acquisition under subsection (a)(2) of this section; or
> (F) the bidding structure and number of contractors selected under this section.

Id. § 1395w-3(b)(10).

        Through this provision, Congress insulated from judicial review the fundamental aspects of the competitive bidding process established in this section – essentially covering its creation, design, and operation.  A clear statutory bar of this kind overcomes the general presumption of review of agency action under the APA, 5 U.S.C. §§ 701-706.  Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 673 (1986) (explaining that the presumption "may be overcome by, inter alia, specific language . . . that is a reliable indicator of congressional intent" (internal

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction, Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 10 -

1    quotation omitted)).  Thus, in <u>Skagit County Public Hospital Dist. No. 2 v. Shalala</u>, 80 F.3d 379

2    (9th Cir. 1996), the Ninth Circuit recognized that the statutory bar of judicial review of

3    administrative geographic reclassification decisions in 42 U.S.C. § 1395ww(d)(10)(C)(iii)(II)

4    effectively deprived the district court of jurisdiction over challenges to such decisions.  80 F.3d at

5    386.[3]  Indeed, a number of courts have recognized that similar "no review" provisions bar

6    judicial review with respect to other aspects of Medicare Part B.  <u>See, e.g.</u>, <u>Amgen, Inc. v.</u>

7    <u>Smith</u>, 357 F.3d 103, 112 (D.C. Cir. 2004) (holding judicial review barred under 42 U.S.C. §

8    1395*l*(t)(12)); <u>Am. Soc'y of Cataract & Refractive Surgery v. Thompson</u>, 279 F.3d 447, 452 (7th

9    Cir. 2002) (holding judicial review barred under 42 U.S.C. § 1395w-4(*i*)(1)); <u>Painter v. Shalala</u>,

10    97 F.3d 1351, 1356-57 (10th Cir. 1996) (same); <u>Am. Soc'y of Anesthesiologists v. Shalala</u>, 90 F.

11    Supp. 2d 973, 975 (N.D. Ill. 2000) (same); <u>Am. Soc'y of Dermatology v. Shalala</u>, 962 F. Supp.

12    141, 146 (D.D.C. 1996), <u>aff'd</u>, 116 F.3d 941 (1997) (same).

13         Plaintiffs here seek to challenge the criteria that CMS has established for who is required

14    to submit bids in order to participate in the San Diego demonstration project, as well as other

15    aspects of the competitive bidding process.  Compl. ¶ 36.  In particular, they challenge the

16    requirement that bidders include in their submissions a bid for specimen acquisition.  <u>Id.</u> ¶ 43.

17    They also challenge, on both procedural and substantive grounds, what they refer to as

18    "substantive changes in the policy for paying for and delivering laboratory services" in the

19    demonstration project area.  <u>Id.</u> ¶ 32; <u>see also</u> <u>id.</u> ¶ 38 (alleging that these changes effect an

20    unconstitutional taking).  The subjects of plaintiffs' challenge fit within at least three of the

21    categories for which judicial review is prohibited – specifically, bidding structure, 42 U.S.C. §

22    1395w-3(b)(10)(F); award of contracts, <u>id.</u> § 1395w-3(b)(10)(B); and establishment of payment

23

24

25

26         [3]In <u>Skagit</u>, the Ninth Circuit distinguished between challenges to individual
27    reclassification decisions, which are barred under the language of the "no review" provision in §
      1395ww(d)(10)(C)(iii)(II) , and challenges to "'methods' and other collateral issues." <u>Id.</u> The
28    "no review" provision in § 1395w-3(b)(10) is by its terms much broader in scope, including all
      major aspects of the competitive bidding process.

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 11 -

1  amounts, id. § 1395w-3(b)(10)(A).  Judicial review is therefore foreclosed.[4]

2  **B.    IF JUDICIAL REVIEW IS NOT STATUTORILY BARRED,
           JURISDICTION IS LACKING BECAUSE PLAINTIFFS FAIL TO MEET
3          MEDICARE'S PRESENTMENT AND EXHAUSTION REQUIREMENTS**

4      If the Court disagrees that 42 U.S.C. § 1395w-3(b)(10) bars administrative and judicial

5  review of plaintiffs' claims, those claims remain doomed because plaintiffs have failed to pursue

6  the administrative avenue that would then be open to them under 42 U.S.C. § 1395ff.  Plaintiffs

7  assert jurisdiction under 28 U.S.C. § 1331.  However, where judicial review is potentially

8  available (after exhaustion of the administrative appeals process) pursuant to § 1395ff(b)(1)(A),

9  relief is precluded under any other jurisdictional statute.  Under 42 U.S.C. § 1395ii

10  (incorporating 42 U.S.C. § 405(h)), "the sole avenue for judicial review for all 'claim[s] arising

11  under' the Medicare Act" is 42 U.S.C. § 1395ff(b)(1)(A) (incorporating 42 U.S.C. § 405(g)), "to

12  the exclusion of 28 U.S.C. § 1331."  Heckler v. Ringer, 466 U.S. 602, 615 (1984); see also

13  Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 10 (2000).  The "claim arising

14  under" language is broadly construed, "includ[ing] any claims in which 'both the standing and

15  the substantive basis for the presentation' of the claims" is the Medicare Act.  Ringer, 466 U.S. at

16  615 (quoting Weinberger v. Salfi, 422 U.S. 749, 760-61 (1975)).  Indeed, the bar on federal-

17  question jurisdiction "plainly" applies "irrespective of whether the individual challenges the

18  agency's denial on evidentiary, rule-related, statutory, constitutional, or other legal grounds."

19  Illinois Council, 529 U.S. at 10.  Most significantly for purposes of this case, in Illinois Council,

20  the Court recognized that the bar also applies where a plaintiff seeks to challenge an agency

21  policy on "general legal grounds," if that plaintiff *might* later" submit a claim to the agency that

22  _____

23      [4]Plaintiffs cite two cases in support of their contention that judicial review is available
    under the APA.  Pl. Mem. at 11.  However, neither of these cases involved challenges to aspects
24  of Medicare programs over which judicial review was statutorily prohibited, or to demonstration
    projects that were specifically authorized, indeed mandated, by Congress.  See Beno v. Shalala,
25  30 F.3d 1057, 1066-67 (9th Cir. 1994) (rejecting argument that a compliance waiver in the
    context of the Aid to Families with Dependent Children program was unreviewable under the
26  APA exception for actions "committed to agency discretion by law" because the waiver statute
    provided standards that could be applied); Nat'l Ass'n of Psychiatric Treatment Ctrs. v.
27  Weinberger, 658 F. Supp. 48, 51-53 (D. Colo. 1987) (applying similar analysis), vacated by 909
    F,2d 1378 (10th Cir. 1990).
28

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

1    "*might* later" be denied due to that policy. Id. at 11, 23. In other words, the "channeling

2    requirement" set forth in § 1395ff(b)(1)(A) is mandatory even though the agency policy in

3    question would, if adhered to, lead the agency to deny the administrative claim. Id. at 23

4    (explaining that even though the pursuit of an administrative remedy may itself be futile, a

5    plaintiff will "remain free," afterwards, "to contest in court the lawfulness of any regulation or

6    statute upon which an agency determination depends"). Following this path "provides the

7    agency the opportunity to reconsider its policies, interpretations, and regulations in light of th[e]

8    [administrative] challenges." Id. at 24.

9         The bar on federal question jurisdiction applies here, assuming there is no bar on

10   administrative and judicial review in the first place. A laboratory participating in Medicare may

11   challenge a laboratory test reimbursement decision through the administrative process set forth in

12   § 1395ff(b)(1). See Mich. Ass'n of Indep. Clinical Labs. v. Shalala, 52 F.3d 1340, 1345-46 (6th

13   Cir. 1994) (describing the administrative review process for Part B suppliers, including

14   laboratories). The availability of that avenue of relief prevents plaintiffs from bringing any of the

15   claims they raise in their Complaint.[5] Instead, in order to bring their claims to a court, plaintiffs

16   would have to proceed through the bidding process. Once the winners are selected, plaintiffs

17   would then (whether they win or lose) be in a position to submit claims for laboratory tests to

18   Medicare. If they are dissatisfied with the reimbursement they receive, they may then present

19   their claim to CMS and pursue an administrative remedy – both prerequisites to judicial review.

20   Ringer, 466 U.S. at 617 (explaining that exhaustion in the Medicare context "consists of a

21   nonwaivable requirement that a claim for benefits shall have been presented to the Secretary,"

22   together with "a waivable requirement that the administrative remedies prescribed by the

23   Secretary be pursued fully by the claimant" (internal quotation omitted)). Once the Secretary

24   renders a decision, plaintiffs may then seek judicial review – but pursuant to § 1395ff(b)(2) rather

25

26   ─────────────

27        [5]In particular, the Supreme Court explained in Ringer that procedural challenges based on
     the rulemaking requirements of 5 U.S.C. § 553 are barred under this analysis because rulemaking
28   claims in this context are "inextricably intertwined" with claims for benefits. Ringer, 466 U.S. at
     614.

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 13 -

1    than the APA.[6]  Because plaintiffs have neither presented their claim to the agency nor pursued

2    their administrative remedy to completion, their current claims before this Court are barred.[7]

3              **C.    RIPENESS AND STANDING REQUIREMENTS ARE NOT MET**

4              The fact that plaintiffs cannot yet seek an administrative remedy because they have yet to

5    file a claim within the framework of the demonstration project – and indeed, have yet to submit

6    their bids, and be declared (according to their own predictions) nonwinners – should only serve

7    to reinforce the Court's conclusion that judicial review is barred at this time.  As the Supreme

8    Court recognized in Illinois Council, the "channeling requirement" for claims arising under

9    Medicare "reaches beyond ordinary administrative law principles of 'ripeness' and 'exhaustion of

10   administrative remedies.'"  529 U.S. at 13.  Even without regard to the specific Medicare context

11   that governs this case, the concerns underlying the Article III "case or controversy" requirements

12   of ripeness and standing are clearly in play here and warrant dismissal of plaintiffs' claims.

13             The purely speculative nature of plaintiffs' alleged injury is by itself sufficient to bar their

14   claims.  The intertwined standing and ripeness doctrines require a plaintiff to assert an injury

15   "that is real and concrete rather than speculative and hypothetical."  Thomas v. Anchorage Equal

16   Rights Comm'n, 220 F.3d 1134 (9th Cir. 2000) (en banc) (internal quotation omitted); see Bates

17   v. UPS, Inc., 511 F.3d 974, 985 (9th Cir. 2007) (Article III standing requires plaintiffs to assert

18   an injury that is "'concrete and particularized'" and "'actual or imminent, not conjectural or

19   hypothetical'" (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)); Portman

20   v. County of Santa Clara, 995 F.2d 898, 902 (9th Cir. 1993) (the ripeness doctrine "seeks to

21   separate matters that are premature for review because the injury is speculative and may never

22

23             [6]Because the Court lacks jurisdiction over plaintiffs' claims, dismissal of the case, and
     denial of plaintiffs' applications for a TRO and preliminary injunction as moot, would be
24   appropriate.  See Pinewood Healthcare, LLC v. Leavitt, No. 07-59, 2007 WL 1381802, at *4 (D.
     Idaho Mar. 16, 2007).
25

26             [7]Notably, to the extent plaintiffs' claim might otherwise be construed as a pre-award bid
     protest, for which jurisdiction would be available in the Court of Federal Claims under the
27   Tucker Act, 28 U.S.C. § 1491(b)(1), the Federal Circuit has held that such jurisdiction is
     unavailable in cases arising under the Medicare Act.  Wilson ex rel. Estate of Wilson v. United
28   States, 405 F.3d 1002, 1015 (Fed. Cir. 2005).

1    occur from those cases that are appropriate for federal court action" (internal quotation omitted)).

2        In <u>Florida Ass'n of Medical Equipment Dealers v. Apfel</u>, 194 F.3d 1227 (11th Cir. 1999),

3    the court considered a challenge to the demonstration project under the previous version of §

4    1395w-3, involving competitive bidding for contracts to supply other Medicare Part B items and

5    services – specifically, durable medical equipment, prosthetics, and orthotics ("DMEPOS"). <u>Id.</u>

6    at 1228-29. Similar to this case, the plaintiffs filed suit before submitting any bids, challenging

7    the process that was used to develop the project. <u>Id.</u> at 1229. The court held that the plaintiffs

8    lacked standing based on the speculative nature of their alleged injury. <u>Id.</u> at 1230 (describing

9    plaintiffs' assertion that "*if* [they] were to bid, [they] *could* be forced to participate in a 'tainted'

10   bidding project, which *might* prove unsuccessful, and *potentially* threaten the[ir members']

11   livelihood . . . *should their bids be rejected*"). Though the claim in that case was brought under

12   the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. II, rather than the APA, plaintiffs

13   here rely on the same series of speculative assumptions regarding what *might* happen if they

14   submit bids. Plaintiffs simply have not shown with any degree of certainty that they will be

15   unsuccessful in the bidding process, nor have they provided more than bare assertions in support

16   of the notion that they will inevitably go out of business should their bids fail. Indeed, they have

17   not even shown that the San Diego area laboratory test competitive bidding demonstration

18   project will necessarily go forward at all.

19       The fact that plaintiffs qualify as "required bidders" under the Secretary's implementation

20   of § 1395w-3(e), and must therefore submit bids if they choose to be considered for selection as

21   "winners" in the demonstration project's competitive bidding process, is not an "injury"

22   sufficient to confer standing. No rights or obligations on the part of laboratories are established

23   by their designation as a "required bidder." That designation is only the first step toward the

24   ultimate determination of which laboratories will be selected as "winners." Plaintiffs have

25   therefore failed to point to any concrete nonspeculative injury that would allow them to assert a

26   claim under the doctrines of ripeness or standing.[8]

27   ───────────────

28       [8]Plaintiffs lack standing to assert some of their specific claims for other reasons as well.
     For example, plaintiffs claim that CMS' designation of laboratories that only serve nursing

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 15 -

1

2

### D.   PLAINTIFFS HAVE FAILED TO SHOW THEY ARE LIKELY TO SUCCEED ON COUNT ONE

Plaintiffs allege in Count I of their Complaint that the Secretary violated 5 U.S.C. § 553(b) by failing to engage the informal rulemaking process set forth in that provision in the course of developing the laboratory services competitive bidding demonstration project.  They are unlikely to succeed on this claim.  Even if the Court determines there is federal question jurisdiction over plaintiffs' APA claims, judicial review under the APA would be unavailable for plaintiffs' rulemaking claim because the Secretary has not taken a "final agency action" that required him to follow the rulemaking process.  A claim alleging failure to follow rulemaking procedures falls under the APA judicial review provisions at 5 U.S.C. §§ 701-706.  Specifically, a claim such as plaintiffs' would be reviewed under 5 U.S.C. § 706(2)(D), which allows a court to set aside agency action that is taken "without observance of procedure required by law."  It is well established, however, that only "final agency action" can be challenged under the provisions of § 706(2).  Ecology Ctr., Inc. v. U.S. Forest Serv., 192 F.3d 922, 924 (9th Cir. 1999) (recognizing that an agency action challenged under the APA "must be a final agency action for which there is not any other adequate court remedy" (citing 5 U.S.C. § 704)).

In order for an agency action to qualify as "final," two independent requirements must be met: (1) the action must "mark the consummation of the agency's decision making process"; and (2) the action must "be one by which rights or obligations have been determined or from which

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

facility and end stage renal disease ("ESRD") patients as nonrequired bidders is arbitrary and capricious.  Compl. ¶ 36(b).  Yet plaintiffs themselves do not fall in this category.  Thus, even if plaintiffs could satisfy the injury-in-fact requirement, that injury could not possibly be caused by this alleged policy, see Bates, 511 F.3d at 985 (standing's causation prong requires that the alleged injury be "'fairly traceable' to the challenged conduct"), nor have plaintiffs asserted any basis for recognizing third-party standing on behalf of such laboratories, see Devlin v. Scardelletti, 536 U.S. 1, 7 (2002).  In addition, plaintiffs do not allege any concrete injury resulting from the project's alleged proposed "use [of] Medicare claims paid data to determine and project test volume demand."  Compl. ¶ 36(e).  Their statement that "laboratories find themselves having to bid on testing for which the volume is not known," id., is far too nebulous to qualify as an allegation of injury.  Moreover, since whatever impact the projected test volume demand might have would presumably affect all bidders, it is unclear what injury could conceivably result to plaintiffs through the course of the competitive process.

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction, Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 16 -

1  legal consequences flow." Id. at 925 (citing Bennett v. Spear, 520 U.S. 154, 177 (1997)); cf.

2  Indus. Customers of Nw. Utilities v. Bonneville Power Admin., 408 F.3d 638, 646 (9th Cir.

3  2005) (listing as "indicia" of a final agency action "whether the [action] amounts to a definitive

4  statement of the agency's position, whether the [action] has a direct and immediate effect on the

5  day-to-day operations of the party seeking review, and whether immediate compliance [with the

6  terms] is expected" (internal quotation omitted)).  Plaintiffs have failed to identify any CMS

7  action that meets both of these requirements.  They certainly cannot claim that any rights,

8  obligations, or legal consequences have flowed to them at this point – where no bids have been

9  awarded –  as a result of any policies that they claim to challenge.

10        In addition, it is clear that the "policies" that, according to plaintiffs, should already have

11 been promulgated through § 553 rulemaking do not represent the consummation of CMS'

12 decisionmaking process.  Indeed, plaintiffs' Complaint admits that the policies they seek to

13 challenge are still "continu[ing] to evolve."  Compl. ¶ 33.  In their brief, plaintiffs specifically

14 refer to 'the policies . . . set forth in the December 2007 questions and answers."  Pl. Mem. at 18.

15 Yet at the same time, they acknowledge that CMS "continue[s] to tweak and revise" those

16 policies.  Id. at 17.  Policies that are still being developed and revised are not "final" for purposes

17 of APA review.  Cf. Whitman v. Am. Trucking Ass'n, 531 U.S. 457, 478 (2001) (holding that an

18 "interim" EPA policy was a "final" agency action only where there were significant indications

19 that the EPA did not intend to modify the policy).  Moreover, the fact that the award of bids

20 during the three-year project may have some economic consequence does not suffice to make

21 agency action final where the agency may still make adjustments as the project goes along.  Cf.

22 Indus. Customers, 408 F.3d at 646, 647 (an agency decision that triggers the beginning of a rate

23 adjustment process is not a "final agency action" despite the "sometimes profound" economic

24 consequences the decision might have on affected companies); In re Sac & Fox Tribe of Miss. in

25 Iowa/Meskwaki Casino Litig., 340 F.3d 749, 756 (8th Cir. 2003) ("A temporary closure order

26 inherently is not 'the consummation of the agency's decisionmaking process,' even though it may

27 have an immediate effect on the [plaintiff's] finances in the near term.").

28        It is hardly surprising that CMS is at this point continuing to make adjustments to the

competitive bidding process that the demonstration project is designed to test.  Indeed, the entire purpose of the demonstration project is to provide a limited experimental context that allows CMS to try out a new payment system before it reports back to Congress recommending statutory programmatic change and, subsequently, initiates the rulemaking process to implement that change.  Congress' grant of authority to the Secretary to carry out such projects reflects the reasonable notion that abstract theorizing about how an untested system will work, even theorizing that involves input from outside sources, is no substitute for an on-the-ground practical experiment.  See 42 U.S.C. § 1395w-3(e).  The broad discretion granted to the Secretary, which allows him to impose any conditions on the project that he "determines to be appropriate," id. § 1395w-3(e)(2)(A), also reflects the specialized technical nature of designing a project within a limited geographic area, within a limited time period, that will facilitate market competition through competitive bidding; the forces at work in such an endeavor are likely to call for on-the-ground adjustment.  The policies that will emerge from this project remain to be clarified, and possibly modified, on an ongoing basis as the project continues.  Once the project is concluded, CMS will decide whether to proceed with a competitive bidding system for determining Medicare payment amounts for laboratory testing, and, if it does proceed, it will then engage in a rulemaking process.[9]  Requiring CMS to complete that process now would significantly impair its flexibility in monitoring and adjusting the demonstration project as it goes forward, which may in turn interfere with the project's success, as well as with CMS' stated goal of implementing the project without adversely affecting the access to and quality of laboratory services provided to Medicare beneficiaries.  Thus, even assuming that plaintiffs' rights or obligations with respect to some Medicare payments have been, or may at some point during the course of the project be, determined – at least for a temporary period and in a limited geographic

_____

[9]That is exactly what happened for the DMEPOS competitive bidding, tested in the demonstration projects conducted under the previous version of § 1395w-3, and now, as modified, being phased in on a permanent basis. See CMS, Proposed Rule, 71 Fed. Reg. 25654, 25657 (May 1, 2006) (discussing the prior competitive bidding demonstration projects and proposing regulations that would govern the competitive bidding process in the future).

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction, Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 18 -

1    area – that is insufficient to invoke APA review.[10]

2         Plaintiffs are also unlikely to prevail because they are unlikely to be able to show that

3    they were prejudiced by CMS' failure to promulgate rules under § 553 prior to its

4    implementation of the project.  The APA instructs that reviewing courts take "due account ... of

5    the rule of prejudicial error."  5 U.S.C. § 706; see Riverbend Farms, Inc. v. Madigan, 958 F.2d

6    1479, 1488 (9th Cir. 1992) (holding agency's failure to comply with technical requirements of §

7    553 notice and comment procedures was harmless where sufficient notice and public comment

8    occurred); Sagebrush Rebellion, Inc. v. Hodel, 790 F.2d 760, 764-69 (9th Cir. 1987) (same).

9    Although CMS did not publish a notice of rulemaking for the geographically and temporally

10   limited demonstration project in the Federal Register, it has, during a period of more than three

11   years, made information about the project publicly available in a number of different fora and

12   media, has solicited comments and held meetings, and, as plaintiffs acknowledge, has been

13   responsive to input from those sources.  Pl. Mem. at 17 (stating that CMS has "change[d] and

14   clarif[ied] certain policies" in response to laboratory input).  As plaintiffs are Medicare suppliers,

15   there is no question that they, like laboratories across the country, received actual notice of the

16   project and ample opportunity to provide input well in advance of its scheduled implementation.

### E.    PLAINTIFFS HAVE FAILED TO SHOW THEY ARE LIKELY TO SUCCEED ON COUNT TWO

17   
18         In Count Two of their Complaint, plaintiffs list what they refer to as "new policies" that

19   the Secretary "intends to implement with respect to the demonstration project" and seek to set

20   aside these "policies" as arbitrary, capricious, and an abuse of discretion pursuant to 5 U.S.C. §

21   706(2)(A).  The "final agency action" requirement discussed above applies equally to Count

22   Two, and – to the extent the subjects of plaintiffs' challenge constitute "policies" at all – bars this

23   APA claim as well.  See Citizens for Better Forestry v. U.S. Dep't of Agric., 481 F. Supp. 2d

24   1059, 1070 (N.D. Cal. 2007) (applying "final agency action" requirement to § 706(2)(A)

25   challenge).  In addition, for at least some of plaintiffs' claims, the broad grant of authority to the

26   

27         [10]Adhering to 5 U.S.C. § 553 does not always involve following notice and comment
28   procedures, where an agency "for good cause finds . . . that notice and public procedure thereon
     are impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(3)(B).

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

1  Secretary to apply CMS' specialized expertise to design and implement a successful – in both

2  economic and noneconomic terms – competitive bidding demonstration project leaves no

3  meaningful standards for a court to apply, removing those claims from review under 5 U.S.C. §

4  701(a)(2).  If the Court were to reach plaintiffs' Count Two claims on the merits, it should easily

5  conclude that the Secretary's interpretation of the demonstration project criteria set forth in 42

6  U.S.C. § 1395w-3(e) is neither arbitrary nor capricious.

7          The degree of judicial deference owed an agency interpretation depends on whether the

8  agency is acting under authority expressly delegated to it by Congress.  Gonzales v. Oregon, 546

9  U.S. 243, 255-56 (2006); see also United States v. Mead Corp., 533 U.S. 218, 233 (2001)

10  (explaining that the degree of authority delegated by Congress is a more significant indicator than

11  whether an agency issues its interpretation through notice-and-comment rulemaking or formal

12  adjudication procedures).  In the Medicare context, courts have recognized that the Secretary's

13  interpretations must be accorded the highest degree of deference, pursuant to the standard set

14  forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44

15  (1984).  Resident Councils of Wash. v. Leavitt, 500 F.3d 1025 (9th Cir. 2007) ("[W]e have

16  regularly applied *Chevron* deference to agency interpretations of the Medicare and Medicaid

17  statutes.").  This deference is warranted not only because the Secretary is charged with

18  administering the Medicare program, but also because "the statute is one of great complexity, and

19  the area it regulates – the financing of health-care delivery – is one in which the agency has much

20  expert understanding."  Kean v. Heckler, 799 F.2d 895, 903 (3d Cir. 1986).

21          Here, Congress expressly directed the Secretary to conduct the laboratory services

22  competitive bidding demonstration project.  42 U.S.C. § 1395 w-3(e).  The Sixth Circuit has

23  previously recognized that a less explicit statute, 42 U.S.C. § 1395b-1, vested considerable

24  discretion in the Secretary to develop demonstration projects for the purposes listed in the statute.

25  See Am. Acad. of Opthalmology, Inc. v. Sullivan, 998 F.2d 377, 383 (6th Cir. 1993) (affirming

26  that§ 1395b-1 "expressly allows the Secretary to carry out demonstration projects").  That

27  discretion is at a high point here where Congress has specifically mandated that competitive

28  bidding demonstration projects take place for this particular category of services, has expressly

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 20 -

1   authorized the Secretary to set such "conditions" on the project "as [he] determines to be

2   appropriate," 42 U.S.C. § 1395w-3(e)(2)(A), and has generally expressed an intent that all major

3   aspects of the competitive bidding process be unreviewable, id. § 1395w-3(b)(10).  Where the

4   conditions imposed by the Secretary have to do with how best to design a competitive bidding

5   experiment to achieve the goals of the statute, it is surely the case that a court has no judicially

6   manageable standards by which to review such decisions.  See Heckler v. Chaney, 470 U.S. 821,

7   830 (1985); cf. Beno, 30 F.3d at 1067.  To the extent the Secretary's exercise of this discretion is

8   reviewable at all, his interpretation of his obligations under § 1395w-3(e) must be upheld as long

9   as the interpretation is reasonable and not "'manifestly contrary to the statute.'"  Ariz. Health

10   Care Cost Containment Sys. v. McClellan, 508 F.3d 1243, 1253 (9th Cir. 2007) (quoting

11   Chevron, 467 U.S. at 844).

12       Plaintiffs challenge the Secretary's interpretation of 42 U.S.C. § 1395w-3(e)(1)(B), which

13   requires that the demonstration project include tests furnished by entities "that did not have a

14   face-to-face encounter with the individual."  According to plaintiffs, the Secretary includes them

15   within the project even though they do have "face-to-face encounters" with patients.  Compl. ¶

16   36(a); Pl. Mem. at 21-22.  However, the Secretary has explained that the "face-to-face" exclusion

17   in § 1395w-3(e)(1)(B) was intended to exclude "laboratory testing provided for [physicians

18   office laboratory] patients, hospital inpatients, and hospital outpatients."  Wynn Decl. ¶ 23.

19   Essentially, the Secretary interpreted the statute as distinguishing between laboratories that

20   provide tests as part of a hospital or a physician's office and those that are independent entities,

21   even if they are located on hospital or office premises.  Plaintiffs concede that their laboratories

22   are independent in that sense but claim that they should qualify as providing "face-to-face

23   encounters" because their patients may not know that they are billing independently, because

24   their laboratories are owned by the same parent companies that own hospitals or physicians'

25   offices, or because they actually do "encounter" the patients when collecting specimens.  It was

26   perfectly reasonable, however, for the Secretary to understand Congress as drawing a distinction,

27   for purposes of a demonstration project designed to test competitive bidding as a payment

28   method, based on whether the laboratories in question are actually part of a hospital or

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 21 -

1   physician's office or whether, in contrast, they are, in a business sense, independent and thus

2   potential competitors with other independent laboratories for the laboratory services they

3   provide.  Similarly, it was reasonable for the Secretary to consider laboratory contact with

4   patients for the purpose of collecting a sample for testing not to qualify as a face-to-face

5   encounter since laboratories that collect specimens directly from patients compete for the same

6   business with laboratories that obtain their specimens in some other way.

7          Plaintiffs also object to the Secretary's failure to exempt them from bidding even though

8   they supply more than $100,000 worth of tests included in the demonstration project to Medicare

9   beneficiaries.  Plaintiffs fail to cite any legal authority for their claim of an entitlement to such an

10  exemption.[11]  Again, the Secretary's decision to include laboratories that expect to have more

11  than a $100,000 stake in the demonstration project as bidders is entirely reasonable.  As the

12  Secretary has explained, the $100,000 threshold was chosen based on a careful assessment of the

13  number of laboratories needed to participate in the bidding process in order for the process to

14  yield a competitive result.  Wynn Decl. ¶¶ 19-23.  The selection of this threshold was well within

15  the scope of the Secretary's authority to develop competitive bidding demonstration projects and

16  is not arbitrary.  The fact that the $100,000 threshold does not match the SBA's definition of

17  "small business" is simply irrelevant.  Congress did not reference the SBA's definition in §

18  1395w-3, nor did it specify that small laboratories should not be required to submit bids.  Rather,

19  it stated that the Secretary "shall take appropriate steps to ensure that small suppliers . . . have an

20  opportunity to be considered for participation in the program."  42 U.S.C. § 1395w-3(b)(6)(D).

21  This provision clearly gives the Secretary discretion to decide how best to include small suppliers

22

23

24

_____

25         [11]Plaintiffs cite various requirements involving "small business" concerns.  Pl. Mem. at
26  23-25.  Notably, of the three plaintiffs, only Internist appears to qualify as a "small business"
    (having revenue under $12.5 million) under the Small Business Administration ("SBA")'s
27  definition.  See id. at 24.  More to the point, a cause of action under the Regulatory Flexibility
    Act, 5 U.S.C. §§ 601-612, does not exist where an agency has not engaged in rulemaking.  Id. §
28  611.  Nor have plaintiffs asserted a claim under 5 U.S.C. § 611 in their Complaint.

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

1  in the project, and the Secretary has exercised that discretion reasonably here.[12]

2  As for the remaining claims asserted in Count Two, Compl. ¶ 36(b), (e), as previously

3  noted, plaintiffs are not laboratories that exclusively serve ESRD or nursing facility patients and

4  therefore lack standing to challenge how such laboratories will be paid in the demonstration

5  project. Plaintiffs' vague claim regarding test volume is also meritless. Supra note 8.

6  **F.    PLAINTIFFS HAVE FAILED TO SHOW THEY ARE LIKELY TO**
    **SUCCEED ON COUNT THREE**

7  In Count Three of their Complaint, plaintiffs allege that the implementation of the

8  demonstration project will effect an unconstitutional taking of their property by requiring them to

9  provide services to Medicare beneficiaries without just compensation. This claim is without

10  merit. First of all, it is unripe. Plaintiffs do not contend that any taking has yet occurred.

11  Second, as a practical matter, plaintiffs are unlikely to suffer this alleged harm because laboratory

12  tests are conducted through referrals from physicians and hospitals, who will be informed of

13  which laboratories can bill Medicare under the project. Wynn Decl. ¶ 29. In addition, as

14  explained, nothing prevents nonwinning laboratories from contracting with winning laboratories

15  to receive compensation for such services.

16  Third, it is well established that the Takings Clause is not implicated by Medicare fee

17  regulation because providers and suppliers participate in Medicare on a voluntary basis. E.g.,

18  Garelick v. Sullivan, 987 F.2d 913, 916-17 (2d Cir. 1993) (rejecting takings claim of

19  anesthesiologists and stating that "[a]ll court decisions of which we are aware that have

20  considered takings challenges by physicians to Medicare price regulations have rejected them in

21  the recognition that participation in Medicare is voluntary"); Burditt v. U.S. Dep't of Health &

22  Human Servs., 934 F.2d 1362, 1376 (5th Cir. 1991) (rejecting physician's takings claim because

23  provider participation in Medicare is voluntary); Whitney v. Heckler, 780 F.2d 963, 972 (11th

24  

25  

26  [12]The regulations implementing the DMEPOS competitive bidding program define "small

27  supplier" as a supplier generating "$3.5 million or less in annual receipts including Medicare and
    non-Medicare revenue." 42 C.F.R. § 414.402. For purposes of a demonstration project limited to

28  a single metropolitan area, the Secretary's $100,000 threshold is a reasonable means of ensuring
    a sufficient number of bidders so that the bidding will be competitive. See Wynn Decl. ¶¶ 19-23.

1    Cir. 1986) (same). Plaintiffs' contention that "disenrolling from the program is not an option" for

2    business reasons does not change the analysis.  See Garelick, 987 F.2d at 917 (rejecting similar

3    argument because "economic hardship is not equivalent to legal compulsion for purposes of

4    takings analysis"); Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare,

5    742 F.2d 442, 446 (8th Cir. 1984) (rejecting argument that "business realities" require nursing

6    homes to participate in Medicaid because participation "is nonetheless voluntary").  If plaintiffs'

7    argument were accepted, virtually any action that Congress or the Secretary took to reduce

8    payments from the Medicare Trust Fund would constitute a "taking," a notion long since rejected

9    by the Supreme Court. Flemming v. Nestor, 363 U.S. 603, 608 (1960) (upholding Social Security

10   Act amendment against dissenting opinion that considered the amendment to effect a taking).

11   **G.     PLAINTIFFS HAVE FAILED TO SHOW THEY ARE LIKELY TO
               SUCCEED ON COUNT FOUR**

12          In Count Four, plaintiffs allege that the Secretary has acted beyond the scope of his

13   authority under 42 U.S.C. § 1395w-3(e) by requiring bidders to bid on collecting and handling

14   laboratory specimens.  According to plaintiffs, § 1395w-3(e) authorizes a competitive bidding

15   demonstration project only in regard to laboratory tests, not specimen collection.  This claim is

16   without merit.  Section 1395w-3(e) requires the Secretary to conduct a demonstration project for

17   laboratory tests "for which payment would otherwise be made under section 1395*l*(h)."  42

18   U.S.C. § 1395w-3(e)(1)(A).  As plaintiffs point out, payment for specimen collection and

19   handling is otherwise governed by subsection (h) of § 1395*l*.  See id. § 1395*l*(h)(3).  That

20   subsection authorizes a nominal fee for collection and handling in addition to the fee for the test

21   itself, id., clearly indicating that collection and handling is considered an ancillary aspect of any

22   laboratory test.  Nothing in § 1395w-3(e) restricts the Secretary's authority to include that aspect

23   of testing in the competitive bidding demonstration project.  Doing so is within the Secretary's

24   broad discretion to set "conditions [he] determines to be appropriate" to carry out the project, id.

25   § 1395w-3(e)(2)(A), and is certainly reasonable as a means of evaluating the overall cost

26   competitiveness of bids.

27

28

Defendant's Opposition to Plaintiffs' Application for TRO / Order to Show Cause re Preliminary Injunction,
Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 24 -

1

**IV.    PLAINTIFFS HAVE FAILED TO SHOW THAT EITHER THE BALANCE OF HARDSHIPS OR THE PUBLIC INTEREST WEIGHS IN THEIR FAVOR**

2

3          The same flaws that plague plaintiffs' claim of irreparable injury, if the demonstration

4   project bidding process is allowed to proceed as scheduled, prevent them from showing that the

5   balance of hardships "tips sharply" in their favor.  The purely speculative injuries that they

6   predict cannot offset the disruption and interference that an injunction would wreak on CMS

7   operations, as it attempts to implement a congressionally-mandated demonstration project.  In

8   addition, the public interest weighs against preliminary injunctive relief.  The demonstration

9   project is aimed at the important goal of protecting Medicare Trust Fund assets by reducing

10  program costs, thus sustaining the program's long-term viability.  The public interest is served by

11  allowing the project to go forward.  Cf. Natural Res. Def. Council, Inc., 502 F.3d at 862 (holding

12  that the public interest in maintaining an effective Navy must be taken into account in a

13  preliminary injunction analysis).  In contrast, plaintiffs' asserted interests in sustaining their own

14  business operations are purely private, and the interests of Medicare beneficiaries in using the

15  services of specific laboratories, to the extent they are implicated, do not rise to the same level as

16  the public interest in sustaining the program as a whole.

17                                    **CONCLUSION**

          For the foregoing reasons, this Court should deny plaintiffs' application.

18

19

20  DATED: February 12, 2008                    Respectfully Submitted,

21                                              JEFFREY S. BUCHOLTZ
                                                Acting Assistant Attorney General
                                                KAREN P. HEWITT
22                                              United States Attorney
                                                SHEILA LIEBER
23                                              Deputy Director

24                                              /s/   Kathryn L. Wyer
                                                KATHRYN L. WYER
25                                              U.S. Department of Justice, Civil Division
                                                20 Massachusetts Avenue, N.W.
26                                              Washington, DC  20530
                                                Tel.  (202) 616-8475 / Fax (202) 616-8470
27                                              kathryn.wyer@usdoj.gov
                                                *Attorneys for Defendant*

28

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

_____ )    Case No. 08 CV 0170 W (POR)
SHARP HEALTHCARE; INTERNIST      )
LABORATORY; AND SCRIPPS          )
HEALTH,                          )
                                 )
            Plaintiffs,          )    **CERTIFICATE OF SERVICE**
                                 )
        v.                       )
                                 )
MICHAEL LEAVITT, SECRETARY       )
OF THE DEPARTMENT OF             )
HEALTH AND HUMAN SERVICES,       )
                                 )
            Defendant.           )
_____ )

STATE OF CALIFORNIA
COUNTY OF SAN DIEGO

        IT IS HEREBY CERTIFIED that:

        I, Kathryn L. Wyer, am a citizen of the United States over the age of eighteen years

and a resident of the District of Columbia; my business address is 20 Massachusetts Ave.,

Washington, DC  20530; I am not a party to the above-entitled action.

        I have caused service of the following document(s) on the parties indicated below by

electronically filing said document(s) with the Clerk of the District Court using its ECF System,

which electronically notifies them:

DOCUMENT(S) SERVED:

        - Defendant's Opposition to Plaintiffs' Application for Temporary Restraining Order /

Order to Show Cause Regarding Preliminary Injunction

PARTIES ON WHOM SERVED:

        Plaintiffs, by and through their counsel of record, Patric Hooper,
        phooper@health-law.com

        I declare under penalty of perjury that the foregoing is true and correct.

        Executed on February 12, 2008.

                                        s/ Kathryn L. Wyer
                                        KATHRYN L. WYER