JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General
KAREN P. HEWITT
United States Attorney
SHEILA LIEBER
Deputy Director
KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W.
Washington, DC 20530
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

SHARP HEALTHCARE; INTERNIST LABORATORY; AND SCRIPPS HEALTH,

    Plaintiffs,

v.

MICHAEL LEAVITT, SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES,

    Defendant.

Case No. 08 CV 0170 W Por

**DECLARATION OF MARK WYNN IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER/ORDER OF SHOW CAUSE RE: PRELIMINARY INJUNCTION**

Date: TBD
Time: TBD
Courtroom: 7

HONORABLE THOMAS J. WHELAN

    Mark Wynn, pursuant to 28 U.S.C. § 1746, declares the following under penalty of perjury:

    1. I am Director of the Division of Payment Policy Demonstrations in the Office of Research, Development, and Information ("ORDI") within the Centers for Medicare and Medicaid Services ("CMS"). CMS is the federal agency within the United States Department of Health and Human Services responsible for administering the Medicare and Medicaid programs. I have been a Division Director in ORDI since 2004. Prior to that time I served as a branch chief or Social Science Analyst in ORDI since 1987. As part of my responsibilities I have overseen the development of the clinical laboratories competitive bidding demonstration project.

    2. I am familiar with the subject matter of the above-captioned lawsuit, which involves a

1  challenge to the implementation of the clinical laboratory competitive bidding demonstration
2  project ("the demonstration project"). The statements made in this Declaration are based on my
3  personal knowledge, information contained in agency files, and information supplied to me by
4  my staff.

5      3. In December 2003, Congress enacted the Medicare Modernization and Drug
6  Improvement Act of 2003 (MMA), section 302(b) of which mandated that CMS conduct a
7  demonstration project for clinical laboratory tests through application of competitive acquisition.
8  Pub. L. 108-173. The demonstration allows Congress and CMS to try a new Medicare payment
9  system on a small scale, before establishing that system as a new program initiative. Any
10 decision to expand the demonstration project beyond this limited scope would require further
11 action from Congress.

12     4. The clinical laboratory competitive bidding demonstration, consistent with other
13 MMA-mandated programs, employs market-based competition with the hope of increasing cost
14 efficiency in Medicare. Medicare data reveals that as recently as 2006, suppliers of laboratory
15 services received nearly $6.7 billion in Medicare Part B reimbursements under the
16 administrative fee schedule that is currently used to set payment amounts. Conducting a
17 demonstration project allows CMS to test the effectiveness of the proposed new payment system
18 while closely monitoring the limited area where the project takes place to ensure that quality of
19 care and access for Medicare beneficiaries are maintained.

20     5. Congress previously required that CMS implement a competitive bidding
21 demonstration project for Durable Medical Equipment, Prosthetics, Orthotics and Supplies
22 (DMEPOS) in section 4319 of the Balanced Budget Act of 1997 (Pub. L. No. 105-33). The
23 current demonstration project for clinical laboratory services follows procedures similar to those
24 employed for the DMEPOS demonstration. Like the clinical laboratory services project, the
25 DMEPOS demonstration required that suppliers in the jurisdiction where the demonstration
26 would be implemented submit competitive bids after which winning bidders would be selected
27 and a competitive market-driven fee schedule would be established and applied throughout the
28

Declaration of Mark Wynn, Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 2 -

1  jurisdiction to test whether Medicare costs could be reduced while maintaining quality care to
2  Medicare recipients. CMS did not engage in informal rulemaking in designing or implementing
3  the DMEPOS demonstration. CMS submitted several reports to Congress on the DMEPOS
4  demonstration project, including reports in 2000, a report in 2002, and then a final evaluation
5  report in 2004. Each of these reports explained how CMS designed the DMEPOS demonstration
6  and included a timeline of the DMEPOS competitive bidding procedures. Congress found the
7  DMEPOS model so successful that it then amended the statute to require CMS to implement the
8  DME competitive-bid process nationally, and to conduct a clinical laboratory competitive
9  bidding process on a demonstration test basis "under the same conditions" as the DME project.
10 42 U.S.C. § 1395w-3; 42 C.F.R. Part 414, Subpart F; 72 Fed. Reg. 17992, 17996 (April 10,
11 2007).

12    6. Savings are also anticipated from this clinical laboratory competitive bidding
13 demonstration in light of information suggesting that the current Medicare fee schedule for
14 clinical laboratory services is above market rates. For example, a recent article published in the
15 July, 2007 issue of Laboratory Economics (vol. 2, no. 7, Jondavid Klipp, Ed.), noted that in
16 August, 2007, the private insurer United Healthcare planned to reduce its clinical lab fee
17 schedule, on average, to 48% of the Medicare fee schedule, in order to bring its clinical lab fees
18 in "line with current market rates."

19    7. The Department has put administrative mechanisms in place to commence this
20 demonstration project in the third budget quarter of this year, beginning on July 1, 2008. If bids
21 are not received by the current due date of February 15, 2008, the Department will not be able to
22 start the demonstration on time, at best until the following quarter, October 1, 2008. Such a
23 delay would result in significant administrative costs to the Department.

24    8. Further delays in the implementation of the demonstration would also result in an
25 inability of Medicare to realize the cost savings contemplated by Congress in the demonstration.
26 Congress has mandated that under the demonstration Medicare will pay less than that which is
27 currently paid under the Medicare Part B clinical laboratory fee schedule in the aggregate. 42
28

Declaration of Mark Wynn, Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 3 -

1  U.S.C. § 1395w-3(b)(2)(A)(iii), (e)(2)(A).

2      9. CMS began gathering public comment on the laboratory demonstration project
3  through Open Door Forum Special Listening Sessions beginning March 3, 2004.

4      10. In September 2004, CMS entered into a contractual relationship with Research
5  Triangle International (RTI) to design and implement the demonstration project. RTI has
6  convened a Technical Expert Panel to provide recommendations based on the members'
7  expertise in technical, operational, and laboratory performance issues.

8      11. CMS set up an email box and website address beginning in 2004 to communicate
9  with the laboratory services community about implementation of the demonstration project. The
10 industry was very active in questioning CMS and providing input. Organizations such as the
11 Clinical Laboratory Coalition and Clinical Laboratory Management Association (CLMA)
12 interacted with CMS during the development stages. CMS has been accessible throughout the
13 development of the demonstration through the Open Door Forums, CMS website, telephone and
14 email communications. See CMS, Medicare Demonstration Projects website, at
15 http://www.cms.hhs.gov/demoprojectsevalrpts/MD/ItemDetail.asp?ItemID=CMS1198949.
16 Information has been widely distributed through CMS listservs, including those targeted to
17 laboratories, this special project, and hospitals.

18     12. As the project was being developed, CMS gave numerous presentations at industry
19 and professional meetings, including: the G2 Reports Laboratory Institute Annual Meeting (fall
20 of 2004, 2005, 2006, and 2007); Medicare Devices Manufacturers Association (MDMA)
21 Medicare Coverage and Reimbursement Conference (November 2007); AdvaMed meetings
22 (May, August, September, 2006; April 2007); American Clinical Laboratory Association
23 (ACLA) annual meeting (January 2006). CMS also participated in a special audio-conference
24 session for ACLA members on October 19, 2006, to discuss the demonstration project. Former
25 CMS Administrator Mark McClellan met with industry representatives, including the Clinical
26 Laboratory Coalition (CLC) on January 12, 2005, to discuss this demonstration. ORDI Director
27 Timothy Love met with the CLC in early August 2005 and November 15, 2006. In July 2006,
28

Declaration of Mark Wynn, Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 4 -

Director Love met with ACLA representatives and discussed the idea of excluding all lab tests for End Stage Renal Disease (ESRD) beneficiaries ordered by dialysis clinics from the demonstration.

13. Another Special Open Door Forum public meeting occurred on August 24, 2005 to share a summary of the draft demonstration design recommendations.

14. CMS submitted an initial Report to Congress on April 19, 2006. That report included a summary of the proposed design for the demonstration.

15. The Office of Management and Budget (OMB) approved the Medicare Clinical Laboratory Services Competitive Bidding Demonstration Project Application Form on April 26, 2006. OMB cleared the Cost Estimate Package on March 28, 2007.

16. A draft of the Bidders' Package was posted on the CMS website on July 3, 2007 and announced via CMS listservs, and a third Special Open Door Forum was held on July 16, 2007, focusing on the draft Bidders' Package. On July 25, 2007, a Congressional Hearing by the House Committee on Small Business was held to discuss the demonstration project. CMS and industry representatives participated.

17. On October 9, 2007, CMS sent out an email through its listservs noting changes to the demonstration design since the July 16, 2007 Open Door Forum.

18. On October 17, 2007 the bidding process was published and described in the Federal Register Notice (CMS-5045-N). 72 Fed. Reg. 58856-01 (October 17, 2007). CMS also announced that the San Diego-Carlsbad-San Marcos, California Metropolitan Statistical Area (MSA) had been selected for a competitive bidding demonstration for clinical laboratory services. A second notice was published in the Federal Register on November 21, 2007 (CMS-5045-N2). 72 Fed. Reg. 65581 (November 21, 2007). A Bidder's Conference was held in San Diego on December 5, 2007. After the conference, CMS issued additional follow-up questions and answers.

19. An important consideration in CMS' design of the demonstration project has been ensuring, consistent with the requirements of 42 U.S.C. § 1395w-3, that the bidding process will

be competitive within a limited geographic area and over a relatively brief period of time. In order to set the criteria for requiring a supplier of laboratory services to bid, CMS retrieved claims data from the 22 metropolitan areas in the United States that were determined to meet initial site selection criteria. The data included all Medicare payments from the Clinical Laboratory Fee Schedule for Medicare beneficiaries enrolled in fee for service. CMS reviewed the Medicare payments to the clinical labs. In order to obtain a sufficient number of bidders, including enough independent laboratories, and also to protect small businesses, this data led CMS to determine that it would require bids from laboratories that received $100,000 or more in Medicare payments for 303 tests from the Clinical Laboratory Fee Schedule for services to beneficiaries in the demonstration project area.

20. The MMA, 42 U.S.C. § 1395w-3(e)(1)(A), indicates that hospital inpatient testing, covered under Medicare Part A, is outside the scope of the demonstration project. 42 U.S.C. § 1395w-3(e)(1)(A). Tests performed by entities that have "face-to-face encounter[s]" with patients are excluded from the demonstration, and will continue to be paid under the existing Part B Clinical Laboratory Fee Schedule. 42 U.S.C. § 1395w-3(e)(1)(B). CMS has worked to define the "face-to-face encounter" exclusion consistent with the purpose of the demonstration project. CMS has also sought to protect smaller laboratories by exempting them from the bidding process (although they remain free to bid, if they so choose).

21. In its initial report to Congress, CMS indicated that "[i]ndependent, hospital and/or physician office laboratories with $100,000 or more in annual Medicare Part B (fee-for-service) payment for nonpatient services will be required to participate in the demonstration." (Report to Congress at 2, April 2006, available at Demonstration Project Website, and attached to plaintiffs' Complaint as Exhibit A). The Report further indicated that "[s]mall laboratories, . . . defined as independent laboratories, [and] hospital and/or physician office laboratories with less than $100,000 in annual Medicare Part B (fee-for-service) payment for nonpatient services will not be required to bid." Id. At the time of the Report, whether a laboratory met this threshold was to be based "on the most recent 12-month period prior to demonstration for which data is available."

Declaration of Mark Wynn, Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

- 6 -

1 | Id.

2 |     22. In the October 17, 2007, Notice announcing the demonstration project
3 | site, "[r]equired bidders" were defined as "those organizations that will supply, or expect to
4 | supply, at least $100,000 annually in demonstration tests to Medicare beneficiaries residing in the
5 | [project area] during any year of the demonstration." CMS, Notice, 72 Fed. Reg. 58856, 58856
6 | (Oct. 17, 2007). The Notice further stated that nonrequired bidders would include those "small
7 | business laborator[ies]" that "supply less than $100,000 annually in demonstration tests to
8 | Medicare [fee-for-service] beneficiaries residing in the [project area]," as well as those
9 | laboratories that exclusively serve Medicare beneficiaries in the project area whose Medicare-
10 | eligibility was due to their having end-stage renal disease (ESRD), and those laboratories that
11 | exclusively serve Medicare beneficiaries in the project area who reside in nursing homes or
12 | receive home health services. 72 Fed. Reg. at 58857.

13 |     23. In November 2007, CMS issued a list of Frequently Asked Questions (FAQs) as
14 | Appendix A to its final Bidders' Package. See FAQs (attached to this Declaration as Exhibit 1).
15 | FAQ #5 explains that Congress' exclusion of entities having "face-to-face encounter[s]" with
16 | beneficiaries from the scope of the demonstration project was "inten[ded] . . . to exclude testing
17 | performed by physician office laboratories or by hospital laboratories for their own patients."
18 | FAQs at 4. "[T]he face-to-face exclusion is defined as laboratory testing provided for [physicians
19 | office laboratory] patients, hospital inpatients, and hospital outpatients." Id. at 5. FAQ #21
20 | explains that in order to decide on the $100,000 threshold, CMS had analyzed "the number of
21 | laboratories that would be required to bid if the threshold for bidding was set at $50,000,
22 | $100,000, or $200,000," and that with the threshold set at $100,000, CMS "could expect bids
23 | from between 10 and 13 laboratory firms in each of the geographic areas under consideration."
24 | Id. at 9. The FAQs also explained that CMS "attempted to design the demonstration so as to
25 | ensure healthy competition among the largest possible number of laboratory firms, while
26 | affording smaller firms the opportunity to continue providing services in the" project area. Id.
27 | (FAQ #23).

28 |

Declaration of Mark Wynn, Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR

24. The demonstration requires bidders to submit prices for 303 test codes. CMS does not anticipate that any single laboratory will itself provide tests for all 303 of these codes. The demonstration is designed to build on the existing common practice whereby laboratories often send patients who require services they do not provide to other laboratories that do provide the service, on a referral or subcontract basis. The demonstration therefore allows bidders to use the prices set through these contracting arrangements for bidding purposes, in anticipation that such collaboration will continue after implementation of the project. The demonstration project requires bidding laboratories to designate those laboratories to which they expect to refer the tests that they do not perform themselves, and to bid on those tests based on the amounts that they pay the reference laboratories. If a bidding laboratory does not establish a relationship with a reference laboratory to cover a particular test, it may use the fee schedule cost in its bid since that cost represents the maximum cost for that test for purposes of the demonstration. Only laboratories that submitted winning bids, along with those that were not required to bid and chose not to, will be permitted to bill Medicare for the designated 303 laboratory tests for beneficiaries residing in the demonstration project area. However, laboratories are not "locked into" the relationships established during the bidding process. Winning laboratories can contract with other laboratories after the bidding process, including with laboratories that did not submit winning bids, and can therefore establish new business relationships with regard to referring and reference testing.

25. The Bidder's Application was developed to enable each bidder to establish specific qualities, other than price alone, that the bidder believes should be taken into account, including information regarding the bidder's location and methods of obtaining laboratory samples. The Application reserves space that allows the bidder to inform the evaluator of any unique concerns the bidder desires to address. These factors will be considered in addition to price in evaluating the bids and selecting the winners. (FAQs #7, 45). The demonstration project envisions multiple winning bidders, rather than one laboratory winning the entire award. 42 U.S.C. § 1395w-3(b)(4)(B). CMS anticipates that it will select more winning bidders than its calculation of

1  demand for laboratory services would require in order to take into account non-price factors,
2  such as ensuring beneficiary access in particular geographic locations within the project, and to
3  provide a safety net to ensure that if a winning bidder drops out, there is a sufficient number of
4  laboratory service suppliers to ensure that beneficiaries have access to necessary laboratory
5  services.

6      26. Laboratories providing services exclusively to beneficiaries entitled to Medicare by
7  reason of end-stage renal disease (ESRD) are excluded from the bidding process, and tests paid
8  as part of the ESRD payment bundle are excluded from the demonstration. FAQs at 7 (#16).
9  Laboratories providing services exclusively to beneficiaries in nursing facilities are excluded
10 from the bidding process. Non-required bidders that do not bid as well as those that bid and win
11 will be paid under the competitively set demonstration fee schedule for the duration of the
12 demonstration.

13     27. Laboratories will remain able to receive payment for mileage, phlebotomy, and the
14 existing payment under any schedule other than the Part B Clinical Laboratory Fee Schedule
15 (CLFS) for those tests included in the demonstration.

16     28. CMS anticipates that laboratories not chosen to participate in the demonstration
17 project would refer covered Medicare laboratory procedures to successful bidders, or enter into
18 agreements with successful bidders to provide the services.

19     29. The criteria by which the demonstration project's success is measured includes not
20 only price but also quality and access. The MMA mandates that the standards established under
21 the Clinical Laboratory Improvement Amendments ("CLIA") program apply to the
22 demonstration. 42 U.S.C. § 1395w-3(e)(2)(B). These CLIA standards are the same standards
23 that labs must currently meet in order to participate in Medicare. In addition, the demonstration
24 design requires winning bidders to supply quality data throughout the demonstration in such
25 critical areas as: test turnaround time, log-in error rates, and unusable or lost specimens.

26     30. The demonstration will apply to Medicare beneficiaries enrolled in traditional fee-
27 for-service Medicare whose permanent residence is in the competitive bidding area. 72 Fed.
28

Declaration of Mark Wynn, Sharp Healthcare v. Leavitt, No. 08-CV-0171 W POR
- 9 -

1    Reg. 58856. Both beneficiaries and providers will be notified which laboratories are
2    participating in the project. FAQs at 19 (#61). In order to ensure quality care to these
3    beneficiaries, CMS has set up a toll-free number specific to this demonstration. Members of the
4    public (including beneficiaries) may call this number to report problems in accessing quality
5    laboratory services under this demonstration so appropriate action can be taken immediately.
6    There is enough flexibility in the demonstration project to accommodate changes in the project
7    methodologies, including soliciting participation from additional laboratories, if significant
8    problems or concerns arise. The prospect of harm to beneficiaries could lead CMS, if necessary,
9    to end the project.
10          I declare under penalty of perjury under the laws of the United States of America that the
11   foregoing is true and correct.
12          Executed on February 12, 2008, at Baltimore, Maryland.

                                    *Mark E Wynn* (signature)
                                    MARK WYNN