# Exhibit A





**News Flash - It's Not Too Late to Give and Get the Flu Shot!** In the U.S., the peak of flu season typically occurs anywhere from late December through March; however, flu season can last as late as May. Each office visit presents an opportunity for you to talk with your patients about the importance of getting an annual flu shot and a one time pneumococcal vaccination. Protect yourself, your patients, and your family and friends by getting and giving the flu shot. **Don't Get the Flu. Don't Give the Flu. Get Vaccinated!** Remember - Influenza and pneumococcal vaccinations and their administration are covered Part B benefits. Note that influenza and pneumococcal vaccines are NOT Part D covered drugs. You and your staff can learn more about Medicare's coverage of adult immunizations and related provider education resources, by reviewing Special Edition MLN Matters article SE0748 at *http://www.cms.hhs.gov/MLNMattersArticles/downloads/SE0748.pdf* on the CMS website.

MLN Matters Number: MM5772

Related CR Release Date: February 1, 2008

Related CR Transmittal #: R56DEMO

Related Change Request (CR) #: 5772

Effective Date: July 1, 2008

Implementation Date: July 7, 2008

# Implementation of the Medicare Clinical Laboratory Services Competitive Bidding Demonstration

## Provider Types Affected

Providers or suppliers who bill Medicare contractors (carriers, fiscal intermediaries (FI), or Medicare Administrative Contractors (A/B MAC)) and/or order laboratory services for Medicare fee-for-service (FFS) beneficiaries under the Medicare Clinical Laboratory Services Competitive Bidding Demonstration project.

## What you need to know

CR 5772, from which this article is taken, implements the Centers for Medicare & Medicaid Services (CMS) Medicare Clinical Laboratory Services Competitive Bidding Demonstration in the first Competitive Bidding Area (San Diego-Carlsbad-San Marcos, California metropolitan statistical area, or CBA1); and changes some of the demonstration's requirements that were stated in CR5205, issued August 1, 2006, (see the MLN Matters article at

Disclaimer
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents.

*http://www.cms.hhs.gov/MLNMattersArticles/downloads/MM5205.pdf* on the CMS website) and superceded by CR5359, issued November 1, 2006, (see the MLN Matters article at *http://www.cms.hhs.gov/MLNMattersArticles/downloads/MM5359.pdf* on the CMS website).

Specifically, CR5772 requires that:

- The demonstration covers tests provided to beneficiaries enrolled in the traditional fee-for-service (FFS) Medicare program who reside in the competitive bidding area (CBA1) during the 3-year demonstration period Required bidders that do not bid, or bid and do not win, may serve as a reference laboratory to laboratories participating in the demonstration. However, they would not be allowed to bill Medicare directly for demonstration tests performed for Medicare FFS beneficiaries residing in the CBA.

- *Laboratories not required to bid:* These laboratories will be paid under the competitively set demonstration fee schedule for the duration of the demonstration.

    o CMS will exempt laboratories that supply less than $100,000 annually in demonstration tests to Medicare FFS beneficiaries residing in the CBA from submitting bids.

    o CMS will exempt laboratories providing services exclusively to beneficiaries entitled to Medicare by reason of end-stage renal disease (ESRD) from submitting bids.    (Tests that are paid as part of the ESRD payment bundle are excluded from the demonstration.)

    o CMS will exempt laboratories providing services exclusively to beneficiaries in nursing facilities or receiving home health services from submitting bids.

CR5772 further announces that the demonstration in CBA1 is scheduled to begin on July 1, 2008; and provides Medicare contractors detailed record layouts for the quarterly report and for listing laboratories in the CBA.

CMS will issue a later CR that implements the demonstration in the second CBA (CBA2), which is tentatively scheduled to start on July 1, 2009.

## Background

Section 302(b) of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) requires CMS to conduct a project to demonstrate the application of competitive acquisition for the payment of most clinical laboratory services that would otherwise be payable under the Medicare Part B fee schedule.

In this project, each of two demonstration sites (competitive bidding areas – CBA1 and CBA2) will run for three years with a staggered start of one year.  It will cover certain "demonstration tests"

Disclaimer
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents.

furnished under Medicare Part B to any beneficiary enrolled in FFS Medicare who lives in the CBAs.

Competitively bid fees will be set for all tests paid under the Medicare Part B clinical laboratory fee schedule in these demonstration sites, with the exception of Pap smears, colorectal cancer screening tests, and new tests added to the Medicare Part B clinical laboratory fee schedule during the course of the demonstration. In each CBA, the payment basis determined by the bidding will substitute for present payment under the existing clinical laboratory fee schedule.

CBAs will be defined geographically by ZIP codes, and will roughly correspond to a Metropolitan Statistical Area (MSA). Beneficiary residence status will be determined by information in the Medicare system as of the date the claim is processed, and review of a beneficiary's ZIP code of residence must reveal that it is included in the same listed CBA. CMS will provide Medicare contractors with a list of ZIP codes included in each MSA, which they will use to determine whether a beneficiary's residence is included in one of the CBAs.

Two previous Change Requests, (CR) 5205 and 5359 (issued August 1, 2006 and November 1, 2006, respectively), implemented the necessary system requirements to accomplish this project. CR 5772, from which this article is taken, establishes the project implementation dates; changes the requirements for referring and reference laboratory services, Skilled Nursing Facility (SNF) and Home Health services; and provides Medicare contractors a detailed record layout for the quarterly report, for listing laboratories in the CBA with their CB status.

The demonstration in CBA1 is scheduled to begin on July 1, 2008. CMS will issue a later CR that implements the demonstration in the second CBA (CBA2), which is tentatively scheduled to start on July 1, 2009. You should note that multiple winners are expected in each CBA.

> **Note: Only CLIA-certified laboratories will be allowed to participate in the demonstration.**

## Laboratory Categories

Under the demonstration, laboratories will be classified as either: 1) "Required bidders" (laboratories that are required to bid in the demonstration because (regardless of where they are located) they provide FFS beneficiaries residing in the CBAs "demonstration tests" that yield $100,000 or more in annual Medicare Part B (fee-for-service) payments as of calendar year (CY) 2006); or 2) "Non-required bidders" (laboratories whose payments for Medicare Part B (fee-for-service) payments for demonstration tests are below this $100,000 threshold.

"Non-required bidders" may choose to bid or not bid. Those that do not bid will be considered "passive" laboratories. Such passive laboratories, as well as "non-required bidders" who choose to bid (and win) and "required bidders" who win, (both labeled "winners") will be allowed to provide laboratory services to Medicare beneficiaries in the CBA and will be paid at the competitive bid rate for the demonstration tests paid under the Part B Clinical Laboratory Fee Schedule (CLFS), regardless of where the laboratory firm is located.

Disclaimer
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents.

Conversely, "required bidders" and "non-required bidders" who bid and do not win (along with "required bidders" who do not bid) will be labeled "non-winners" under the demonstration. Medicare will not directly pay these "non-winner" laboratories (under either the Part B clinical laboratory fee schedule or the competitively bid price) for demonstration tests that they provide to beneficiaries residing in the CBAs for the duration of the demonstration (regardless of where the laboratory firm is located). Therefore, a passive laboratory that chooses to bid but does not "win" cannot participate in the demonstration in its "passive" status.

There are three types of passive laboratories: 1) "Passive-small business" (those with less than $100,000 in annual Medicare Part B (fee-for-service) payments for demonstration tests provided to beneficiaries residing in the CBA); 2) "Passive-ESRD" – those that provide clinical laboratory services exclusively to beneficiaries with end stage renal disease (ESRD) residing in the CBAs); and 3) "Passive SNF/Home Health" – those that provide laboratory services exclusively to beneficiaries residing in nursing homes or are receiving home health services.

The "passive-small business" category of passive laboratories is subject to an annual payment ceiling of $100,000, however this payment ceiling threshold does not apply to the "passive ESRD" or "passive SNF/Home Health" laboratories. Further, you should note that the $100,000 threshold for "passive" laboratories does not include Medicare payment for tests excluded from the demonstration test list, services for beneficiaries residing in areas outside the CBA, or revenues from sources other than Medicare fee-for-service

You should also note that the $100,000 threshold does not apply to either the "passive ESRD" or passive SNF/Home Health laboratory categories.

In addition, in order to make it easier for nursing facilities to continue to provide continuity of care, CMS is exempting "passive SNF/Home Health" laboratories from being required bidders. Laboratories providing both Part A and Part B laboratory services to nursing facilities will be able to continue existing business relationships because they will not be at risk of losing Medicare Part A business as a result of the demonstration. They will be paid at the competitively set rate for demonstration tests otherwise paid under the Part B CLFS, and will also continue to receive payment for mileage, phlebotomy, and the existing payment under any schedule other than the Part B CLFS for those tests included in the demonstration.

You should also be aware that during the demonstration period, CMS will require that Medicare contractors monitor (and report to CMS quarterly):

- "Passive-small business" laboratories to ensure that their Medicare Part B annual payments for demonstration tests provided to beneficiaries residing in the demonstration sites do not exceed the dollar threshold (so that they do not unfairly gain market share within the CBA). Passive laboratory firms exceeding their threshold limitations during the demonstration period will be converted to a "non-winner" status, and will be terminated from the demonstration project, and not be paid anything by Medicare for demonstration tests provided to beneficiaries residing in the CBAs (regardless of where the laboratory firm is located) for the duration of the demonstration.

Disclaimer
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents.

> *Note: All changes from a "passive" to a "non-winner" will be prospective to the next quarter.*

- "Passive-ESRD" laboratories to ensure that payments under Medicare Part B for demonstration tests are provided only to beneficiaries with ESRD residing in the demonstration sites; and

- "Passive SNF/Home Health" laboratories to ensure that payments under Medicare Part B for demonstration tests are provided only to beneficiaries residing in nursing homes or are receiving home health in the demonstration sites.

## Project Implementation

The project is being implemented in multiple phases. The first phase (analysis and design) was implemented in January 2007. The second phase (finalization of the requirements, coding development, testing and documentation) was implemented in April 2007.

CR 5772, from which this article is taken, announces that the demonstration in CBA1 is scheduled to begin on July 1, 2008, and that the tentative start date for the demonstration in the second CBA is July 1, 2009.

During the second quarter of calendar year (CY) 2008, CMS will provide Medicare contractors with:

- Information that specifies (along with a few other required fields) the laboratories' names and Medicare provider numbers, address and zip code, demonstration status (winning, passive (SB, SNF/Home Health, ESRD), or non-winner) and each laboratory's payment history for services provided to beneficiaries' living within the first CBA1 as of CY 2006. This information will identify the laboratories eligible to participate in the demonstration ("winning" laboratories), the passive laboratories that are exempt from bidding in the demonstration due to their relatively small size as measured by annual Medicare payments or due to their status as an ESRD or SNF/Home Health laboratory, and those not selected to participate in the demonstration after unsuccessfully bidding ("non-winner" laboratories). The list will specify the name of the laboratory, address, ZIP code, Medicare provider number, and the laboratory's demonstration status. Any changes to a laboratory's status in this report will be handled on an ad hoc basis

- A test version of the laboratory competitive bidding demonstration fee schedule file containing the demonstration fee amounts for the preliminary list of services that the demonstration covers. (This test file will be populated only with the data pertaining to CBA1.)

- Modifications to the existing 5-position national ZIP code pricing file for the laboratory competitive bidding demonstration. Also during the second quarter of CY 2008, CMS will provide the final version of the laboratory competitive bidding demonstration fee schedule file containing the Current Procedural Terminology (CPT) codes of the services covered by the demonstration and fees for CBA1.

Disclaimer
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents.

To determine the correct laboratory competitive bidding fee schedule amount, contractors will use the July 2008 version of the 5-position national ZIP code pricing file to locate the ZIP code of the beneficiary's residence and map the beneficiary locality designation (i.e., CBA1 or CBA2) to the matching locality on the laboratory competitive bidding demonstration fee schedule file.

> *Notes:*
>
> *1) This mapping is for demonstration pricing purposes only, and will not be used to report the laboratory state locality information.*
>
> *2) For claims within a local carrier's jurisdiction, carriers will continue to report the state locality of the billing laboratory as they do now for clinical laboratory services.*

*CR 5772 also contains the following details about the demonstration:*

- Physician office laboratory (POL) testing and hospital-based laboratories that function as an independent laboratory performing testing for a beneficiary who is not a patient of the physician or hospital are included in the demonstration.  A POL enrolled as an independent laboratory or a hospital-based laboratory furnishing laboratory services to non-patients are subject to the demonstration rules.  Services provided by a POL and/or a hospital-based laboratory for their own patients are not included in the demonstration and will continue to be paid under the existing CLFS.

> *Note:*
>
> *For hospital-based laboratories, only 14X Type of Bills submitted for non-patient laboratory services are covered under this demonstration.*

- Hospital inpatient testing is covered by Medicare Part A, it is, therefore, exempt from the demonstration.

- Pap smears and colorectal cancer screening tests are excluded from this demonstration by statute.

- Requirements under the Clinical Laboratory Improvement Amendments (CLIA) program as mandated in section 353 of the Public Health Service Act are applicable.

- Claims for phlebotomy, Healthcare Common Procedure Coding System (HCPCS) code 36415 (Collection of venous blood by venipuncture) must identify the place of service (POS), e.g., Skilled Nursing Facility (POS 31), Home (POS 12), ESRD treatment facility (POS 65), Physician's office (POS 11) or Independent laboratory (POS 81).  If the specimen is collected at an independent laboratory draw station, you should use POS 81.  For this demonstration, when the specimen is collected at a hospital laboratory or draw station that is acting as an independent laboratory, you should indicate the place of service for CPT code 36415 as POS 81.

- Referring and reference laboratories may be paid under the demonstration with some restrictions:

Disclaimer
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents.

**MLN Matters Number: MM5772**                    **Related Change Request Number: 5772**

- A winning or passive laboratory can refer out and bill for the reference laboratory service and be paid directly by Medicare;

- A reference laboratory that was required to bid in the competitive bidding process but was not a winner under the demonstration can perform reference laboratory services but cannot bill Medicare directly or bill the beneficiary; and

- A reference laboratory that was not required to bid in the competitive bidding process can choose to bill for services that other laboratories refer to them.  However, these laboratories are restricted to receiving payment  less than $100,000 a year (for demonstration tests  provided to FFS beneficiaries residing in the CBA), and if they exceed the $100,000 limit, they will be considered a non-winner and Medicare payment will not be allowed.

- **Non-winner laboratories that furnish a demonstration test to a Medicare beneficiary residing in the CBA during the demonstration have no appeal rights when Medicare denies payment for the test, nor may they charge the beneficiary for such a test.**  However, non-winners may continue to furnish tests (that are outside the scope of the demonstration) to beneficiaries residing within the CBA, receive Medicare payment for such tests, and may appeal denial decisions for these services.

- Effective for claims with dates of services between July 1, 2008 and June 30, 2011, Medicare contractors will pay competitive bidding demonstration fee schedule amounts for claims that winning and/or passive laboratories submit for demonstration-covered services (including reference laboratory services) provided to beneficiaries residing in the CBA1.  Moreover, CMS is aware that the allowed amount under the demonstration could be  less than the regular fee schedule allowed amount.  Therefore, contractors will add the following message for a demonstration remittance advice:

  **M114 –** *This service was processed in accordance with rules and guidelines under the Competitive Bidding Demonstration Project.  If you would like more information regarding this project, contact your local contractor.*

- Laboratory tests which are exempt from the demonstration (e.g., pap smears, colorectal cancer screening tests), as well as new procedure codes that are added subsequent to the start of the demonstration will be paid in accordance with the existing CLFS.  Laboratory tests provided to beneficiaries enrolled in the Medicare Program other than FFS or residing outside the CBA will be paid in accordance with the existing Part B CLFS.

- Effective for claims with dates of services on or after July 1, 2008 through June 30, 2011, carriers will deny, and intermediaries will reject, claims submitted by non-winner laboratories for demonstration-covered services provided to beneficiaries residing in the CBA1, using the following remittance advice reason code and remark codes:

  **Reason code 96 –** Non-covered charge(s).

Disclaimer
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents.

**Remark Code M114** - This service was processed in accordance with rules and guidelines under the Competitive Bidding Demonstration Project. If you would like more information regarding this project, you may contact your local contractor.

**Remark Code M115** (For carriers) – No appeal rights. This item is denied when provided to this patient by a non-contract or non-demonstration supplier.

**Remark Code N83** (For intermediaries) - No appeal rights. Adjudicative decision based on the provisions of a demonstration project.

- Effective for claims with dates of services on or after July 1, 2008 through June 30, 2011, carriers will not reject claims with a modifier "90" (Reference (Outside) Laboratory) submitted by a winning or passive laboratory for demonstration-covered services provided to beneficiaries residing in the CBA1. However, they will reject claims from non-winning laboratories for demonstration covered services provided to such beneficiaries, even with modifier "90" present.

- Finally, all of the other business rules provided in CR 5205 and CR 5359 remain applicable, and are not changed by CR 5772.

## Additional Information

You can find the official instructions given to your carrier, FI, or A/B MAC in CR 5772 located at *http://www.cms.hhs.gov/Transmittals/downloads/R56DEMO.pdf* on the CMS website.

You might also want to look at MLN Matters article MM5359 (Laboratory Competitive Bidding Demonstration) which you can find at *http://www.cms.hhs.gov/MLNMattersArticles/downloads/MM5359.pdf* on the CMS website. (MM5359 superseded MM5205.)

If you have any questions, please contact your Medicare contractor at their toll-free number, which may be found at http://www.cms.hhs.gov/MLNProducts/downloads/CallCenterTollNumDirectory.zip on the CMS website.

Disclaimer
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents.

# Exhibit B

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTOR VALLEY COMMUNITY HOSPITAL, a non-profit California corporation, | Case No. EDCV 07-1189-VAP (OPx) |
| Plaintiff, | **[Motion filed on September 20, 2007]** |
| v. | **ORDER ISSUING PRELIMINARY INJUNCTION** |
| MICHAEL LEAVITT, Secretary of the Department of Health & Human Services, | |
| Defendants. | |

Plaintiff's Application for a Preliminary Injunction came before the Court for hearing on December 10, 2007. After reviewing and considering all papers filed in support of, and in opposition to, the Application, as well as the arguments advanced by counsel at the hearing, the Court ISSUES the Preliminary Injunction.

# I. BACKGROUND

## A.  Procedural History

On September 20, 2007, Plaintiff Victor Valley Community Hospital filed an Application for Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction ("Mot."), seeking an order enjoining Defendant Michael Leavitt, Secretary of the United States Department of Health and Human Service ("Secretary") from canceling Plaintiff's approval to receive Medicare and Medicaid[1] payments for clinical laboratory services.  Plaintiff challenges the validity of regulations that allow Defendant to cancel its Medicare payment approval.  (Reply at 9-11.)

Defendant filed a Response to Plaintiff's Application for Temporary Restraining Order, indicating it would not oppose issuance of the TRO.  The Court issued a Temporary Restraining Order on September 24, 2007.  On October 2, 2007, Defendant filed an Opposition to the Motion for

---

[1]In the interest of brevity, this Order often refers only to "Medicare" payments, rather than Medicare and Medicaid payments.  Any references to Medicare payments or to Medicare payment approval should be understood to include both Medicare and Medicaid.

2

Preliminary Injunction ("Opp'n").  Plaintiff filed a

Reply on October 9, 2007.  The Court then set the matter

for a hearing on the issuance of a preliminary

injunction.


**B.    Plaintiff's Allegations**

Under 42 U.S.C. § 263a, a clinical laboratory may

perform testing of human specimens only if the Secretary

certifies it as meeting the requirements of the Clinical

Laboratory Improvement Act of 1986 ("CLIA"). To maintain

this certification, a laboratory must periodically

undergo "proficiency testing," in which the laboratory's

results are judged for acceptable accuracy.  (Mot. at

3.); see 42 C.F.R. §§ 493.801-.959.


In July 2007, the Centers for Medicare and Medicaid

Services ("CMS") determined that Plaintiff was "out of

compliance" with the proficiency testing condition and

improperly had referred proficiency testing samples to an

outside laboratory.  (Mot. at 6-7.)  CMS proposed

revoking Plaintiff's CLIA certification.  (Id.)  CMS

informed Plaintiff that it would postpone the CLIA
certification revocation if Plaintiff requested an
administrative hearing, but that "the cancellation of all
Medicare and Medicaid payments will go into effect
regardless of whether a hearing is requested."  (Id. at
7.)

On September 11, 2007, CMS informed Plaintiff that it
was revoking the CLIA certification for Plaintiff's
laboratory ("the laboratory") and canceling the
laboratory's Medicare and Medicaid approval.  (Id. at 7.)
Plaintiff filed an appeal with an Administrative Law
Judge for the Secretary's departmental Appeals Board on
September 17, 2007.  (Id. at 8.)  The appeal stayed the
CLIA certification revocation, but CMS refused to stay
the cancellation of Plaintiff's Medicare and Medicaid
approvals.  (Id. at 1, 8.)

Plaintiff is one of four hospitals in the High Desert
region, which contains approximately 500,000 people.
(Id. at 10.)  Plaintiff handles approximately 2,000

4

births each year and its emergency department receives nearly one hundred patients a day. (<u>Id.</u> at 11.)  More than sixty percent of Plaintiff's patients receive Medicare or Medi-Cal benefits,[2] and nearly all receive services from the laboratory.  (Peterson Decl. ¶ 8.)

If Plaintiff loses Medicare and Medi-Cal payments for laboratory services, Plaintiff immediately will have to struggle to provide basic services and to maintain necessary equipment, and likely will trim their operations or shut down.  (Mot. at 9.)  Within four weeks after the cancellation, Plaintiff will be unable to satisfy its payroll obligations.  (<u>Id.</u> at 10.)  If Plaintiff ceases operations, it will be difficult or impossible for the remaining hospitals in the High Desert region to satisfy the community's need for birthing and emergency services.  (<u>Id.</u> at 11.)

///

///

///

---

[2]Medi-Cal is the California Medicaid program.

## II. JURISDICTION

Plaintiff argues the Secretary lacks the authority to cancel the laboratory's Medicare payment approval before its administrative appeal of the CLIA revocation is completed. (<u>See</u>, <u>e.g.</u> Reply at 9-10.) Defendant argues that (1) the Court does not have jurisdiction over this dispute because Plaintiff has failed to exhaust administrative remedies, and, alternately, (2) that Plaintiff does not satisfy the requirements for injunctive relief. (<u>See</u> Opp'n at 1-3.)

### A.  Legal Standard

Federal courts have no jurisdiction to hear a claim arising under the Medicare Act before the plaintiff has exhausted its administrative remedies. 42 U.S.C. §§ 405(g), 405(h), 1395ii. Under § 405(h), as incorporated into the Medicare Act by § 1395ii, "'[n]o action against the United States, the [Secretary], or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 *to recover on any claim arising under this subchapter*.'" <u>Shalala v. Illinois Council on Long</u>

1  <u>Term Care, Inc.</u>, 529 U.S. 1, 10 (2000) (quoting § 405(h);

2  emphasis in original).

3

4

5       Section 405(h) "'channels most, if not all, Medicare

6  claims through the special review system' of an

7  administrative hearing and 'purports to make exclusive

8  the judicial review method set forth in section 405(g).'"

9

10  <u>Cathedral Rock of North College Hill, Inc. v. Shalala</u>,

11  223 F.3d 354, 358-59 (6th Cir. 2000) (quoting <u>Illinois</u>

12  <u>Council</u>, 529 U.S. at 8-9).

13

14

15       Section 405(g), in turn, allows judicial review after

16  a "final judgment" of the Secretary.    42 U.S.C. § 405(g).

17

18

19            A  final  judgment  consists  of  two
              elements: the presentment of a claim to
20            the  Secretary  and  the  exhaustion  of
              administrative remedies.  The presentment
21            requirement   is   jurisdictional,   and
              therefore  cannot  be  waived  by  the
22            Secretary or the courts. The exhaustion
              requirement . . . is not jurisdictional,
23            and  thus,  is  waivable  by  either  the
              Secretary or the courts.
24

25

26  ///

27  ///

28

                          7

1   <u>Johnson v. Shalala</u>, 2 F.3d 918, 921 (9th Cir. 1993.)

2   (citing <u>Matthews v. Eldridge</u>, 424 U.S. 319, 330 (1975)).

3

4

5       Accordingly, jurisdiction is proper here if (1) the

6   claim does not arise under the Medicare Act; (2)

7   Plaintiffs have satisfied the presentment and exhaustion

8   requirements; or (3) Plaintiffs have satisfied the

9   presentment requirement, and the exhaustion requirement

10  is waived.

11

12

13

14  B.   Discussion

15       1.   Arising Under the Medicare Act

16           [T]he Supreme Court has applied two tests
17           to determine whether claims arise under
             Medicare. First, claims that are
18           "inextricably intertwined" with a
             Medicare benefits determination may arise
19           under Medicare. Second, "claims in which
             'both the standing and the substantive
20           basis for the presentation' of the
             claims" is the Medicare Act may arise
21           under Medicare.

22

23  <u>Kaiser v. Blue Cross of California</u>, 347 F.3d 1107,

24  1112 (9th Cir. 2003) (citing <u>Heckler v. Ringer</u>, 466 U.S.

25  602, 614-15 (1984)).

26  ///

27

28

1    A complaint regarding CMS action may "arise under"

2    the Medicare Act even when it alleges a denial of due

3    process.   For instance, in <u>Ancillary Affiliated Health

4    <u>Servs. v. Shalala</u>, the Health Care Financing

5    Administration ("HCFA," the predecessor to CMS) withheld

6    Medicare reimbursements from the plaintiff in order to

7    recoup prior overpayments.   <u>Ancillary Affiliated Health

8    <u>Servs. v. Shalala</u>, 165 F.3d 1069, 1069-70 (7th Cir.

9    1998).   Although the plaintiff challenged the withholding

10   of Medicare on due process grounds, the Seventh Circuit

11   determined the claim arose under the Medicare Act because

12   "'both the standing and the substantive basis for the ...

13   claims' stem[med] from the Medicare Act." <u>Id.</u> at 1070

14   (quoting <u>Ringer</u>, 466 U.S. at 615); <u>see</u> <u>Kaiser</u>, 347 F.3d

15   at 1114.

16

17        The Ninth Circuit has held that a challenge to the

18   validity of a CMS regulation arises under the Medicare

19   Act.   In <u>Kaiser v. Blue Cross of California</u>, among other

20   claims, the plaintiffs alleged faults in the HCFA's home

21   health care regulations. <u>Kaiser</u>, 347 F.3d at 1114.   The

28

1    Ninth Circuit held that these claims were "inextricably

2    intertwined" with Medicare benefits determinations

3    because they challenged the HCFA's decisions about

4    Medicare compensation.  Id. at 1114-15.

5

6

7    Similarly, in Illinois Council, plaintiffs challenged

8    regulations under which the Secretary could impose

9    sanctions on nursing homes receiving Medicare after

10   inspectors found the homes violated applicable standards.

11   Illinois Council, 529 U.S. 1 at 6-7.  Among other

12   challenges, the nursing homes argued the regulations

13   "exceed[ed] the legislative mandate of the Medicare Act,"

14   id. at 7,  a challenge to the validity of the regulation

15   that the Supreme Court found arose under the Medicare

16   Act.  Id. at 12.

17

18   Here, Plaintiff attacks regulations, 42 C.F.R. §§

19   493.1842(a), 493.1844(d)(3) ("the cancellation

20   regulations"), that allow Defendant to cancel its

21   Medicare payments before the administrative appeal of the

22   CLIA revocation is completed, arguing that the Medicare

10

1   Act does not authorize such sanctions.  (Reply at 9-11.)

2   Plaintiff argues that both the standing and substantive

3   basis of its claims arise under the Administrative

4   Procedure Act ("APA"), not the Medicare Act.  (Reply at

5   6-7.)  As in Illinois Council, however, the primary

6   substance of Plaintiff's challenge is its claim that the

7   regulations exceed the authority Congress granted the

8   agency under the Medicare Act.  See Illinois Council at

9   7; (Reply at 9-10 (arguing that Congress only authorized

10  suspension, not cancellation, of Medicare payments in the

11  Medicare Act.))

12

13      Furthermore, as in Kaiser, Plaintiff's claim

14  challenges the Secretary's decision to withhold Medicare

15  payments.  See Kaiser, 347 F.3d at 1114-15.  Accordingly,

16  Plaintiff's claim arises under the Medicare Act, and thus

17  § 405(h) bars the Court from exercising subject matter

18  jurisdiction unless Plaintiff has complied with the

19  exhaustion requirements of § 405(g).  See Oakland Medical

20  Group, P.C. v. Secretary of Health and Human Services,

21  ///

1  Health Care Financing Admin., 298 F.3d 507, 510 (6th Cir.

2  2002).

3

4

5      2.   Presentment

6      Plaintiff must proceed under 42 U.S.C. § 405(g)

7  because its claim arises under the Medicare Act.  Kaiser,

8  347 F.3d at 1115.  That is, it must satisfy the

9

10  presentment and exhaustion requirements of that

11  subsection before seeking judicial relief.  Id. (citing

12  Ringer, 466 U.S. at 605-06).

13

14

15      A plaintiff fulfills the presentment requirement by

16  contesting tentative agency determinations.  Eldridge,

17  424 U.S. at 329; Cassim v. Bowen, 824 F.2d 791, 794 (9th

18

19  Cir. 1987).  In Eldridge, the Supreme Court found the

20  plaintiff had presented his claim when he answered a

21  state agency questionnaire and wrote a letter in response

22

23  to the state's initial determination that his disability

24  had ceased.  Eldridge, 424 U.S. at 329.

25  ///

26  ///

27

28

1    Lodging an administrative appeal also constitutes
2
     presentment. <u>Hillhaven West, Inc. v. Bowen</u>, 669 F. Supp.
3
     312, 315 (S.D. Cal. 1987). Presentment may occur,
4
5    however, even if the plaintiff does not pursue
6    administrative review. In <u>Cassim</u>, an agency informed the
7    plaintiff, a surgeon, that it intended to recommend his
8
9    exclusion from participation in the Medicare program.
10   <u>Cassim</u>, 824 F.2d at 793. The plaintiff met the
11   presentment requirement by meeting with agency
12   representatives to contest this determination, submitting
13
14   materials to contest agency findings, and finally sending
15   a letter to the agency and the Secretary stating his
16   intent *not* to pursue administrative review but to bring a
17
18   due process challenge in federal court. <u>Id.</u> at 794.
19
20   Here, Plaintiff filed an appeal with an
21
22   Administrative Law Judge for the Secretary's departmental
23   Appeals Board contesting the revocation of the CLIA
24   certificate and the revocation of approval to receive
25   Medicare payments. (Mot. at 8.) Accordingly, it has
26
27   satisfied the presentment requirement.
28

### 3.  Waiver of Exhaustion

The Ninth Circuit applies a three-part test to determine if a court should waive the exhaustion requirement.  "The claim must be (1) collateral to a substantive claim of entitlement (collaterality), (2) colorable in its showing that denial of relief will cause irreparable harm (irreparability), and (3) one whose resolution would not serve the purposes of exhaustion (futility)."  <u>Kaiser</u>, 347 F.3d at 1115 (quoting Johnson, 2 F.3d at 921); <u>see also</u> <u>Illinois Council</u>, 529 U.S. 1 at 23 (explaining that the exhaustion requirement in § 405(g) is waived if a claim is "entirely collateral" to the substantive claim of entitlements to benefits and the plaintiff could not obtain full relief through retroactive payment).

The Sixth Circuit considered a case similar to the one now before the Court, and declined to waive the exhaustion requirement.  In <u>Oakland Medical</u>, as here, the Secretary revoked the CLIA certificate of the plaintiffs' laboratory and withdrew Medicare payment approval for

1  plaintiffs' laboratory services.  <u>Oakland Medical</u>, 298

2  F.3d at 509.  Before exhausting their administrative

3

4  remedies, the plaintiffs filed suit in federal court to

5  enjoin the withdrawal of Medicare payment approval.  <u>Id.</u>

6  The <u>Oakland Medical</u> plaintiffs based their claims,

7

8  however, on alleged due process violations, not on lack

9  of statutory authority for the withdrawal of payment

10  approval.  <u>Id.</u>

11

12

13  To waive the exhaustion requirement, the Sixth

14  Circuit, unlike the Ninth Circuit, requires only that a

15  claim be (1) collateral; and (2) colorable.  The court

16  found the <u>Oakland Medical</u> claim *was* collateral to the

17

18  administrative appeal, but was not colorable.  <u>Id.</u> at

19  510-11.

20

21

22  **(a)  Collateral to the Administrative Review**

23  Defendant argues that under <u>Illinois Council</u>, a

24  challenge to a regulation must proceed through

25  administrative review, whether or not it is "collateral."

26

27  (<u>See</u> Opp'n at 11-13.)  In the hearing on this matter and

28

15

in its Opposition, Defendant quoted a passage of _Illinois_

_Council_ which states,

> [T]he [statutory] language "to recover on
> any claim arising under" the Social
> Security (or, as incorporated through §
> 1395ii, the Medicare) Act is, if read
> alone, uncertain. Those words clearly
> apply in a typical Social Security or
> Medicare benefits case, where an
> individual seeks a monetary benefit from
> the agency (say, a disability payment, or
> payment for some medical procedure), the
> agency denies the benefit, and the
> individual challenges the lawfulness of
> that denial. The statute plainly bars §
> 1331 review in such a case, irrespective
> of whether the individual challenges the
> agency's denial on evidentiary, rule-
> related, statutory, constitutional, or
> other legal grounds.

_Illinois Council_, 529 U.S. at 10.    Defendants also cite

this passage:

> [Previous Supreme Court cases] foreclose
> distinctions based upon the . . .
> "collateral" versus "noncollateral"
> nature of the issues, or the
> "declaratory" versus "injunctive" nature
> of the relief sought. Nor can we accept a
> distinction that limits the scope of §
> 405(h) to claims for monetary benefits.
> Claims for money, claims for other
> benefits, claims of program eligibility,
> and claims that contest a sanction or
> remedy may all similarly rest upon
> individual fact-related circumstances,
> may all similarly dispute agency policy
> determinations, or _may all similarly_

1
2
3
4
*involve the application, interpretation, or constitutionality of interrelated regulations or statutory provisions. There is no reason to distinguish among them in terms of the language or in terms of the purposes of § 405(h).*

5 <u>Id.</u> at 14 (emphasis added).

6

7

8    Despite the language quoted above, <u>Illinois Council</u>

9 does not foreclose the waiver of § 405(g)'s exhaustion

10 requirement in all cases challenging the validity of a

11 regulation.   The <u>Illinois Council</u> passages quoted above

12

13 address whether § 405(h) applies to a claim, not  whether

14 the requirements of § 405(g) have been satisfied; <u>id.</u> at

15 10-15; <u>Illinois Council</u> merely holds there is no basis

16

17 for distinguishing claims challenging the validity of a

18 regulation when determining whether they "arise under"

19 the Medicare Act and thus fall under § 405(h).   <u>Id.</u> at

20 14.

21

22

23    Defendant also argued at the hearing on this matter,

24 that <u>Illinois Council</u> itself dealt with a challenge to

25

26 the validity of a regulation, and yet the Supreme Court

27 still required exhaustion.   <u>Illinois Council</u>, however,

28

considered only the narrow question of whether the claim

arose under the Medicare Act.  <u>Id.</u> at 10-15.    The Supreme

Court declined to waive exhaustion in that case only

because the plaintiff had not met the presentment

requirement, and did not consider whether the claim was

sufficiently collateral to warrant waiver of exhaustion

if, as here, the presentment requirement had been met.

<u>Id.</u> at 24 ("At a minimum . . . the matter must be

presented to the agency prior to review in a federal

court. This the Council has not done.")


     Defendant also quoted <u>Illinois Council</u> language which

states that "[p]roceeding through the agency in this way

provides the agency the opportunity to reconsider its

policies, interpretations, and regulations in light of

those challenges."    <u>Illinois Council</u>, 529 U.S. at 24.

The remainder of that paragraph, however, which clarifies

that "the agency can waive many of the procedural steps

set forth in § 405(g), and a court can deem them waived

in certain circumstances, even though the agency

technically holds no 'hearing' on the claim."  <u>Id.</u>

18

1    (citations omitted).  That paragraph goes on to explain

2    that a court may waive the exhaustion requirement if it

3

4    finds that the "collateral nature of claim and potential

5    irreparable injury from delayed review satisfy the 'final

6    decision' requirement of § 405(g)."  Id. (citing

7    Eldridge,  424 U.S. at 330-31 and n.11).

8

9

10       Like the claim in Illinois Council, Plaintiff's

11   challenge to the validity of the cancellation regulations

12   does "arise under" the Medicare Act.  Even where a claim

13

14   "arises under" the Medicare Act, however, Illinois

15   Council holds that a court may excuse the exhaustion

16   requirements of § 405(g) if the claim is "entirely

17

18   collateral" to the administrative adjudication.  Id. at

19   15.  Indeed, a claimant "compl[ies] with, rather than

20   disregard[s], the strictures of § 405(h)" when it

21

22   proceeds directly to the District Court on an entirely

23   collateral claim.  Id. at 15.

24   ///

25   ///

26

27

28

                                19

Moreover, in a case after _Illinois Council_, the Ninth Circuit indicated that it would waive the exhaustion requirement of § 405(g) for challenges to regulations arising under the Medicare Act, provided the _Johnson_ requirements were met.  See _Kaiser_, 347 F.3d at 1115-16. _Kaiser_, like the case at hand, involved a challenge to a regulation.  _Id._  In that case, the court did not waive exhaustion because the plaintiffs failed to show irreparability or futility.  _Id._  The Ninth Circuit indicated that if the challenge had met the three requirements of collaterality, irreparability, and futility, however, it would have waived the exhaustion requirement.  _Id._  Defendant does not address _Kaiser_; indeed it does not cite to any Ninth Circuit cases to address whether the Court should waive exhaustion.

Finally, the Supreme Court has held "some (but not all) of the procedural steps set forth in § 405(g)" will be excused when a claimant challenges the constitutionality of an agency procedure and that challenge is "entirely collateral" to its administrative

1   claims.   Illinois Council, 529 U.S. at 15.   Indeed, the

2   Sixth Circuit has held that a claim challenging CMS's

3   CLIA revocation procedures is "collateral" to the

4   administrative review of the CLIA revocation itself.   See

5   Oakland Medical, 298 F.3d at 509.   Thus, despite the

6   Illinois Council language citing claims "involv[ing] the

7   application, interpretation, or constitutionality of

8   interrelated regulations or statutory provisions," a

9   court may waive exhaustion for claims involving the

10  constitutionality or validity of a regulation.[3]

11

12

13      In the Ninth Circuit, a claim is "entirely

14  collateral" if it is "not 'bound up' with the merits so

15  closely that [the court's] decision would constitute

---

[3] As a general principle, courts should not resolve a
constitutional question if a dispute could be resolved on
another basis that avoids the need to resolve the
constitutional question.   See Ashwander v. TVA, 297 U.S.
288, 347 (1936).   Courts will, however, consider the
constitutionality of agency procedures prior to
exhaustion of administrative remedies if the agency
proceeding is unlikely to aid the court in resolving the
constitutional issue, if the constitutional issue is
"entirely collateral" to the agency proceeding, or if the
petitioner could not obtain meaningful judicial
consideration of the constitutional issues after
conclusion of the administrative adjudication.   See,
e.g., Weinberger v. Salfi, 422 U.S. 749, 765-66 (1975);
Eldridge, 424 U.S. at 330-31; Massieu v. Reno, 91 F.3d
416, 424 (3d Cir. 1996) (considering whether "plaintiff's
claims can be afforded meaningful judicial review in this
court after exhaustion").

1  interference with the agency process."  <u>Johnson</u>, 2 F.3d

2  at 922.  Here, administrative review involves

3  reconsideration of the revocation of the CLIA certificate

4  and the imposition of related sanctions.  (Mot. at 16-

5  17.)  In contrast, the judicial claim contests the

6  validity of regulations that Plaintiff argues exceed the

7  scope of statutory authority.  Resolution of the validity

8  of the regulations will not interfere with the ongoing

9  ALJ proceeding regarding revocation of the CLIA

10 certificate.  Accordingly, like the due process claim in

11 <u>Oakland Medical</u>, Plaintiff's challenge to the validity of

12 the cancellation regulations is entirely collateral to

13 the administrative proceedings.[4]

14 ///

15 ///

16 ///

17 ///

18

19

20

21

22

23

24     [4]<u>See also</u> <u>Marcus v. Sullivan</u>, 926 F.2d 604, 614 (7th
   Cir. 1991) (holding that "claims of system-wide
25 violations," including the plaintiffs' challenge to the
   facial validity of agency rules and regulations, "are
26 collateral to claims for individual benefits.") (citing
   <u>Johnson v. Sullivan</u>, 922 F.2d 346, 353 (7th Cir. 1990);
27 <u>Bailey v. Sullivan</u>, 885 F.2d 52, 65 (3rd Cir.1989)).

28

                              22

**(b)  Colorable Showing of Irreparability**

Defendant argues that under the reasoning in <u>Oakland Medical</u>, Plaintiff's claim is not colorable because the government interest in expediting Medicare terminations outweighs Plaintiff's interest in Medicare payments. (Opp'n at 13-14.)  <u>Oakland Medical</u>, however, does not support such a sweeping proposition.  In that case, the Sixth Circuit examined the plaintiff's interest, the risk of erroneous deprivation of that interest, and the government's interest, because these are factors going to the likelihood of success on a due process claim. <u>Oakland Medical</u>, 298 F.3d at 510-11.  These factors do not apply here, as Plaintiff does not present a due process claim.  Instead, the Court must examine Plaintiff's likelihood of success on its challenge to the validity of the cancellation regulations to determine whether Plaintiff's claim is colorable.

As explained below at III.B., Plaintiff has established its likelihood of success on the merits and has shown a possibility of irreparable injury.

23

1  Accordingly, Plaintiff's claim is "colorable in its

2  showing that denial of relief will cause irreparable

3

4  harm." See Johnson, 2 F.3d at 921.

5

6      (c) **Purposes of Exhaustion (Futility)**

7

8      The final criterion mitigating against exhaustion is

9  futility.  See Johnson, 2 F.3d at 922.  "[S]aying that

10 exhaustion would be futile is merely another way of

11 stating that the policies underlying the exhaustion

12

13 requirement do not apply in a given case." Abbey v.

14 Sullivan, 978 F.2d 37, 45 (2d Cir. 1992).  Indeed, "[t]he

15 Supreme Court has held that the 'ultimate decision of

16 whether to waive exhaustion should not be made solely by

17

18 mechanical application of the Eldridge factors

19 [collaterality and irreparable harm], but should also be

20 guided by the policies underlying the exhaustion

21

22 requirement.'" Johnson, 2 F.3d at 922 (quoting Bowen v.

23 City of New York, 476 U.S. 467, 484 (1986)).

24

25     To determine whether a claim is futile, the Ninth

26 Circuit examines four goals of the exhaustion

27

28

24

requirement: (1) to compile a detailed factual record;

(2) to apply agency expertise in administering its own

regulations; (3) to preserve judicial resources; and (4)

to provide the agency the opportunity to correct errors

through administrative review.  <u>Id.</u>

Requiring Plaintiff's challenge to proceed through

administrative review would serve none of these goals.

Here, the question presented to the Court--validity of a

regulation--is purely legal.  No facts are in dispute, so

the goal of compiling a detailed factual record is not

implicated.  Similarly, agency expertise would not be

helpful in determining the validity of the cancellation

regulations.  As explained by the Second Circuit,

> [T]he policy of permitting an agency to
> correct its own errors is chimerical when
> the    challenge    is    to    regulations
> promulgated and consistently enforced by
> the agency, and which the agency has
> either no power, or no inclination, to
> correct.  .  .  .  In this context,
> exhaustion would serve no legitimate
> purpose, i.e., it would be futile.

<u>Abbey v. Sullivan</u>, 978 F.2d 37, 45 (2d Cir. 1992) (citing

<u>Eldridge</u>, 424 U.S. at 330-31; <u>Weinberger v. Salfi</u>, 422

U.S. 749, 765-66 (1975); <u>Marcus v. Sullivan</u>, 926 F.2d

604, 614 (7th Cir. 1991)).


In <u>Marcus</u>, plaintiffs challenged agency rules and

regulations governing social security disability benefit

determinations.  <u>Marcus</u>, 926, F.2d at 606-608.  The

Seventh Circuit held that exhaustion under § 405(g) would

be futile because it was "unlikely that [the Secretary]

would have corrected his own error on some individual's

administrative appeal, given his commitment to, and

indeed promulgation of, the improper [benefit

determination] methodology."  <u>Id.</u> at 614.  Here, as in

<u>Marcus</u>, it is unlikely that Defendant would correct any

error in the validity of its policy of canceling Medicare

payment authorization pending administrative review,

since the agency has promulgated regulations committing

it to that policy.[5]

---

[5]At the hearing on this matter, Defendant argued,
citing 56 Fed. Reg. 13430, that an ALJ considering the
appeal of a CLIA revocation also has the power to decide
claims challenging the cancellation of Medicare payment
authorization.  The agency commentary cited by Defendant,
however, does not grant an ALJ the power to hear a
challenge to the validity of the cancellation
regulations--it only provides that a laboratory may
present evidence to the ALJ arguing why its Medicare
                                    (continued...)

Moreover, requiring Plaintiff to pursue its challenge through the administrative process would be futile in a practical and logical sense. As emphasized by the Supreme Court, the "application of the exhaustion doctrine is 'intensely practical.'" <u>Bowen v. City of New York</u>, 476 U.S. 467, 484 (1986) (quoting <u>Eldridge</u>, 424 U.S. at 331, n. 11). Here, Plaintiff is challenging the agency policy of canceling Medicare authorization *pending* administrative review. By the time the ALJ renders its decision, this issue will be moot, because administrative review will no longer be *pending*. Accordingly, pursuing the issue of the validity of the cancellation regulations through the administrative process would be futile.[6]

---

[5](...continued)
authorization should not have been cancelled. <u>See</u> 56 Fed. Reg. 13430, 13436.

[6]Futility can also arise from extreme delay in the administrative adjudication. <u>See</u>, <u>e.g.</u> <u>Southwestern Bell Telephone Co. v. FCC</u>, 138 F.3d 746, 750 (8th Cir. 1998) (holding that "unreasonable administrative delay would render the administrative remedy inadequate"). Here, however, there is no indication of the type of "unreasonable delay" which would excuse the exhaustion requirement. <u>Cf.</u> <u>Southwestern Bell</u>, 138 F.3d at 750 (nine year delay); <u>Pension Ben. Guar. Corp. v. Carter & Tillery Enterprises</u>, 133 F.3d 1183, 1187 (9th Cir. 1998) (statute of limitations would expire before completion of agency adjudication).
Moreover, that a petitioner will suffer irreparable harm before the agency hears its petition is not a sufficient reason to excuse exhaustion. <u>Cf.</u> <u>Perot v.</u>
(continued...)

1    Thus, the Court waives the exhaustion requirement of

2  § 405(g) because Plaintiff's challenge to the validity of

3

4  the cancellation regulations is collateral to its

5  administrative appeals and presents a colorable showing

6  of irreparable harm, and because it would be futile for

7  Plaintiff to pursue this challenge in its administrative

8

9  appeal.   Accordingly, the Court has jurisdiction over

10 Plaintiff's claim for injunctive relief.

11

12

13               **III. PRELIMINARY INJUNCTION**

14 **A.   Legal Standard**

15    In seeking a preliminary injunction, a plaintiff

16

17 meets its burden by demonstrating either:   (1) a

18 combination of probable success on the merits and the

19 possibility of irreparable injury; or (2) that serious

20 ─────────────────────────────────────────────────

21 (...continued)
   Federal Election Com'n, 97 F.3d 553, 559 (D.C. Cir. 1996)
22 (refusing to excuse exhaustion of FEC remedies where
   petitioner, a presidential candidate, challenged his
23 exclusion from presidential debates, even though the FEC
   decision would not be rendered until after the election.)
24 Indeed, the Second Circuit refused to excuse exhaustion
   in a case similar to this one, where petitioners appealed
25 denial of Medicare reimbursements without which elderly
   beneficiaries in poor health might suffer irreparable
26 harm.   See Pavano v. Shalala, 95 F.3d 147, 151 (2d Cir.
   1996).   Nevertheless, as explained above, waiver of
27 exhaustion is appropriate here because it would be futile
   for Plaintiffs to bring their claim of facial invalidity
28 of these regulations in the administrative process.

                              28

questions are raised and the balance of hardships tips sharply in its favor. Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1120 (9th Cir. 2005); see also Fed. R. Civ. P. 65. These two formulations are not separate tests but represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. Clear Channel Outdoor, Inc. v. City of Los Angeles, 340 F.3d 810, 813 (9th Cir. 2003).

**B.  Discussion**

**1.  Likelihood of Success on the Merits**

Ordinarily, courts give controlling weight to an agency's interpretation of a statute, and will not strike down regulations based on a reasonable interpretation "unless they are arbitrary, capricious, or manifestly contrary to the statute." Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44 (1984). Courts only grant this deference to agency interpretations, however, where there is ambiguity in the text and the agency interpretation is a reasonable

1   construction of the authorizing act.   See Sutton v.

2   United Air Lines, Inc., 527 U.S. 471, 483 (1999).

3

4

5   Plaintiff argues that less deference is due to agency

6   interpretations when reviewing an agency's imposition of

7   sanctions, and that courts should only allow sanctions

8   that are "expressly listed" in the enabling legislation.

9   (Reply at 9.)   Indeed, the D.C. Circuit has held that the

10  APA requires express statutory authority for any

11  sanctions.   American Bus Ass'n v. Slater, 231 F.3d 1, 6-

12  7 (D.C. Cir. 2000) (citing 5 U.S.C.A. § 558(b)

13  (preventing imposition of sanctions "except within

14  jurisdiction delegated to the agency and as authorized by

15  law")).

16

17  The Ninth Circuit, in contrast, defers to agency

18  statutory interpretations even in the context of

19  sanctions.   See, e.g. Krull v. SEC, 248 F.3d 907, 912

20  (9th Cir. 2001); Metropolitan Stevedore Co. v. Brickner,

21  11 F.3d 887, 889-890 (9th Cir. 1993); Bosma v. USDA, 754

22  F.2d 804, 810 (9th Cir. 1984).   The Ninth Circuit will

1   overturn an agency choice of sanction only if "the remedy

2   chosen is unwarranted in law or is without justification

3

4   in fact." <u>Krull</u>, 248 F.3d at 912.

5

6   Here, the challenged regulations provide that "CMS

7   always cancels a laboratory's approval to receive

8   Medicare payment" when it revokes a CLIA certificate, and

9

10  that "[t]he effective date of the cancellation of a

11  laboratory's approval to receive Medicare payment for its

12  services is not delayed because the laboratory has

13

14  appealed and the hearing or hearing decision is pending."

15  42 C.F.R. §§ 493.1842(a), 493.1844(d)(3).

16

17

18  Defendant argues that these regulations are

19  authorized by 42 U.S.C. § 1395w-2, which provides, in

20  pertinent part,

21
        (a) If the Secretary determines that any
22      provider or clinical laboratory approved
        for participation under this subchapter
23      no   longer   substantially   meets   the
        conditions   of   participation   or   for
24      coverage specified under this subchapter
        with respect to the provision of clinical
25      diagnostic laboratory tests under this
        part, the Secretary may (for a period not
26      to exceed one year) impose intermediate
27

28

                              31

1
2
3
4

     sanctions developed pursuant to
subsection (b) of this section, in lieu
of terminating immediately the provider
agreement or cancelling immediately
approval of the clinical laboratory.
(b)(1) The Secretary shall develop and
implement--

5
6
7

(A) a range of intermediate sanctions to
apply to providers or clinical
laboratories under the conditions
described in subsection (a) of this
section, and

8
9
10

(B) appropriate procedures for appealing
determinations relating to the imposition
of such sanctions.

11
12

(2)(A) The intermediate sanctions
developed under paragraph (1) shall
include--

13

. . . .

14
15
16
17
18
19

(iv) suspension of all or part of the
payments to which a provider or clinical
laboratory would otherwise be entitled
under this subchapter with respect to
clinical diagnostic laboratory tests
furnished on or after the date on which
the Secretary determines that
intermediate sanctions should be imposed
pursuant to subsection (a) of this
section.

20

42 U.S.C. § 1395w-2.

21
22
23

     Plaintiff concedes that § 1395w-2(b)(2)(A)(iv)

24

authorizes Defendant to *suspend* its Medicare payment

25

authorization temporarily, pending review of its CLIA

26
27

certificate revocation. (Reply at 9-11.) It contends,

28

however, that Congress did not authorize Defendant to

*cancel* its Medicare payment authorization permanently.

(Id.)  Plaintiff argues the distinction between

suspension and cancellation must be significant because

the regulations treat them distinctly. (Id. (citing 42

C.F.R. § 493.1842 (governing cancellation); 42 C.F.R. §

493.1828 (governing suspension)).)  The regulations cited

by Plaintiff do not, however, define "cancellation" or

"suspension" and provide little guidance about the

significance of the distinction.


Without more information regarding the procedural and

substantive difference between a cancellation and a

suspension of Medicare payment authorization, the Court

cannot decide whether the sanction of cancellation is

"unwarranted in law."[7]  See Krull, 248 F.3d at 912.  On

---

[7]At the hearing on this matter, counsel made conflicting statements about the distinction between cancellation and suspension.  Plaintiff's counsel stated that if Medicare authorization is suspended and Plaintiff prevails in the administrative appeal, it could seek reimbursement for laboratory services rendered during the suspension, whereas if Medicare authorization is cancelled, no reimbursement is possible.  Defendant's counsel, in contrast, claimed that distinguishing cancellation from suspension is a "distinction without a difference."  Defendant's insistence on pursuing the
(continued...)

1  its face, however, the statutory authorization of "a

2  range of intermediate sanctions" "for a period of no more

3

4  than one year," including "suspension," would not

5  authorize a *cancellation*, which by its plain meaning

6  lasts for more than one year.  See Metropolitan

7

8  Stevedore, 11 F.3d 887, 889 (explaining that in reviewing

9  agency sanctions, while the court has a duty to construe

10 the statute "liberally in light of the Act's purpose," it

11 cannot "disregard the plain meaning of the statute or its

12

13 legislative history, nor may we create rights not given

14 or implied by the terms of the Act.")  Accordingly,

15 Plaintiff has established a likelihood of success on the

16 merits of its challenge to the validity of the

17

18 regulations allowing cancellation of Medicare payment

19 authorization pending administrative review of CLIA

20 certificate revocation.

21

22

23

24

25

26

---

[7](...continued)

27 cancellation sanction as opposed to the suspension
   sanction, however, indicates that the distinction is

28 significant.

34

## 2.  Possibility of Irreparable Injury

Defendant argues that mere financial injury does not constitute irreparable harm justifying imposition of a preliminary injunction.  (Opp'n at 16 (citing Sampson v. Murray, 415 U.S. 61, 90 (1974); Hughes v. U.S., 953 F.2d 531, 536 (9th Cir. 1992)).)  Indeed, in one case cited by Defendant, the Eleventh Circuit found that recovery of Medicare overpayments by CMS would not cause irreparable injury even if it would force the plaintiff out of business.  V.N.A. of Greater Tift County, Inc. v. Heckler, 711 F.2d 1020, 103-35 (11th Cir. 1983) (explaining that allowing injunctive relief for such injuries would cause courts to be inundated by claims).

The V.N.A. court, however, required a "virtual certainty of irreparable injury" before granting an injunction.  Id. at 1027-28, 1034 (applying a heightened standard because the injunction could only issue under the All Writs Act).  In contrast, here only a "possibility of irreparable injury" is required.  Save Our Sonoran, 408 F.3d at 1120.  Thus, an injury may

justify an injunction here even if it would not satisfy
the heightened V.N.A. requirements.

Here, Plaintiff's CEO attests that Plaintiff is one
of four hospitals serving approximately 500,000 people.
(Peterson Decl. ¶ 7.)  If one of these hospitals closed,
"it would be extremely difficult if not impossible for
the remaining hospitals to handle the additional patient
burden."  (Id.)  Plaintiff's emergency department
receives nearly 110 patients each day and its labor and
delivery unit handles the delivery of approximately 2,000
newborns a year.  (Id.)

Forty-three percent of Plaintiff's patients are Medi-
Cal beneficiaries and twenty-one percent are Medicare
beneficiaries.  (Id. ¶ 8.)  Payments from these
government programs comprise most of Plaintiff's income.
(Id.)  If CMS cancels Plaintiff's approval to receive
Medicare and Medi-Cal payments for laboratory services,
it will affect Plaintiff's operations immediately.  (Id.
¶ 12.)  Plaintiff will stop paying vendors in a timely

1   manner and immediately will struggle to maintain the

2
3   basic services that patients need and to provide routine

4   maintenance to necessary equipment.  (Id.)  Within four

5   weeks of cancellation of Medicare and Medicaid payments,

6   Plaintiff will be unable to satisfy its payroll

7
8   obligations and quickly will start to lose employees.

9   (Id. ¶ 13.)  Ultimately, Plaintiff likely will have to

10  trim its operations or shut down completely.  (Id. ¶ 12.)

11
12  Defendant does not contest any of these assertions.

13

14       Unlike mere financial injury, which could be

15  rectified following a final judgment, these potential

16
17  injuries to Plaintiff and the community it serves, if

18  realized, would be far-reaching and permanent.  Moreover,

19  Plaintiff's uncontested allegations establish a

20  sufficient showing that these injuries are "possible" if

21
22  the Court does not issue a preliminary injunction.

23  Accordingly, Plaintiff has established the possibility of

24  irreparable injury.

25  ///

26
27  ///

28

### 3. Balance of Hardships

Defendant argues the Court must balance Plaintiff's asserted interests against the government's interest in taking prompt action to ensure safe, accurate, and reliable laboratory tests. (Opp'n at 18-19.) Plaintiff argues that because Defendant has not revoked Plaintiff's CLIA certificate, mere withdrawal of payment approval will not affect the safety and accuracy of the laboratory's tests. (Reply at 11-12.) This argument, however, ignores the fact that cancellation of Medicare approval is a sanction that may deter future CLIA violations or may lessen the public's exposure to laboratories the Secretary deems a potential hazard. Issuance of a preliminary injunction would impose a hardship on Defendant by depriving him of the use of such sanctions to protect the public.

Plaintiff has also established potential hardship in that it and the community it serves may suffer irreparable injury if the Court does not issue an injunction. See supra at III.B.2. In light of

38

1 Defendant's demonstrated interest in protecting the

2 public, however, Plaintiff has not established that the

3

4 balance of hardships tips *sharply* in its favor.  <u>See</u>

5 <u>Goto.com</u>, 202 F.3d at 1204-05 (9th Cir. 2000).

6

7

8 **C.    Injunction Bond**

9     Under Federal Rule of civil Procedure 65(c),

10        The court may issue a preliminary
11        injunction or a temporary restraining
          order only if the movant gives security
12        in an amount that the court considers
13        proper to pay the costs and damages
          sustained by any party found to have
14        been wrongfully enjoined or restrained.

15 Fed. R. Civ. Proc. 65(c).

16

17

18     To determine the amount of a bond the Court will look

19 to evidence regarding the potential financial harm to the

20 Defendant of issuing a preliminary injunction.  <u>See</u> <u>e.g.</u>,

21

22 <u>Connecticut General Life Ins. Co. v. New Images of</u>

23 <u>Beverly Hills</u>, 321 F.3d 878, 882 (9th Cir. 2003); <u>Walczak</u>

24 <u>v. EPL Prolong Inc.</u>, 198 F.3d 725, 733-34 (9th Cir.

25

26 1999).  A court has discretion to require only a nominal

27 bond or to waive the bond entirely.  <u>See</u>, <u>e.g.</u>, <u>Save Our</u>

28

Sonoran, 408 F.3d at 1126; Jorgensen v. Cassiday, 320

F.3d 906, 919 (2003).  For example, courts may waive the

bond requirement if the defendant fails to request a

bond.  See Aoude v. Mobil Oil Corp., 862 F.2d 890, 896

(1st Cir. 1988); Connecticut General Life Ins. Co. v. New

Images of Beverly Hills, 321 F.3d 878, 882 (9th Cir.

2003).


In this case, no evidence is before the Court

regarding the potential financial ramifications to the

Defendant of an injunction prohibiting cancellation of

Plaintiff's Medicare payment authorization.  Plaintiff

sought an injunction without bond, and Defendant did not

argue in favor of a bond.  (See Pl's. Proposed Temporary

Restraining Order.) Accordingly, the Court does not order

a bond at this time, but Defendant may apply for a bond

by presenting evidence as to the potential financial harm

it may incur as a result of the preliminary injunction.

///

///

///

40

## IV. CONCLUSION

This Court has jurisdiction to hear the Motion for Preliminary Injunction, because the requirements for judicial review of claims arising under the Medicare Act have been met: Plaintiff has presented its claim to the agency, and the Court has waived the exhaustion requirement. See 42 U.S.C. §§ 405(g), (h). Although Plaintiff has not established that the balance of hardships tips sharply in its favor, Plaintiff is entitled to a preliminary injunction because (1) it is likely to succeed on the merits; and (2) absent an injunction, Plaintiff faces a possibility of irreparable injury. See Save Our Sonoran, 408 F.3d at 1120.


Accordingly, the Court ORDERS that Defendant, his employees, his agents, and others acting in concert with them, are enjoined from canceling Plaintiff's approval to receive Medicare and Medicaid payments for clinical

///

///

///

1    laboratory services before revocation of Plaintiff's CLIA

2    certificate.

3

4

5    Dated: <u>January 10, 2008</u>                    _____

6                                                    VIRGINIA A. PHILLIPS
                                                     United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

42