1   JEFFREY S. BUCHOLTZ
    Acting Assistant Attorney General
2   KAREN P. HEWITT
    United States Attorney
3   SHEILA LIEBER
    Deputy Director
4   KATHRYN L. WYER
    U.S. Department of Justice, Civil Division
5   20 Massachusetts Avenue, N.W.
    Washington, DC  20530
6   Tel.  (202) 616-8475 / Fax (202) 616-8470
    kathryn.wyer@usdoj.gov
7   *Attorneys for Defendant*

8              UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF CALIFORNIA
9

10  _____  )   Case No. 08 CV 0170 W Por
                                     )
11  SHARP HEALTHCARE; INTERNIST      )
    LABORATORY; AND SCRIPPS          )   **DEFENDANT'S OPPOSITION TO**
    HEALTH,                          )   **PLAINTIFFS' MOTION FOR**
12                                   )   **PRELIMINARY INJUNCTION**
            Plaintiffs,              )
13                                   )   Date: April 7, 2008
            v.                       )   Time: 10:30 a.m.
14                                   )   Courtroom: 7
    MICHAEL LEAVITT, SECRETARY       )
15  OF THE DEPARTMENT OF             )   HONORABLE THOMAS J. WHELAN
    HEALTH AND HUMAN SERVICES,       )
16                                   )
            Defendant.               )
17  _____  )

18

19

20

21

22

23

24

25

26

27

28  Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction          08cv0171 W POR

1

# TABLE OF CONTENTS

2    TABLE OF AUTHORITIES .................................................................................................iv

3    INTRODUCTION ...........................................................................................................1

4    STANDARD FOR PRELIMINARY INJUNCTION ..................................................... 3

5    ARGUMENT ..................................................................................................................4

6        I.     PLAINTIFFS' SPECULATION THAT THEY MAY SUFFER LOSS OF
     BUSINESS IF THEY LOSE IN COMPETITIVE BIDDING IS INSUFFICIENT
7              TO ESTABLISH AN IRREPARABLE INJURY .......................................................4

8              A.     The Speculative Nature Of Plaintiffs' Asserted Injuries Defeats
                      Their Motion ....................................................................................................4
9
          B.     The Injuries Asserted By Two Of The Three Plaintiffs Fail To
10                    Qualify As Irreparable, And None Of The Plaintiffs Provide Evidence
                      Of The Extent Of Any Injury That Might Occur ...........................................6
11
          C.     Plaintiffs Cannot Rest Their Assertion Of Irreparable Injury On
12                    Harms They Allege Could Be Suffered By Third Parties .........................9

13             D.     Plaintiffs Mischaracterize The Irreparable Injury Standard That
                      Applies To Alleged Violations Of A Statute ...............................................10
14
    II.    IN THE ABSENCE OF IRREPARABLE INJURY, THE BALANCE
15             OF HARDSHIPS DOES NOT WEIGH IN PLAINTIFFS' FAVOR,
               AND THE PUBLIC INTEREST IN A VIABLE AND AFFORDABLE
16             MEDICARE PROGRAM DOES NOT SUPPORT AN INJUNCTION ...............12

17       III.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR APA
               RULEMAKING CHALLENGE ................................................................................12
18
          A.     The "Policies" That Plaintiffs Challenge Do Not Qualify As "Final
19                    Agency Action" And Therefore Cannot Be Subject To
20                    Rulemaking Requirements ..........................................................................12

21             B.     Plaintiffs Have Had Ample Notice And Opportunity To Comment
                      On The Demonstration Project As It Has Developed Thus Far .................15
22
    IV.   PLAINTIFFS ARE UNLIKELY TO SUCCEED IN ESTABLISHING THAT
23             THE DEMONSTRATION PROJECT CRITERIA THEY REFERENCE
               ARE ARBITRARY OR CAPRICIOUS ..............................................................16
24

25       V.    PLAINTIFFS WILL NOT SUCCEED IN ESTABLISHING AN
               UNCONSTITUTIONAL TAKING BECAUSE CMS HAS INDICATED
26             THAT NONWINNING BIDDERS NEED NOT PROVIDE THE
               COVERED SERVICES IN THE DEMONSTRATION PROJECT AREA,

27

28

1            AND BECAUSE MEDICARE FEE REGULATION DOES NOT QUALIFY
             AS A TAKING .................................................................................................. 18

2

3    VI.     PLAINTIFFS WILL NOT SUCCEED IN ESTABLISHING THAT
             THE SECRETARY HAS EXCEEDED THE SCOPE OF HIS AUTHORITY
             BY RECOGNIZING SPECIMEN COLLECTION AS PART AND
4            PARCEL OF LABORATORY TESTING ............................................................ 19

5    CONCLUSION ...................................................................................................................... 21

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

3  <u>CASES</u>

4  <u>Abend v. MCA, Inc.</u>, 863 F.2d 1465 (9th Cir. 1988) ...................................................4

5  <u>Am. Passage Media Corp. v. Cass Commc'ns, Inc.</u>, 750 F.2d 1470 (9th Cir. 1985) .................6-7

6  <u>Appalachian Power Co. v. EPA</u>, 208 F.3d 1015 (D.C. Cir. 2000) ..................................14

7  <u>Arcamuzi v. Continental Airlines, Inc.</u>, 819 F.2d 935 (9th Cir. 1987) ...........................11

8  <u>Augusta News Co. v. News Am. Pub. Inc.</u>, 750 F. Supp. 28 (D. Me. 1990) ....................7

9  <u>Bates v. UPS, Inc.</u>, 511 F.3d 974 (9th Cir. 2007) ..................................................17

10 <u>Bennett v. Spear</u>, 520 U.S. 154 (1997) ..............................................................13

11 <u>Big Country Foods, Inc. v. Bd. of Educ.</u>, 868 F.2d 1085 (9th Cir. 1989) .........................4

12 <u>Buckeye Forest Council v. U.S. Forest Service</u>, 337 F. Supp. 2d 1030 (S.D. Ohio 2004) .............5

13 <u>Burlington N. R.R. Co. v. Dep't of Revenue</u>, 934 F.2d 1064 (9th Cir. 1991) ...............11

14 <u>Caribbean Marine Servs. Co. v. Baldrige</u>, 844 F.2d 668 (9th Cir. 1988) ...........................4

15 <u>Cooper v. TWA Airlines, LLC</u>, 274 F. Supp. 2d 231 (E.D.N.Y. 2003) ..........................8

16 <u>De La Nueces v. United States</u>, 778 F. Supp. 191 (S.D.N.Y. 1991) ..............................7

17 <u>Earth Island Inst. v. U.S. Forest Serv.</u>, 351 F.3d 1291 (9th Cir. 2003) ...........................4

18 <u>Ecology Ctr., Inc. v. U.S. Forest Serv.</u>, 192 F.3d 922 (9th Cir. 1999) ...........................13

19 <u>Ekimian v. INS</u>, 303 F.3d 1153 (9th Cir. 2002) ...................................................17

20 <u>Erringer v. Thompson</u>, 371 F.3d 625 (9th Cir. 2004) ...............................................12

21 <u>Frontier Health, Inc. v. Shalala</u>, 113 F. Supp. 2d 1192 (E.D. Tenn. 2000) ....................9-10

22 <u>Goldie's Bookstore, Inc. v. Superior Court</u>, 739, F.2d 466 (9th Cir. 1984) ......................4

23 <u>Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers,</u>
       <u>Local No. 70 of Alameda County</u>, 415 U.S. 423 (1974) .....................................3

24 <u>Heckler v. Chaney</u>, 470 U.S. 821 (1985) .............................................................16

25 <u>Ibrahim v. United States</u>, 650 F. Supp. 163 (N.D.N.Y. 1987) .......................................7

26 <u>Indus. Customers of Nw. Utilities v. Bonneville Power Admin.</u>, 408 F.3d 638 (9th Cir. 2005) ...13

27 <u>Int'l Long Term Care, Inc. v. Shalala</u>, 947 F. Supp. 15 (D.D.C. 1996) ...........................9

28

1   Kean v. Heckler, 799 F.2d 895 (3d Cir. 1986) ...........................................................17

2   Kim v. United States, 822 F. Supp. 107, 110 (E.D.N.Y. 1993) ...................................8

3   L.A. Memorial Coliseum Comm'n v. NFL, 634 F.2d 1197 (9th Cir. 1980) ..................9

4   Lazaro v. U.S. Dep't of Agriculture, 186 F. Supp. 2d 1203 (M.D. Fla. 2001) .................7

5   Martin v. Int'l Olympic Comm., 740 F.2d 670 (9th Cir. 1984) ....................................3

6   Mazurek v. Armstrong, 520 U.S. 968 (1997) ...............................................................3

7   Nat'l Ass'n of Psychiatric Treatment Ctrs. v. Weinberger, 661 F. Supp. 76 (D. Colo. 1986) .........9

8   Natural Res. Def. Council v. Winter, 502 F.3d 859 (9th Cir. 2007) ..............................3

9   Poeng v. United States, 167 F. Supp. 2d 1136 (S.D. Cal. 2001) ...........................7, 8, 9

10  Pony v. County of Los Angeles, 433 F.3d 1138 (9th Cir. 2006) ..................................10

11  Resident Councils of Wash. v. Leavitt, 500 F.3d 1025 (9th Cir. 2007) ........................17

12  Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479 (9th Cir. 1992) .............................15

13  Royal Crown Bottling Co. v. Royal Crown Cola Co., 358 F. Supp. 290 (D. Colo. 1979) .............9

14  Sagebrush Rebellion, Inc. v. Hodel, 790 F.2d 760 (9th Cir. 1987) ..............................15

15  Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113 (9th Cir. 2005) ..............................5

16  SUWA v. Thompson, 811 F. Supp. 635 (D. Utah 1993) .............................................11

17  United States v. D'Annolfo, 474 F. Supp. 220 (D. Mass. 1979) ................................11

18  W. State University v. ABA, 301 F. Supp. 2d 1129 (C.D. Cal. 2004) ...........................5

19  **STATUTES**

20  5 U.S.C. § 552 ............................................................................................................15

21  5 U.S.C. § 553 ............................................................................................................15

22  5 U.S.C. § 706 ......................................................................................................11, 16

23  42 U.S.C. § 1395*l* .................................................................................................8, 9, 20

24  42 U.S.C. § 1395w-3 ...........................................................................................*passim*

25  42 U.S.C. §§ 1395w-21 to 1395w-28 .........................................................................9

26  42 U.S.C. § 1395mm .................................................................................................9

27  **ADMINISTRATIVE MATERIALS**

28  45 C.F.R. 5.65(c) .......................................................................................................15

1

<u>**INTRODUCTION**</u>

2      Plaintiffs' renewed motion for preliminary injunctive relief offers little of substance

3 beyond their previous motion for a temporary restraining order ("TRO") and order to show cause,

4 which this Court correctly denied.  First and foremost, the Court lacks jurisdiction over plaintiffs'

5 claims, as discussed in other briefing that is currently under the Court's consideration.[1]

6 Moreover, the injury plaintiffs assert is still speculative. The Court has already recognized that

7 plaintiffs' asserted injury will only occur, if ever, after plaintiffs lose in the competitive bidding

8 process.  As was true when plaintiffs requested a TRO, winners of the bidding process have yet

9 to be announced.  The only change since the time of the Court's order of February 14, 2008, is

10 that plaintiffs now assert they have submitted bids. That step does not bring them any closer to a

11 real and concrete, as opposed to speculative and hypothetical, threat of injury.  Plaintiffs cannot

12 establish a real danger of irreparable injury now, nor may they circumvent standard judicial

13 process by forcing the Court to stand poised to grant preliminary injunctive relief in the event

14 their claims ripen. Moreover, plaintiffs have not established that any injury they might suffer is

15 irreparable, or that they will suffer any injury at all before their claims can be resolved,

16 particularly as the demonstration project is not scheduled to begin until July 1, 2008.

17      For the same reasons, the balance of hardships does not tilt sharply in plaintiffs' favor.

18 The balance in this case involves the speculative harm that the demonstration project may inflict

19 on plaintiffs' Medicare reimbursement revenues, on the one hand, and the real costs that the

20 Secretary, through the Centers for Medicare and Medicaid Services ("CMS"), will incur if forced

21 to bring the project to a halt.  These costs include not only the administrative expense of stopping

22

23      [1]In response to plaintiffs' prior Application for a Temporary Restraining Order and Order
to Show Cause Regarding a Preliminary Injunction, the Court issued an Order on February 14,
24 2008, denying plaintiffs' motion and ordering plaintiffs to show cause why this case should not
be dismissed for lack of subject matter jurisdiction.  <u>See</u> Order of Feb. 14, 2008 (dkt. #13).
25 Briefing in response to that order was completed on March 14, 2008.  Because the issue of
subject matter jurisdiction has already been briefed and is pending before the Court, defendant
26 will not repeat the jurisdictional arguments here but respectfully refers the Court to his prior
submissions.  See Def.'s TRO Opp. at 10-15 (dkt. #12), Def.'s Response to Pls.' Mem. Pursuant
27 to the Court's Feb. 14, 2008, Order (dkt. #16).

28

1  the project, but the missed savings that the Medicare program is expected to benefit from once

2  the demonstration project is put into place.  In light of these anticipated savings, and the concerns

3  with Medicare's high costs and the potential threat these costs pose to the program's long-term

4  viability – which led Congress to order this demonstration project in the first place – the public

5  interest here is on the side of implementing the project as soon as possible.

6          Even if the Court were to conclude that it had subject matter jurisdiction and that the

7  speculative nature of plaintiffs' asserted injury did not alone compel a denial of their requested

8  preliminary injunction, denial is warranted because plaintiffs are unlikely to succeed on the

9  merits.  The Secretary has not established any policies governing the demonstration project with

10  sufficient finality to make plaintiffs' Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-

11  706, challenge appropriate.  Even the Bidder's Package that plaintiffs attached to their

12  memorandum demonstrates that bidding criteria and project participation terms are subject to a

13  continuing process of reevaluation and modification – just as one would expect in an

14  experimental demonstration project of this kind.  The so-called policies that plaintiffs identify

15  and claim are arbitrary and capricious are in fact reasonable.  Moreover, the determination of

16  who must submit bids – which appears to be plaintiffs' primary concern – requires agency

17  expertise regarding what is necessary to ensure the project's success in reducing costs without

18  harming beneficiaries' interests.  In the complex context of Medicare competitive bidding, there

19  are no judicially manageable standards to guide the Court's review, nor have plaintiffs

20  established any abuse of the Secretary's considerable discretion in this area.

21          The basis of plaintiffs' Takings claim is fatally undermined by a recent CMS listserv

22  posting establishing that, contrary to plaintiffs' assertions, CMS does not actually require

23  nonwinning bidder laboratories to provide services to Medicare beneficiaries in the project area

24  without compensation.  Even aside from that posting, however, it is well established that

25  Medicare fee reimbursement issues do not implicate the Takings Clause.  Plaintiffs' Takings

26  claim is wholly without merit and should be rejected out of hand.

27          Plaintiffs' assertion regarding specimen collection is also unlikely to succeed.  Plaintiffs

28  evidently seek to challenge the Secretary's inclusion of blood sample drawing – which already

1    appears on the Medicare laboratory services fee schedule – among the 303 test codes for which

2    bidders must submit bids.  However, the statute that directs the Secretary to develop and carry

3    out the demonstration project places no limitation on the Secretary's authority to take into

4    account specimen collection costs in the bidding process.  Rather, the statute expressly delegates

5    to the Secretary the authority to place whatever conditions on the project he deems appropriate.

6    The Secretary's recognition of specimen collection as part and parcel of laboratory testing is well

7    within this broad grant of authority.  In sum, plaintiffs have utterly failed to satisfy the

8    requirements for a preliminary injunction, and their motion should therefore be denied.

9                    **STANDARD FOR PRELIMINARY INJUNCTION[2]**

10       "'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not

11   be granted unless the movant, by a clear showing, carries the burden of persuasion.'"  Mazurek v.

12   Armstrong, 520 U.S. 968, 972 (1997).  The Ninth Circuit has described two sets of criteria for

13   preliminary injunctive relief:  "Under the traditional test, a plaintiff must show: (1) a strong

14   likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if

15   preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4)

16   advancement of the public interest (in certain cases)."  Natural Res. Def. Council v. Winter, 502

17   F.3d 859, 862 (9th Cir. 2007).  Alternatively, a plaintiff must "demonstrate either a combination

18   of probable success on the merits and the possibility of irreparable injury or that serious

19   questions are raised and the balance of hardships tips sharply in his favor."  Id.  "These two

20   formulations represent two points on a sliding scale in which the required degree of irreparable

21   harm increases as the probability of success decreases."  Id.

22       However, no matter how great the plaintiff's showing of irreparable harm, "it must be

23   shown as an irreducible minimum that there is a fair chance of success on the merits."  Martin v.

24   Int'l Olympic Comm., 740 F.2d 670, 675 (9th Cir. 1984).  And no matter how great the

25   likelihood of success on the merits, "the moving party must demonstrate a significant threat of

26   _____

27       [2]Defendant has previously set forth the applicable statutory framework and factual
     background in his opposition to plaintiffs' TRO application.  See Def.'s TRO Opp. at 2-6.  The
28   Court is respectfully referred to that memorandum for this background information.

1   irreparable injury." Big Country Foods, Inc. v. Bd. of Educ., 868 F.2d 1085, 1088 (9th Cir.

2   1989). Mere speculation that an injury will occur, however severe the injury might be, is

3   insufficient. Id.; Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988).

4   Furthermore, "when the public interest is involved, it must be a necessary factor in the district

5   court's consideration of whether to grant preliminary injunctive relief." Id. The petitioner bears

6   the burden of proof on each factor and must provide facts supporting its assertions. See Granny

7   Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers, Local No. 70 of Alameda

8   County, 415 U.S. 423, 441 (1974). As this Circuit has recognized, injunctive relief is a "'harsh

9   and drastic' discretionary remedy, never an absolute right." Abend v. MCA, Inc., 863 F.2d 1465,

10  1479 (9th Cir. 1988).

11                                          **ARGUMENT**

12  I.    **PLAINTIFFS' SPECULATION THAT THEY MAY SUFFER LOSS OF
            BUSINESS IF THEY LOSE IN COMPETITIVE BIDDING IS INSUFFICIENT TO**
13          **ESTABLISH AN IRREPARABLE INJURY**

14          A.    **The Speculative Nature Of Plaintiffs' Asserted Injuries Defeats Their Motion**

15          Just as plaintiffs failed to show a threat of immediate irreparable injury before their bids

16  to participate in the laboratory services demonstration project were even submitted, they fail to

17  establish any such injury now, before winning bids have been announced, and over three months

18  before the demonstration project is scheduled to begin. Plaintiffs argue that their alleged harm is

19  not "too speculative" to warrant a preliminary injunction. Pl. Mem. at 4. Contrary to plaintiffs'

20  contentions, the wholly speculative nature of plaintiffs' asserted harm is by itself sufficient

21  reason to deny their motion: "In order to justify a preliminary injunction – in order to carry

22  enough weight to tip the balance – the cited harm must be real." Earth Island Inst. v. U.S. Forest

23  Serv., 351 F.3d 1291, 1311 (9th Cir. 2003). Even though "[t]he law does not require the

24  identified injury to be certain to occur, . . . it is not enough to identify a purported injury which is

25  only theoretical or speculative. That is true no matter which [preliminary injunction] standard is

26  applied." Id. (emphasis added); accord Goldie's Bookstore, Inc. v. Superior Court, 739, F.2d

27  466, 472 (9th Cir. 1984) ("Speculative injury does not constitute irreparable injury.").

28          In arguing to the contrary, plaintiffs cite cases that are inapposite. The distinguishing

feature of plaintiffs' situation is that it is entirely uncertain that the event that is alleged to pose a threat (here, plaintiffs' failure to be selected as winning bidders, and their subsequent failure to compensate for the inability to bill Medicare directly for tests covered by the demonstration project) will actually occur. In contrast, in the cases cited by plaintiffs, a triggering event either has occurred or is likely to occur, but the nature of the injury that may result is less certain. For example, in <u>Save Our Sonoran, Inc. v. Flowers</u>, 408 F.3d 1113 (9th Cir. 2005), the court recognized that if a property development was not enjoined, it would certainly occur, and that any environmental harm that might result would likely be irreparable. <u>Id.</u> at 1119, 1124 (indicating that construction had already begun when the injunction was issued). In <u>Western State University v. ABA</u>, 301 F. Supp. 2d 1129 (C.D. Cal. 2004), the initial decision to withdraw the university's ABA accreditation had already been made, and the court recognized the harm that would result, if the decision were confirmed, as "real and substantial." <u>Id.</u> at 1137. In <u>Buckeye Forest Council v. U.S. Forest Service,</u> 337 F. Supp. 2d 1030 (S.D. Ohio 2004), the court recognized – at odds with plaintiffs' description – that if it did not issue a preliminary injunction, the Forest Service "would proceed with the timber sales and would follow the Projects' plans for tree cutting, thinning, logging, and prescribed burning." <u>Id.</u> at 1039. There is a significant difference between the real "possibility" of irreparable injury that the courts in these cases recognized and the speculative suggestion of future loss of business that plaintiffs describe.

Plaintiffs' asserted injuries are speculative not only because they assume, for no good reason, that they will lose in the bidding process, but also because they also assume, without support, that the loss in revenue that plaintiffs claim they will experience if they are unable to bill Medicare directly for laboratory services within the limited demonstration project area cannot be offset. Plaintiffs' declarants have failed to explain why plaintiffs would be unable to serve as reference laboratories for winning bidders and thus receive compensation for the covered laboratory tests on a contract basis.

Moreover, even if plaintiffs were unable to form contractual relationships with winning laboratories, plaintiffs have failed to explain the timing of their asserted harm sufficiently to conclude that it would actually occur before this case is resolved. <u>See, e.g.</u>, Stevens Decl. ¶ 15

1   (asserting that plaintiff Internist would "effectively lose 65% of its business" and that it could not

2   survive such a loss, but failing to explain the time period in which it would expect to have to

3   close if it lost in the bidding process).  If the Court does not dismiss the case for lack of

4   jurisdiction and does not issue a preliminary injunction, the merits of plaintiffs claims' should be

5   resolved without discovery, as matters of law or based on an administrative record.  It is not clear

6   that any impact of the project's implementation would even be felt before the case was decided,

7   particularly as the project is not set to be implemented until July 1, 2008.  Thus, it is likely that if

8   plaintiffs were to prevail in this lawsuit they would sustain no injury at all.

9       Plaintiffs further suggest that the Court should issue an injunction now based on an

10  "assum[ption]" that one of them will lose in the bidding process because if plaintiffs were to wait

11  until after CMS announces winners to request an injunction, "it is questionable" whether judicial

12  review of any challenge would be available due to the statutory bar on judicial review in 42

13  U.S.C. § 1395w-3(b)(10).  Pl. Mem. at 5.  In effect, plaintiffs ask the Court to overlook the

14  "irreparable injury" requirement so that they may circumvent a statutory jurisdictional bar.[3]

15  Plaintiffs cannot be allowed to avoid Congress' limitation on judicial review in this manner.

16  Indeed, plaintiffs' assertion should reinforce the Court's conclusion that plaintiffs' claims are

17  already barred by § 1395w-3(b)(10).[4]

18  **B.    The Injuries Asserted By Two Of The Three Plaintiffs Fail To Qualify As**
        **Irreparable, And None Of The Plaintiffs Provide Evidence Of The Extent Of**
19      **Any Injury That Might Occur**

20  Even aside from the speculative nature of plaintiffs' asserted injuries, plaintiffs have also

21  failed to establish that the injuries are irreparable.  Monetary harm alone has been held

22  insufficient to justify preliminary injunctive relief.  Cf. Am. Passage Media Corp. v. Cass

23

24      [3]Alternatively, plaintiffs appear to suggest that the Court's lack of jurisdiction would

25  itself constitute an irreparable injury sufficient to justify a preliminary injunction – an equally
    meritless notion.

26

27      [4]The question of the Court's jurisdiction – including its jurisdiction in light of the

28  statutory bar in § 1395w-3(b)(10) – has been addressed in separate briefing and is currently
    pending before the Court.

1    Communications, Inc., 750 F.2d 1470, 1473 (9th Cir. 1985) (recognizing that loss in revenue

2    alone was insufficient to establish irreparable harm).  In its Order of February 14, 2008, the Court

3    cited the general rule that "a loss of at least thirty percent of a plaintiff's business constitutes

4    irreparable harm."  Order at 4 (citing Poeng v. United States, 167 F. Supp. 2d 1136, 1143 (S.D.

5    Cal. 2001)).  This thirty percent threshhold is closely tied to the notion that a loss of business of

6    thirty percent or more will likely lead to going out of business entirely.  See Lazaro v. U.S. Dep't

7    of Agriculture, 186 F. Supp. 2d 1203 (M.D. Fla. 2001) (recognizing that an assertion of monetary

8    damage alone is insufficient to establish irreparable injury, but that a forty percent loss of

9    business would likely force the plaintiff's business to close) (citing Ibrahim v. United States, 650

10   F. Supp. 163, 165 (N.D.N.Y. 1987), as recognizing a thirty percent loss of business would likely

11   lead to forced closure); De La Nueces v. United States, 778 F. Supp. 191, 194 (S.D.N.Y. 1991)

12   (recognizing an asserted loss of fifty percent of business, which would lead to forced closure, as

13   establishing irreparable injury); cf. Augusta News Co. v. News Am. Pub. Inc., 750 F. Supp. 28,

14   33 (D. Me. 1990) ("Even a fifty percent loss of business . . .  is insufficient to support the

15   granting of a preliminary injunction in the absence of a clear showing by Plaintiff that it will

16   thereby be destroyed.").

17        Significantly, of the plaintiffs' declarants, only the declarant on behalf of Internist claims

18   that it will lose more than thirty percent of its business if it is not selected as a winning bidder,

19   and that it will, as a result, go out of business.  Stevens Decl. ¶ 15.  While the Scripps declarant

20   suggests it would lose approximately $1.9 million in Medicare reimbursements, the declarant

21   does not indicate what percentage of Scripps' revenue this amount would constitute, and

22   plaintiffs' failure to clarify that point in their memorandum in light of the Court's statement

23   suggests that the amount in question is far less than thirty percent.  Indeed, plaintiffs' brief

24   acknowledges that Sharp and Scripps "likely will be able to continue to operate"even if they did

25   not participate in the demonstration project.  Pl. Mem. at 3.

26        The injuries that Sharp and Scripps do assert do not qualify as irreparable.  In regard to

27   their projection of layoffs as a result of decreased Medicare business, mere downsizing – which

28   is the primary injury that plaintiffs Sharp and Scripps predict, Wiesner Decl. ¶ 11; Thompson

1  Decl. ¶¶ 16-17 – does not itself constitute irreparable injury from the company's perspective

2  since a company can remedy the harm later by hiring additional employees. Cf. Cooper v. TWA

3  Airlines, LLC, 274 F. Supp. 2d 231, 241 (E.D.N.Y. 2003) (rejecting the plaintiffs' assertion that

4  their own layoffs could constitute an irreparable injury justifying preliminary injunction).[5]

5  Plaintiffs also fail to explain why the internal operational changes that the declarations suggest

6  would be necessary in the absence of participation in the demonstration project qualify as

7  irreparable. See Wiesner Decl. ¶¶ 16-17; Thompson Decl. ¶ 18.

8        Moreover, none of the plaintiffs provide sufficient evidence of the scope of the injuries

9  that, they assert, are likely to occur. While Internist makes an allegation of harm that might, if it

10 were supported and were not speculative, qualify as irreparable, its declarant has not established

11 Internist's projected loss through "objective and reasonable documentary evidence," as this Court

12 required in Poeng. Poeng, 167 F. Supp. 2d at 1143.[6] Any loss of business that plaintiffs might

13 conceivably suffer is limited to business associated with Medicare Part B fee-for-service

14 beneficiaries in the greater San Diego area. See 42 U.S.C. § 1395w-3(e)(1)(A) (limiting the

15 project to tests "for which payment would otherwise be made under section 1395*l*(h)). Thus,

16 nonwinning laboratories may continue to provides services, unaffected by the project, to patients

17 who are not Medicare Part B beneficiaries, patients who reside outside the project area, and

18 patients who are Part B beneficiaries and do reside in the project area but participate in Medicare

19 _____

20      [5]As discussed below, plaintiffs have cited no authority that supports the idea that the
21 interests of third parties, such as individual employees, are relevant to an irreparable injury
   inquiry. Even if the employees' perspective were relevant, the analysis should take into account
22 the fact that the demand for laboratory services in the project area is expected to remain the same
   under the demonstration project. If particular laboratories are not able to fill this demand,
23 presumably other laboratories will, which may well, in turn, require them to hire additional
   employees. There is no reason to think that the overall employment level in laboratory services
24 will decrease.

25
26      [6]While the court in another jurisdiction accepted the declaration of a store owner that he
   would suffer a thirty percent loss of business without further supporting evidence because "the
27 government d[id] not directly dispute" the store owner's assertions, Kim v. United States, 822 F.
   Supp. 107, 110 (E.D.N.Y. 1993), defendant notes that no discovery has been conducted in this
28 case, and plaintiffs are the ones with the relevant information in their control.

1    through managed care (for which payment is made under 42 U.S.C. §§ 1395w-21 through

2    1395w-28 and 1395mm(h)) rather than on the Medicare fee-for-service basis covered by §

3    1395*l*(h).[7]

4        **C.    Plaintiffs Cannot Rest Their Assertion Of Irreparable Injury On Harms**
         **They Allege Could Be Suffered By Third Parties**

5        Plaintiffs are incorrect in their claim that a preliminary injunction can be justified based

6    on assertions of irreparable injury to third parties not before the Court.  This Court has previously

7    recognized that the irreparable injury standard measures the harm to plaintiffs, not to third

8    parties.  Poeng, 167 F. Supp. 2d at 1142; see L.A. Memorial Coliseum Comm'n v. NFL, 634

9    F.2d 1197, 1200 (9th Cir. 1980) (identifying "irreparable injury to plaintiff" as preliminary

10   injunction factor (emphasis added)).  The cases cited by plaintiffs in support of their contrary

11   assertion are, once again, inapposite.  In Nat'l Ass'n of Psychiatric Treatment Ctrs. v.

12   Weinberger, 661 F. Supp. 76 (D. Colo. 1986), the mother of a patient was a plaintiff in the

13   lawsuit.  Id. at 81.  The court deemed her to be a "representative" plaintiff and thus considered

14   not only the potential injury to her own child but that to other similarly situated children as well.

15   Id.[8]  Here, in contrast, no Medicare beneficiary is a plaintiff acting as a representative of other

16   beneficiaries.  In Int'l Long Term Care, Inc. v. Shalala, 947 F. Supp. 15 (D.D.C. 1996), the court

17   issued a preliminary injunction where the plaintiff, a nursing home, otherwise faced going out of

18   business.  Id. at 18.  The court acknowledged that nursing home residents would also be injured

19   if the nursing home closed.  Id.  However, the court's observation that the interests of a nursing

20   home and its residents were "closely intertwined," id., did not remove the independent obligation

21   of the plaintiff to establish an irreparable injury of its own.  Similarly, in Frontier Health, Inc. v.

22

23        [7]The latest CMS data available on its website, for 2005, indicates that 38% of Medicare
24   beneficiaries in San Diego participate through managed care.  See
     http://www.cms.hhs.gov/healthplanrepfiledata/02_sc.asp (SC 2005 files, file name sc-1205.csv,
25   row 239, column E).

26        [8]In addition, defendant can find no support whatsoever for the District of Colorado
27   court's general statement regarding the impact on "interested persons" in the case that it cites,
     Royal Crown Bottling Co. v. Royal Crown Cola Co., 358 F. Supp. 290, 297 (D. Colo. 1979)
28   (holding plaintiff did not establish an irreparable injury).

1    <u>Shalala</u>, 113 F. Supp. 2d 1192 (E.D. Tenn. 2000), the court found an irreparable injury based on

2    the likelihood that absent an injunction, the plaintiff hospital would be forced to close. <u>Id.</u> at

3    1193.  Thus, nothing in these cases relieves plaintiffs of their obligation to establish their own

4    irreparable injury.

5            The rule that the relevant irreparable injury is the plaintiff's is consistent with notions of

6    Article III standing, which insure that the party bringing suit has suffered an injury-in-fact,  or, at

7    minimum, that the plaintiff's interests are aligned with those it seeks to represent. <u>Cf.</u> <u>Pony v.</u>

8    <u>County of Los Angeles</u>, 433 F.3d 1138, 1147 (9th Cir. 2006) ("A litigant is granted third-party

9    standing because the tribunal recognizes that her interests are aligned with those of the party

10   whose rights are at issue and that the litigant has a sufficiently close connection to that party to

11   assert claims on that party's behalf.").  It would be inappropriate here to give significant weight to

12   plaintiffs' assertions of alleged injury to Medicare beneficiaries where plaintiffs' interests and

13   those of the beneficiaries are not necessarily in alignment.  Specifically, while plaintiffs have a

14   financial interest in maintaining Medicare reimbursement amounts at their current levels, there is

15   no reason that Medicare beneficiaries would share in that goal; indeed, beneficiaries' interests

16   would likely be far better served by changes to the program that would reduce government costs

17   and thus protect the program's continuing viability. Moreover, plaintiffs offer only one

18   declaration of a Medicare beneficiary, who receives services at Internist, in support of their

19   assertions of irreparable injury to beneficiaries, and the injuries alleged – associated with having

20   to find a different laboratory – do not rise to the level of irreparable injury.  <u>See</u> C.W. Decl ¶¶ 9-

21   10.  The fact that CMS is committed to avoiding any adverse consequences to patient care as a

22   result of the demonstration project – and is prepared to discontinue the project should such

23   consequences arise –  further undermines plaintiffs' assertions in this regard.

24        **D.    Plaintiffs Mischaracterize The Irreparable Injury Standard That Applies To**
              **Alleged Violations Of A Statute**

25            Plaintiffs' final attempt to circumvent the irreparable injury requirement involves their

26   erroneous reference to an allegedly different standard that applies for granting a preliminary

27   injunction "when an injunction is sought to prevent the violation of a federal statute."  Pl. Mem.

28

1   at 7.  None of the authorities cited by plaintiffs support this proposition.  The Ninth Circuit case

2   that plaintiffs cite in fact limits any such rule to instances where the "federal statute [in question]

3   specifically provides for injunctive relief."  Burlington N. R.R. Co. v. Dep't of Revenue, 934

4   F.2d 1064, 1075 (9th Cir. 1991) (internal quotation omitted).  The court concluded that "[w]hen

5   the evidence shows that the defendants are engaged in, or about to be engaged in, the act or

6   practices prohibited by a statute which provides for injunctive relief to prevent such violations,

7   irreparable harm to the plaintiffs need not be shown."  Id. (emphasis added) (internal quotation

8   omitted).  The Medicare Act does not contain any provision of this sort.  Plaintiffs similarly

9   misconstrue the court's discussion in United States v. D'Annolfo, 474 F. Supp. 220 (D. Mass.

10  1979).  That case was an affirmative enforcement action brought by the United States.  See id. at

11  222 (distinguishing enforcement actions from typical "civil litigation").  The court's conclusion

12  there that the government need not show irreparable injury has no application to private plaintiffs

13  simply because they claim to be "enforcing" federal law – a claim that any private plaintiff

14  bringing suit under federal law might make.  In SUWA v. Thompson, 811 F. Supp. 635 (D. Utah

15  1993), the court referred to a presumption of irreparable injury when plaintiffs had established a

16  likely violation of the National Environmental Policy Act – a statute imposing specific

17  requirements in the environmental context – not, as plaintiffs assert, of the APA.  Id. at 641.

18  Finally, despite plaintiffs' last-ditch suggestion otherwise, the possibility of injunctive relief

19  pursuant to 5 U.S.C. § 706(1) in some circumstances, after an APA violation is established, says

20  nothing about the appropriateness of preliminary injunctive relief, which instead is governed by

21  the well-established standard previously discussed, including the irreparable injury requirement.

22  See Arcamuzi v. Continental Airlines, Inc., 819 F.2d 935, 937 (9th Cir. 1987) ("Under any

23  formulation of the test, the moving party must demonstrate a significant threat of irreparable

24  injury.").  Plaintiffs' argument on this point is thus meritless.  Accordingly, plaintiffs have failed

25  to show they will suffer an irreparable injury, and this Court should deny plaintiffs' motion for a

26  preliminary injunction on this basis alone.

27

28

1
2

**II.    IN THE ABSENCE OF IRREPARABLE INJURY, THE BALANCE OF HARDSHIPS DOES NOT WEIGH IN PLAINTIFFS' FAVOR, AND THE PUBLIC INTEREST IN A VIABLE AND AFFORDABLE MEDICARE PROGRAM DOES NOT SUPPORT AN INJUNCTION**

3
4
5
6
7
8
9
10
11
12
13
14
15
16

As the Secretary previously explained in his TRO opposition, the wholly speculative nature of plaintiffs' asserted injuries cannot support a conclusion that the balance of hardships "tips sharply" in their favor. On the other hand, definite harm to the government and to the public interest will occur if the competitive bidding demonstration project is brought to a standstill before it even begins. By mandating a demonstration project to test the application of competitive bidding to the provision of laboratory services to Medicare beneficiaries, Congress indicated its awareness of the urgency of finding some remedy to the high costs of Medicare, which threaten the long-term viability of the program. The public interest lies with finding a solution to this problem, not with protecting the revenues of individual laboratory suppliers. Interrupting the project at this stage will require CMS to put a hold on an entire apparatus that is now being prepared to take effect on July 1. The costs associated with reallocating resources and staff will be born by taxpayers, and an additional real cost will be incurred by current and future Medicare beneficiaries if Medicare expenses are not contained. See Def.'s TRO Opp. at 2.

17

**III.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR APA RULEMAKING CHALLENGE**

18
19

**A.    The "Policies" That Plaintiffs Challenge Do Not Qualify As "Final Agency Action" And Therefore Cannot Be Subject To Rulemaking Requirements**

20
21
22
23

Plaintiffs "readily concede that certain aspects of the Demonstration Project may yet change," but they argue that, nevertheless, the Secretary has established policies that qualify as "final agency action" and that can be challenged on the basis that they should have gone through APA notice and comment rulemaking.[9] Pl. Mem. at 11. There is no disagreement over the

24
25
26
27
28

[9]Plaintiffs do not identify the specific "rules" that they contend should have gone through the rulemaking process. In addition to the final agency action requirement, a rule is not subject to notice and comment requirements if it is an "interpretive" rather than "legislative" rule. Erringer v. Thompson, 371 F.3d 625, 630 (9th Cir. 2004). At least some, if not all, of what plaintiffs appear to challenge – such as the Secretary's interpretation of the statutory "face-to-face encounter" exception in 42 U.S.C. § 1395w-3(e)(1)(B), qualifies as "interpretive." See Erringer, 371 F.3d at 631 n.12 (noting that "an interpretation that spells out the scope of an

1    standard that governs the determination of what qualifies as "final" for purposes of an APA

2    challenge: (1) the action must "mark the consummation of the agency's decision making

3    process"; and (2) the action must "be one by which rights or obligations have been determined or

4    from which legal consequences flow." Ecology Ctr., Inc. v. U.S. Forest Serv., 192 F.3d 922, 925

5    (9th Cir. 1999) (citing Bennett v. Spear, 520 U.S. 154, 177 (1997)); cf. Indus. Customers of Nw.

6    Utilities v. Bonneville Power Admin., 408 F.3d 638, 646 (9th Cir. 2005) (listing as "indicia" of a

7    final agency action "whether the [action] amounts to a definitive statement of the agency's

8    position, whether the [action] has a direct and immediate effect on the day-to-day operations of

9    the party seeking review, and whether immediate compliance [with the terms] is expected"

10    (internal quotation omitted)). As already explained in defendant's TRO opposition, plaintiffs

11    have failed to identify any CMS action that meets both requirements. Def.'s TRO Opp. at 16-19.

12        Insofar as plaintiffs seek to contend that the requirements set forth in the Bidder's

13    Package, which they attach to their brief, were "final" under this standard, they are wrong.

14    Plaintiffs incorrectly identify being required to prepare a bid application as an impact on "day to

15    day operations of laboratories." Pl. Mem. at 12. Day-to-day operations are operations that are

16    ongoing (from day to day), not a single activity, such as filling out an application, that ends by a

17    specific deadline. Moreover, the instructions in the Bidder's Package for preparing bid

18    applications did not determine plaintiffs' future rights and obligations in regard to Medicare

19    reimbursements, nor did plaintiffs' submission of bid applications pursuant to those instructions.

20    Indeed, the Bidder's Package specifically reserves CMS's option to negotiate with bidders after

21    bids are submitted. Bidder's Pkg. at 51. In addition, the Bidder's Package informs bidders that

22

23    The steps described in this section are the anticipated bid evaluation process.
       However, since this is a demonstration project that is breaking new ground, it is
       possible that modifications in the bid evaluation process will be necessary based
24     on factors that cannot be predicted. The CMS and the BEP reserve the right to act
       in the best interests of Medicare beneficiaries and the Medicare program.

25

26    Bidder's Pkg. at 51 (emphasis added); see also id. at 61 (indicating that at Stage 4 of the bid

27    ────────────────────

28    agency's . . . pre-existing duty . . . will be interpretive" (internal quotation omitted)).

1  evaluation process, those who are reviewing applications may recommend, among other things,

2  that additional conditions be negotiated or that certain evaluation criteria be modified).  Thus, the

3  Bidder's Package itself establishes that any guidance set forth in the Package will not determine

4  applicants' access to Medicare reimbursements under the project.  Plaintiffs' recognition that

5  demonstration project policies "are continu[ing] to evolve," Compl. ¶ 33, highlights the

6  distinction between this case and that considered in Appalachian Power Co. v. EPA, 208 F.3d

7  1015 (D.C. Cir. 2000), on which plaintiffs rely, where the court concluded that a mere possibility

8  that an already-established policy will be modified in the future does not prevent the established

9  policy from qualifying as a final agency action.  Id. at 1024.  Here, CMS has not announced any

10  established policy.  Instead, it has reserved the right to modify demonstration project policies as

11  circumstances, such as its review of submitted bids, suggest are warranted.[10]  Not until CMS

12  applies one of the "rules" that plaintiffs challenge in such a way that it actually does determine

13  plaintiffs' rights and obligations under Medicare in the demonstration project area can it be said

14  that a final agency action has occurred.

15      Plaintiffs further contend that the inclusion of bid prices and other allegedly "highly

16  sensitive, proprietary information" in their bid applications is "extremely significant" because the

17  information, if kept confidential, allegedly has "independent economic value."  Pl. Mem. at 13.

18  Essentially, they attempt to claim that the "final agency action" requirement is satisfied because

19  "practical and legal consequences" will result from CMS's use or disclosure of this information.

20  The "consequences" relevant to the "final agency action" analysis are those that follow in the

21  natural course from the allegedly final action, not those that depend on the assumption that either

22  CMS or a third party will break the law by disclosing proprietary information.  CMS has

23  indicated that bidders' applications will not be made public, nor will they be released in response

24  _____

25      [10]In regard to bid selection criteria, even after winning bidders are announced, the
   Bidder's Package indicates that nonwinning applicants may "request reconsideration of a
26  decision by email."  Bidder's Pkg. at 62.  This limited review provides another opportunity for
   CMS to modify the demonstration project based on laboratory feedback, even while, as
27  defendant has argued, administrative and judicial review are statutorily barred by 42 U.S.C. §
   1395w-3(b)(10).
28

to Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, requests.  Bidder's Pkg. App. A, FAQ #30.  Moreover, Department of Health and Human Services regulations in any case allow those submitting confidential financial information to the government to designate the information as such, and indicate that records so designated are not subject to FOIA.  See 45 C.F.R. 5.65(c).  Plaintiffs fail to provide any meaningful explanation of how CMS's possession of allegedly proprietary information fits within the "final agency action" rubric.  Their assertion should be disregarded, and, even if plaintiffs were to succeed in obtaining a preliminary injunction, their request that CMS return all bid applications to the laboratories that submitted them should be denied.

**B.    Plaintiffs Have Had Ample Notice And Opportunity To Comment On The Demonstration Project As It Has Developed Thus Far**

Plaintiffs' likelihood of success on Count One is further diminished by the probability that the notice and comment activities in which CMS did engage, during the three years when the project was being developed, were sufficient, and rendered any rulemaking violation harmless.  Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479, 1488 (9th Cir. 1992) (holding agency's failure to comply with technical requirements of § 553 notice and comment procedures was harmless where sufficient notice and public comment occurred); Sagebrush Rebellion, Inc. v. Hodel, 790 F.2d 760, 764-69 (9th Cir. 1987) (same).  As previously described in defendant's TRO opposition and accompanying declaration, CMS has made information about the current demonstration project available through a variety of means, including meetings with relevant populations, posting relevant documents together on an easily-accessible CMS website, and issuing e-mail notifications regarding ongoing changes.  See TRO Opp. at 29; Wynn Decl. ¶¶ 9, 11-14, 16-18. As a result of these efforts, clinical diagnostic laboratories have had ample opportunity, over a period of more than three years, to provide feedback regarding CMS' evolving development of the project.[11]  While plaintiffs may simply have gambled on the odds by

---

[11]CMS has made changes in response to comments it has received.  See, e.g., CMS, Summary of Changes (Oct. 9, 2007) (listing changes made in the final Bidder's Package "in response to public comment on the draft Bidder's Package") (attached here as Exhibit A), also

1   choosing not to become involved in the process before it was determined that the first

2   demonstration project area would be in San Diego, that does not change the fact that they had the

3   opportunity to do so if they had wished.

4   **IV.  PLAINTIFFS ARE UNLIKELY TO SUCCEED IN ESTABLISHING THAT THE
        DEMONSTRATION PROJECT CRITERIA THEY REFERENCE ARE**

5       **ARBITRARY OR CAPRICIOUS**

6           In support of their claim in Count Two of their Complaint, plaintiffs point to three

7   demonstration project "policies" that they allege are invalid.  Plaintiffs seek to challenge these

8   policies under the APA, 5 U.S.C. § 706(2)(A), which allows a court to set aside final agency

9   action only where the plaintiff shows that the action is "arbitrary, capricious, an abuse of

10  discretion, or otherwise not in accordance with law."[12]  As defendant has previously explained,

11  the Secretary has been granted broad discretion in his implementation of the clinical diagnostic

12  laboratory services competitive bidding demonstration project. Def.'s TRO Opp. at 20-23.  This

13  authority derives from Congress' express direction to the Secretary to implement the

14  demonstration project while at the same time allowing him to set whatever "conditions [he]

15  determines to be appropriate" in doing so. 42 U.S.C. § 1395w-3(e)(2)(A).  Indeed, in light of the

16  statutory bar that Congress erected in § 1395w-3(b)(10) on basic aspects of the program, and the

17  lack of any judicially manageable standards for determining whether the Secretary's decisions in

18  connection with the program are arbitrary or not, determinations such as those plaintiffs

19  challenge, that apply specific Medicare-related agency expertise to the equally complex

20  competitive bidding context, should be deemed unreviewable. Cf. Heckler v. Chaney, 470 U.S.

21  821, 830 (1985) ("[I]f no judicially manageable standards are available for judging how and

22  when an agency should exercise its discretion, then it is impossible to evaluate the agency for

23

24  _____

    available at

25  http://www.cms.hhs.gov/demoprojectsevalrpts/MD/ItemDetail.asp?ItemID=CMS1198949 .

26      [12]In order for any of these alleged policies to be subject to challenge under the APA, they
    would also need to qualify as "final agency action."  As explained in connection with plaintiffs'

27  rulemaking challenge, that requirement is not met here because the demonstration project is

28  essentially an ongoing experiment, subject to modification.

1 'abuse of discretion.'"); cf. Ekimian v. INS, 303 F.3d 1153, 1159 (9th Cir. 2002). Additionally,

2 plaintiffs have asserted no concrete interest in one of the three policies they challenge, involving

3 reimbursement rates for nursing facility and end stage renal disease ("ESRD") patients, and thus

4 lack standing to bring this claim.[13]

5       To the extent judicial review is available, the Secretary's decisions remain entitled to a

6 high degree of deference. Resident Councils of Wash. v. Leavitt, 500 F.3d 1025, 1033 (9th Cir.

7 2007) ("[W]e have regularly applied Chevron deference to agency interpretations of the Medicare

8 and Medicaid statutes."). The complexity of the Medicare program, Congress' express direction

9 to the Secretary to carry out this demonstration project, and the technical factors involved in

10 ensuring a viable competitive bidding process all call for such deference in this case. See Kean

11 v. Heckler, 799 F.2d 895, 903 (3d Cir. 1986) (recognizing the Medicare Act is "of great

12 complexity, and the area it regulates – the financing of health-care delivery – is one in which the

13 agency has much expert understanding").

14       Plaintiffs refer the Court to their TRO papers in regard to the three specific "policies" that

15 they challenge. Defendant has previously responded to plaintiffs' arguments in those papers, and

16 thus respectfully refers the Court to his TRO opposition as well. See Def.'s TRO Opp. at 21-22

17 (explaining that the Secretary's interpretation of the "face-to-face encounter" exclusion in 42

18 U.S.C. § 1395w-3(e)(1)(B) is not arbitrary because it recognizes independent laboratories in

19 hospitals and at physicians' offices as competitors with other independent laboratories), 22-23

20 (explaining that the Secretary's selection of $100,000 as the cut-off amount for determining

21 whether a laboratory was a required bidder was reasonable because it serves to ensure that a

22 sufficient number of laboratories will participate in the competitive bidding process to make it

23

24 _____

25    [13]As explained in defendant's TRO opposition, none of the three plaintiffs claim to
provide laboratory services to nursing facility or ESRD patients. Def.'s TRO Opp. at 15-16 n.8.

26 They therefore cannot have suffered an injury caused by CMS's alleged policy on demonstration
project reimbursement rates to laboratories serving these populations. See Bates v. UPS, Inc.,

27 511 F.3d 974, 985 (9th Cir. 2007) (causation prong of standing requires injury to be "'fairly

28 traceable' to the challenged conduct").

1  successful).[14]  In sum, the criteria that the Secretary has set for determining who is a required

2  bidder in the demonstration project are reasonable and further Congress' goal by increasing the

3  chances that the competitive bidding process will be successful in the laboratory services context.

4  **V.    PLAINTIFFS WILL NOT SUCCEED IN ESTABLISHING AN
        UNCONSTITUTIONAL TAKING BECAUSE CMS HAS INDICATED THAT**

5  **NONWINNING BIDDERS NEED NOT PROVIDE THE COVERED SERVICES
   IN THE DEMONSTRATION PROJECT AREA, AND BECAUSE MEDICARE**

6  **FEE REGULATION DOES NOT QUALIFY AS A TAKING**

7        Plaintiffs' Takings challenge is based on the notion that "one of the Secretary's

8  Demonstration Act policies requires losing bidders to provide laboratory services to Medicare

9  beneficiaries even though they will not be paid for such services."  Pl. Mem. at 16.  On March 7,

10 2008, CMS issued an FAQ through the demonstration project listserv that indicates that no such

11 CMS policy exists.  See CMS, FAQ (Mar. 7, 2008).[15]  Addressing the question "Can a laboratory

12 refuse to provide a laboratory test for a Medicare beneficiary residing in the demonstration area?

13 What if a beneficiary goes to a laboratory that is a non-winning laboratory under the

14 demonstration?", CMS responded that "a non-winning laboratory [is not prohibited] from failing

15 to provide services to the beneficiary or sending their specimen elsewhere, if a physician

16 inadvertently refers a beneficiary to a non-winning laboratory and there is no agreement between

17 the nonwinning laboratory and a winning or passive laboratory to bill Medicare directly."  Id.

18 _____

19        [14]Because, as explained, plaintiffs clearly lack standing to raise their challenge regarding
   demonstration project reimbursement for laboratories serving nursing facility and ESRD

20 populations, defendant did not address the merits of that claim in his TRO opposition.  Plaintiffs'
   argument that it is somehow unfair for such laboratories to be reimbursed according to the rates

21 set through the competitive bidding process because those laboratories are not required to
   participate in competitive bidding is meritless since any such laboratory that wished to submit an

22 application in the competitive bidding process could have done so.  Plaintiffs have not claimed
   that the actual cost of a particular laboratory test is higher for such laboratories (nor are plaintiffs

23 in a position to address that question since they are not in that category), so it is unclear why it
   would be unfair for them to be "stuck with" (as plaintiffs put it, Pl. TRO mem. at 22) competitive

24 bidding rates.  All laboratories subject to the demonstration – laboratories that do not qualify for
   the "face-to-face encounter exclusion of § 1395w-3(e)(1)(B) – will be reimbursed at the same

25 rates.

26

27        [15]This FAQ was attached as Exhibit A to Defendant's Response To Plaintiffs'
   Memorandum Pursuant To The Court's February 14, 2008, Order (dkt. #16).

28

1    Thus, the factual foundation to Count Three of plaintiffs' Complaint is entirely lacking.

2        Moreover, as explained in defendant's TRO opposition, Medicare fee regulation cannot

3    qualify as an unconstitutional Taking. See Def.'s TRO Opp. at 23-24 (citing cases demonstrating

4    that at least four federal circuits have expressly rejected the applicability of a Takings analysis in

5    the Medicare context). Plaintiffs fail to cite a single case in which a court has accepted the

6    contrary view that they espouse; indeed, they fail to cite any authority whatsoever in the sections

7    of their briefs addressing Count Three of their Complaint, either in their memorandum in support

8    of a TRO or their memorandum in support of a preliminary injunction. In their latest submission,

9    they attempt to distinguish this case from the weight of authority rejecting Takings claims in the

10   Medicare context by asserting that they will be entirely, rather than partially, deprived of

11   compensation. This assertion is meritless because the cases holding the Takings Clause

12   inapplicable in the Medicare context did not rest their decision on the fact that the plaintiffs'

13   deprivation was partial, nor is it accurate to say that plaintiffs are wholly deprived of all Medicare

14   reimbursement when the demonstration project covers only a limited geographic area and only a

15   subset (303 billing codes) of laboratory services. Accordingly, plaintiffs have failed to show that

16   they are likely to succeed on the merits of this claim, and indeed, their claim is certain to fail.

17   **VI.    PLAINTIFFS WILL NOT SUCCEED IN ESTABLISHING THAT THE
             SECRETARY HAS EXCEEDED THE SCOPE OF HIS AUTHORITY BY
18           RECOGNIZING SPECIMEN COLLECTION AS PART AND PARCEL OF
             LABORATORY TESTING**

19       Plaintiffs' final challenge involves the allegation that the Secretary has violated the terms

20   of 42 U.S.C. § 1395w-3(e)(1) "by requiring laboratories to submit bids for specimen collection."

21   Pl. Mem. at 18. The statutory language of § 1395w-3(e) makes clear that it is not the narrow

22   directive that plaintiffs make it out to be. The statute authorizes the Secretary to "conduct a

23   demonstration project on the application of competitive acquisition . . . to clinical diagnostic

24   laboratory tests." 42 U.S.C. § 1395w-3(e)(1). The authority granted to the Secretary through this

25   provision is broad. Significantly, the statute does not set forth a defined list of laboratory tests

26   that would otherwise be paid under the Medicare fee schedule, and then require the Secretary to

27   conduct a demonstration project that would request bids on those specific tests. Indeed, nothing

28

1    in this statutory language limits the Secretary's authority to determine how the demonstration

2    project should be designed, or prohibits him from taking into account various aspects of

3    laboratory services that are part and parcel of laboratory testing. On the contrary, § 1395w-

4    3(e)(1) authorizes a demonstration project "on the application of" competitive bidding to clinical

5    laboratory tests, but leaves it to the Secretary to determine what "conditions" are "appropriate" in

6    order to carry out the project.  Id. § 1395w-3(e)(1), (2)(A).

7         The conclusion that specimen collection is part and parcel of laboratory testing is

8    certainly well within the Secretary's authority to make.  While plaintiffs assert that tests and

9    specimen collection are subject to "totally different reimbursement methodologies," Pl. Mem. at

10   19, in fact reimbursement codes for tests as well as various types of specimen collection appear

11   on the same fee schedule.[16]  The first test code listed on this fee schedule, for "routine

12   venipuncture," or blood sample drawing, is included as one of the 303 test codes for which

13   competitive bidding applicants were required to submit bids.[17]  See CMS, List of Demonstration

14   Test Codes (attached to this memorandum as Exhibit B).  The Bidder's Package also indicates

15   that bidders must "[p]rovide information regarding [the] acquisition and/or transportation" of

16   specimens and indicate "the name and physical address" of all "specimen collection locations."

17   Bid. Pkg. at 37-38.  Bidders must also estimate their future capacity in light of their "ability to

18   collect specimens and report results."  Bid. Pkg. at 39.  The fact that 42 U.S.C. § 1395l(h)

19   provides that test fees are generally to be set at 60% of the prevailing charge level in the relevant

20   geographic area while fees for collecting samples are to be "nominal," 42 U.S.C. §

21   1395l(h)(2)(A)(i), (3), only bolsters the notion that collection is an inextricable part of testing.

22

23        [16]The fee schedule is available on the CMS website,
24   http://www.cms.hhs.gov/ClinicalLabFeeSched/, through the "Fee Schedule" link.  The
     downloadable schedule is in Microsoft Excel format and is not attached here because it is wider
25   than letter-size paper and is therefore more easily viewable on a computer screen.

26        [17]Under the fee schedule, the reimbursement amount for routine venipuncture is $3.
27   Other types of specimen collection, such as urine collection through catheterization, are also
     reimbursed at $3.00 under the fee schedule but were not selected for inclusion among the 303
28   demonstration test codes.  See fee schedule, rows 1195, 1196 (codes P9612, P9615).

1    Indeed, the statutory text of § 1395w-3(e) does not support the distinction plaintiffs attempt to

2    draw; it requires the demonstration project to apply competitive bidding to tests "for which

3    payment would otherwise be made under section 1395l(h)," but does not limit the relevant

4    payment to that under § 1395*l*(h)(2) rather than § 1395*l*(h)(3).

5          Since any clinical diagnostic laboratory test must involve specimen collection in one way

6    or another, it stands to reason that the Secretary would take specimen collection into account

7    when designing a competitive bidding demonstration project for laboratory tests.  It is also

8    reasonable for CMS to seek to understand the specifics of a laboratory's specimen collection

9    methodology since that information is relevant in evaluating who, and how many, will be able to

10   access that laboratory's services – a crucial assessment with respect to the demonstration

11   project's goal of ensuring continued access to services by Medicare beneficiaries in the project

12   area.  Seeking such information is neither outside the scope of the Secretary's authority under §

13   1395w-3(e) nor arbitrary or capricious.

14                                   **CONCLUSION**

15          For the foregoing reasons, this Court should deny plaintiffs' application.

16

17   DATED: March 24, 2008                    Respectfully Submitted,

18                                            JEFFREY S. BUCHOLTZ
                                              Acting Assistant Attorney General
19                                            KAREN P. HEWITT
                                              United States Attorney
20                                            SHEILA LIEBER
                                              Deputy Director
21
                                             /s/   Kathryn L. Wyer
22                                            KATHRYN L. WYER
                                              U.S. Department of Justice, Civil Division
23                                            20 Massachusetts Avenue, N.W.
                                              Washington, DC  20530
24                                            Tel.  (202) 616-8475 / Fax (202) 616-8470
                                              kathryn.wyer@usdoj.gov
25                                            *Attorneys for Defendant*

26

27

28

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

_____ )    Case No. 08 CV 0170 W (POR)
SHARP HEALTHCARE; INTERNIST )
LABORATORY; AND SCRIPPS )
HEALTH, )
　　　　　　 Plaintiffs, )    **CERTIFICATE OF SERVICE**
 )
　　　　　　 v. )
 )
MICHAEL LEAVITT, SECRETARY )
OF THE DEPARTMENT OF )
HEALTH AND HUMAN SERVICES, )
 )
　　　　　　 Defendant. )
_____ )

STATE OF CALIFORNIA
COUNTY OF SAN DIEGO

　　　　IT IS HEREBY CERTIFIED that:

　　　　I, Kathryn L. Wyer, am a citizen of the United States over the age of eighteen years

and a resident of the District of Columbia; my business address is 20 Massachusetts Ave.,

Washington, DC  20530; I am not a party to the above-entitled action.

　　　　I have caused service of the following document(s) on the parties indicated below by

electronically filing said document(s) with the Clerk of the District Court using its ECF System,

which electronically notifies them:

DOCUMENT(S) SERVED:

　　　　- Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction

PARTIES ON WHOM SERVED:

　　　　Plaintiffs, by and through their counsel of record, Patric Hooper,
　　　　phooper@health-law.com

　　　　I declare under penalty of perjury that the foregoing is true and correct.

　　　　Executed on March 24, 2008.

　　　　　　　　　　　　　　　　　　s/ Kathryn L. Wyer
　　　　　　　　　　　　　　　　　　KATHRYN L. WYER